# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>PETER H. BLAIR,<br><br>Debtor. | Bankruptcy Case No. 15-15008 TBM<br>Chapter 7 |
| JEFFREY A. WEINMAN,<br>Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>SUELLA M. CROWLEY,<br>FIRST CLASS PRINTING, INC.,<br><br>Defendants. | Adv. Pro. No. 17-1195 TBM |

---

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

---

Unreliable and irrelevant expert testimony is inadmissible.  That cardinal principle is enshrined in Fed. R. Evid. 702 and is the central lesson of the United States Supreme Court's two seminal decisions on expert evidence:  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

This matter comes before the Court on: (1) the "Motion to Exclude Expert Testimony" (Docket No. 138,[1] the "Motion to Exclude") filed by Defendants Suella M. Crowley and First Class Printing, Inc. (together, the "Defendants"); (2) the "Response in Opposition to Defendants' Motion to Exclude Expert Testimony" (Docket No. 157, the "Response") filed by Jeffrey A. Weinman, as Chapter 7 Trustee for the Estate of Peter H. Blair, Sr. (the "Chapter 7 Trustee"); and (3) the "Reply in Support of Motion to Exclude Expert Testimony" (Docket No. 158, the "Reply") filed by the Defendants.

In the Motion to Exclude, the Defendants requested that the Court exclude proposed expert testimony from Mark Dennis, an expert accounting witness whose

---

[1]     Except as otherwise noted, the Court will use the convention "Docket No. ___" to refer to the docket number of a document in the CM/ECF docket for this Adversary Case, *Weinman v. Crowley et al. (In re Blair)*, Adv. Pro. No. 17-1195 TBM.

testimony the Chapter 7 Trustee intends to offer at trial on the issue of the purported insolvency of the Debtor, Peter H. Blair, Sr. (the "Debtor"), as of May 7, 2011.  In the Response, the Chapter 7 Trustee opposed exclusion of the testimony of Mr. Dennis and argued that the anticipated testimony would be reliable and relevant.  Thereafter, the Court conducted an evidentiary *Daubert* hearing on the Motion to Exclude and Response.

Based upon the arguments in the Motion to Exclude and the Response, as well as the evidence submitted with the Motion to Exclude and Response and at the *Daubert* hearing, the Court determines that Mark Dennis qualifies as an expert in the area of accounting and insolvency by reason of his specialized knowledge, skill, experience, training, and education.  Furthermore, in assessing the Debtor's solvency, Mr. Dennis purports to employ an accepted methodology: a fair value balance sheet approach.  However, while paying lip-service to the fair value balance sheet method, Mr. Dennis does not have sufficient facts or data, as required by such method.  Further, he fails to properly apply the method to the collected facts and data.  As a result, Mark Dennis' expert opinion on the Debtor's solvency is unreliable.  Furthermore, the proffered expert opinion is irrelevant because it does not assist the Court (as the trier of fact) to understand the evidence or to determine a fact in issue.  Accordingly, the Court excludes the opinion testimony of Mark Dennis and will not consider such proffered testimony at trial.

## I.      Procedural and Factual Background.

### A.      The Bankruptcy Case and Adversary Proceeding.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on May 7, 2015 in the case captioned:  *In re Peter H. Blair*, Case No. 15-15008 TBM (Bankr. D. Colo.) (the "Bankruptcy Case").  Shortly after initiating the Bankruptcy Case, the Debtor died.  (Docket No. 106 in Bankruptcy Case.)  Thereafter, the Court converted the Bankruptcy Case from a Chapter 11 reorganization to a Chapter 7 liquidation.  (Docket No. 141 in Bankruptcy Case.)  On August 20, 2015, the United States Trustee appointed Jeffrey A. Weinman as the Chapter 7 Trustee for the Debtor's estate in the Bankruptcy Case.  (Docket No. 143 in the Bankruptcy Case.)

About two years after the commencement of the Bankruptcy Case, the Chapter 7 Trustee initiated this Adversary Proceeding against Suella M. Crowley ("Crowley"), the Debtor's widow, and First Class Printing, Inc. ("First Class"), an entity allegedly affiliated with Crowley.  (Docket No. 1.)  As set forth in the operative "Amended Complaint" (Docket No. 6), the Chapter 7 Trustee asserts five claims against Crowley and three overlapping claims against First Class.  The Chapter 7 Trustee alleges that the Debtor: (1) gave at least $8,144 in cash to Crowley (the "Cash Transfers"); (2) transferred at least $55,762 to Crowley through First Class (the "Business Transfers"); and (3) paid $358,593 to satisfy Crowley's mortgage on her home (the "Real Property") located at 2777 South Elmira Street, Denver, Colorado.  Based on these allegations, the Chapter 7 Trustee claims that the Debtor made the Cash Transfers and the Business Transfers with actual intent to defraud in violation of Colorado Uniform Fraudulent Transfer Act (the "CUFTA").  *See* Am. Compl. First and Fifth Claims and COLO. REV. STAT. § 38-8-105(1)(a).  He also asserts

that the Cash Transfers and Business Transfers constitute constructive fraud under the CUFTA.  *See* Am. Compl. Second and Sixth Claims and COLO. REV. STAT. § 38-8-105(1)(b).  Further, the Chapter 7 Trustee seeks to "preserv[e] any and all avoided transfers," disallow Crowley's claim in the Bankruptcy Case, and obtain a declaratory judgment that the Debtor owned at least half of the Real Property.  *See* Am. Compl. Third, Fourth, Seventh and Eighth Claims.  The Defendants answered and denied any liability. (Docket No. 15.)

After completion of the pleadings, the Court issued its "Scheduling Order under Fed. R. Civ. P. 16(b) and Fed. R. Bankr. P. 7016" (Docket No. 37, the "Scheduling Order"), pursuant to which the Court set the case for a three-day trial commencing on August 6, 2018.  Subsequently, the parties engaged in numerous discovery skirmishes. But the discovery deadlines now have passed, and the Adversary Proceeding will be proceeding to trial in short order.

B.    The Motion to Exclude, Response, and *Daubert* Hearing.

The Debtor's financial position (*i.e.,* whether solvent or insolvent) at the time of the allegedly fraudulent transfers is a central issue in this Adversary Proceeding.  *See e.g.,* COLO. REV. STAT. § 38-8-105(2)(i) (consideration may be given to whether "the debtor was insolvent or became insolvent shortly after the transfer was made").  Accordingly, the Chapter 7 Trustee engaged Mark Dennis as an expert witness on solvency issues.

On April 16, 2018, Mr. Dennis issued a "Solvency Opinion" (the "Expert Report")[2] which was disclosed in accordance with Fed. R. Civ. P. 26(a)(2)(B) and (D), as incorporated by Fed. R. Bankr. P. 7026, and the Scheduling Order.  In the Expert Report, Mr. Dennis opined that the Debtor "was clearly insolvent as of May 7, 2011 . . . . and no information has been provided to indicate that he became solvent thereafter."  Expert Report at 7.

Thereafter, the Defendants filed the Motion to Exclude.  The Defendants argue that Mark Dennis' expert testimony, as disclosed in the Expert Report, should be excluded as unreliable and irrelevant under Fed. R. Evid. 702, *Daubert,* 509 U.S. 579, and *Kumho*, 526 U.S. 137.  In further support of the Motion to Exclude, the Defendants attach the Expert Report, the transcript of the deposition of Mark Dennis (hereinafter cited as "Dennis Dep. at ___"), excerpts from the FASB Accounting Standards Codification, excerpts from the deposition of Peter H. [Hy] Blair, and an email.  In the Response, the Chapter 7 Trustee opposes exclusion of the testimony of Mark Dennis.  In support of the Response, the Chapter 7 Trustee attaches an Affidavit of Mark Dennis (hereinafter cited as "Dennis Aff. ¶ ___"), a pleading from a state court probate action, and a letter. Notably, the Chapter 7 Trustee does not object to consideration of the materials submitted by the Defendants, including, among other things, the Dennis Deposition Transcript.

---

2    The Defendants attached a copy of the Expert Report to their Motion to Exclude and the Chapter 7 Trustee attached a copy of the Expert Report to his Response.

Neither the Defendants nor the Chapter 7 Trustee requested an evidentiary *Daubert* hearing in the Motion to Exclude or Response.  However, to protect the due process rights of the parties, and consistent with controlling precedent of the United States Court of Appeals for the Tenth Circuit, the Court afforded a further opportunity for the parties to request an evidentiary *Daubert* hearing.  (Docket No. 164.)  Subsequently, the Chapter 7 Trustee requested a *Daubert* hearing.  (Docket No. 168.)  The Court conducted a *Daubert* hearing on August 1, 2018, during which it received additional evidence including the testimony of Mark Dennis and a copy of a book offered by the Chapter 7 Trustee:  Israel Shaked and Robert F. Reilly, *A Practical Guide to Bankruptcy Valuation* 239 (ABI, 2d ed., 2017) [hereinafter "*Valuation Practical Guide*"].  The parties also agreed that the Court should consider the other exhibits (including the Expert Report) submitted with the Motion to Exclude and Response.

## II.   Legal Analysis.

### A.   The Law of Expert Testimony.

Fed. R. Evid. 702 sets forth the general rule for admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 was revised effective December 1, 2000 to conform with the United States Supreme Court's decisions in *Daubert,* 509 U.S. 579, and *Kumho,* 526 U.S. 137. *See U.S. v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008) (explaining the evolution of Fed. R. Evid.702); *see also* Fed. R. Evid.702 Advisory Committee Notes to 2000 Amendment ("Rule 702 has been amended in response to *Daubert* . . . and to the many cases applying *Daubert*, including *Kumho* . . . .").

To safeguard the trial process, trial judges must act vigilantly in a "gatekeeping role" and ensure that proposed expert opinions meet the Fed. R. Evid. 702 standards of reliability and relevance.  *Daubert*, 509 U.S. at 597; *see also Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) ("Rule 702 imposes a gatekeeping function on

district courts to ensure expert testimony is admitted only if it is relevant and reliable."); *U.S. v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir. 2009) (trial court "was obligated to perform its gatekeeping function"); *TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1178 (D. Colo. 2018) (confirming "gatekeeping" function). As the text of Fed. R. Evid. 702 provides, to determine whether an expert opinion is admissible, the Court must engage in a "two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006); *TBL Collectibles*, 285 F. Supp. 3d at 1178.

In the first step, the Court must decide "whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *103 Investors*, 470 F.3d at 990 (quoting Fed. R. Evid. 702). If the proposed expert passes muster in the first step, then the Court must take the second step and assess "whether the expert's opinion is reliable under the principles set forth in *Daubert*" and incorporated in Fed. R. Evid. 702. *Id.* The second step "focuses on the process or means by which the witness derived the opinion — this is referred to as methodology or application of principles." *Crabbe*, 556 F. Supp. 2d at 1221. Put another way, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Parsing the second step of reliability even further and slightly rearranging Fed. R. Evid. 702, the three requirements are:

> (i) a showing that the method or principle used by the witness is reliable; (ii) a showing that the witness used sufficient facts and data as required by the method or principle; and (iii) a showing that the witness properly applied the method or principle to the collected facts and data.

*Crabbe*, 556 F. Supp. 2d at 1221. And, the proposed expert opinion ultimately can be admitted only if it would help the Court "understand the evidence or determine a fact in issue." Fed. R. Evid. 702. The foregoing "gatekeeping" function and analysis applies in bankruptcy court even though most bankruptcy proceedings are conducted without juries. *Van Cott, Bagley, Cornwall & McCarthy v. Williams*, 98 Fed. Appx. 726 (10th Cir. 2004) (unpublished) (confirming that bankruptcy court "'must, at the outset' assess the reasoning and methodology underlying the expert's opinion . . . ."); *Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*, 511 B.R. 408 (Bankr. N.D. Tex. 2014) (bankruptcy court excluded expert opinion testimony before trial based on *Daubert* analysis); *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Serv., Inc.)*, 350 B.R. 520 (Bankr. N.D. Okla. 2005) (bankruptcy court admitted expert opinion testimony based upon *Daubert* analysis).

Notably, the proponent of expert testimony bears the burden of proving, by the preponderance of the evidence, that the expert opinion is admissible under Fed. R. Evid. 702. *Daubert*, 509 U.S. at 592 n.10; *TBL Collectibles*, 285 F. Supp. 3d at 1179; *Crabbe*, 556 F. Supp. 2d at 1220-21. So, the proponent must establish sufficient qualifications, as well as reliability and relevance.

B.     Qualifications.

Mark Dennis' basic qualifications are set forth in Appendix XV of the Expert Report. Currently, Mr. Dennis is the President of Dennis & Co., P.C., a professional firm offering primarily accounting and tax services.  In terms of education and training, Mr. Dennis earned a Bachelor of Arts degree in economics from Cornell University and a Master of Business Administration degree from the London Business School.

After completing his college training, Mark Dennis embarked upon a "20-year career in the derivatives industry, including futures and options trading, business development for derivatives exchanges, and prime services sales within the investment banking industry."  Expert Report, App. XV.  While in the derivatives industry, he worked in London, England, as "Director of Futures & Options and OTC Clearing Sales at J.P. Morgan" and "Director and Head of EMEA Futures Origination at Barclays Bank plc."  *Id.*

After exiting the derivatives industry, Mark Dennis joined Dennis & Co. in 2012.  *Id.* A few years later, in 2015, he passed the Uniform Certified Public Accountant ("CPA") examination and obtained a Colorado CPA certificate.  *Id.*  Last year, he earned a Certified in Financial Forensics ("CFF") credential from the American Institute of Certified Public Accountants.  *Id.*

Since he joined Dennis & Co. about 6 years ago, Mark Dennis has worked as a "tax and accounting practitioner."  His biography describes his recent experience as follows:

> Mark is an experienced tax and accounting practitioner in the bankruptcy field, having worked on over 500 bankruptcy estates, including Chapter 7, 11 and 13 estates.  Mark advises bankruptcy trustees, attorneys and debtors on bankruptcy matters such as the value, character and basis of assets in the hands of bankruptcy estates, the treatment of tax attributes on debtor and bankruptcy estate tax returns and forecasting tax liability from proposed transactions.

> He also performs complex financial analysis consolidating subsidiaries and investigating transactions to determine possible fraudulent/preference transfer claims and analyzing wage and creditor claims.  His compliance work for bankruptcy estates includes the preparation of periodic operating reports and tax returns for Chapter 11 estates, as well and income and payroll tax returns for personal, corporate, LLC and partnership Chapter 7 bankruptcy estates.  Mark has also testified in US Bankruptcy Court and been hired as an economic damages expert.

> Mark also provides income tax consulting and tax return preparation services to individuals and small businesses.

> Mark's experience includes accounting for rental properties, foreign earned income, restricted stock units and other share-based compensation, pass through entities and master limited partnerships conducting business across state lines.

Expert Report, App. XV.  Recently, Mark Dennis authored three papers presented at continuing legal education seminars.  All three of the publications deal with taxation in bankruptcy.  *Id.*  In the last couple years, he has issued an expert report, testified in a deposition, or testified in various courts a total of five times.  His work in the five cases involved: a proposed sale of intangible property; economic damages; entity identification, classification, and tax compliance; and valuation.  *Id.*

Notably, the record does not establish that Mark Dennis has ever issued an opinion on the solvency of any individual or entity.  During the *Daubert* hearing, he testified that he performed work in about 500 bankruptcy cases and performed "valuations" in nine of such bankruptcy cases.  He was unclear whether the "valuation" work included solvency analysis.  In any event, there was no showing made by the Chapter 7 Trustee that Mr. Dennis has ever previously testified in any court as an expert on solvency.  The Chapter 7 Trustee also did not establish that solvency analysis (as distinct from general "valuation") was part of Mark Dennis' education, training, or work.  Instead, Mr. Dennis engaged in what appears to have been a high-profile international career in the derivates industry in which he traded futures and options and worked in sales and business development.  None of that experience bears on determining solvency.  Then, he changed his career.  He has been at Dennis & Co., P.C., only a few years.  He only very recently obtained certifications as a CPA and CFF.  As best the Court understands, Mr. Dennis focuses on tax and general accounting, including some work for parties in interest in bankruptcy cases.

Under Fed. R. Evid. 702, the Court must determine whether Mark Dennis' "knowledge, skill, experience, training, or education" qualify him as an expert entitled to offer the Expert Report on solvency.  The Court assesses Mark Dennis' qualifications to issue a solvency opinion as rather weak.  He appears to be a tax and general accounting practitioner with no specialized "knowledge, skill, experience, training, or education" about solvency analysis.  However, in the Motion to Exclude, the Defendants did not contest Mark Dennis' qualifications.  Accordingly, in the absence of any objections to his qualifications, the Court determines that Mark Dennis passes the qualifications step (but just barely) because he has some "knowledge, skill, experience, training, or education," generally in finance, economics, and accounting.

C.   The Fair Value Balance Sheet Methodology.

   1.   Methodology.

The initial judicial inquiry centers on identification of the methodology.  *See Crabbe*, 556 F. Supp. 2d at 1222.  Then, the proponent of the expert testimony must establish that the methodology generally is deemed reliable in the field.  *Id.*

In this case, Mark Dennis identified his main purported methodology in his Expert Report, Affidavit, and deposition. According to Mr. Dennis:

> In rendering my opinion on solvency, I used the fair market value, going-concern asset approach to apply the solvency test as defined in 11 U.S.C. § 101(32)(A), an accepted methodology for valuation in a bankruptcy context, rather than the generally accepted account [sic] principles ("GAAP").

Dennis Aff. ¶ 7; *see also* Expert Report at 1. Furthermore, Mark Dennis clarified that he utilized "a balance sheet test for Mr. Blair as of May 7, 2011" [which was the date of at least one transfer]. Expert Report at 1; *see also* Dennis Dep. at 28:20-24 ("There is [sic] three different ways to value any asset. Discounted value, future cash flows . . . and also a balance sheet test, which is the test that we've utilized here in the [Expert] report overall . . . ."). At the *Daubert* hearing, Mr. Dennis again reconfirmed that he utilized a fair value balance sheet test.

So, is the fair value balance sheet approach to solvency deemed reliable in the field? To determine whether expert opinion testimony is reliable, the *Daubert* court suggested the consideration of "several nondispositive factors:"

> (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community.

*103 Investors*, 470 F.3d at 990 (citing *Daubert,* 509 U.S. at 593–94). Such factors seem primarily targeted to scientific inquiry. But Fed. R. Evid. 702 requirements and *Daubert* principles apply "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, 526 U.S. at 141. In such "non-scientific" areas, the test of reliability is "flexible" and the Court has "broad latitude when it decides *how* to determine reliability . . . ." *Id.*, at 142 (emphasis in original).

The fair value balance sheet method proposed by Mark Dennis is not really scientific. But it is a method identified — even mandated — in law. Mark Dennis relied on the definition of the term "insolvent" contained in Section 101(32)(A) of the Bankruptcy Code.[3] Section 101(32)(A) states that, with respect to persons[4] (such as the Debtor), the term "insolvent" means:

---

[3]       11 U.S.C. § 101 *et. seq.* Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[4]       Section 101(32)(A) actually uses the term "entity" rather than "persons." However, Section 101(15) defines the term "entity" as "includes person . . . ." So, for ease of reference since this case concerns an individual bankruptcy, the Court uses the term "person(s)."

> . . . [a] financial condition such that the sum of such [person's]
> debts is greater than all of such [person's] property, at a fair
> valuation, exclusive of — (i) property transferred, concealed,
> or removed with intent to hinder, delay, or defraud such
> [person's] creditors; and (ii) property that may be exempted
> from property of the estate under section 522 of this title.

Mark Dennis never explained why he relied on the Bankruptcy Code definition of "insolvent" for purposes of choosing a methodology. The Chapter 7 Trustee's fraudulent transfer claims in the Amended Complaint are based upon Colorado law. So, Colorado law (the CUFTA) provides the substantive law governing the solvency issues. But, fortunately for Mr. Dennis, the definition of "insolvent" under the Bankruptcy Code is very similar to the definition of "insolvent" under Colorado law. COLO. REV. STAT. § 38-8-103 states:

> (1)    A debtor is insolvent if the sum of the debtor's debts is
>        greater than all of the debtor's assets at a fair valuation.
> (2)    A debtor who is generally not paying his debts as they
>        become due is presumed to be insolvent . . . .
> (4)    Assets under this section do not include property that
>        has been transferred, concealed, or removed with intent
>        to hinder, delay, or defraud creditors or that has been
>        transferred in a manner making the transfer voidable
>        under this article.

Furthermore, under COLO. REV. STAT. § 38-8-102(2)(b), an "asset" does not include "[p]roperty to the extent that it is generally exempt immediately prior to the time of transfer under nonbankruptcy law."

Thus, under both Colorado law and the Bankruptcy Code, the fair value balance sheet method is essentially mandated for individuals. *See CB Richard Ellis, Inc. v. CLGP, LLC,* 251 P.3d 523, 532-33 (Colo. Ct. App. 2010) (identifying the balance sheet method for determining solvency under Colorado law); *Commercial Fin. Serv.,* 350 B.R. at 531 (accepting the fair value balance sheet method as the proper method for assessing solvency under the Bankruptcy Code). Put another way, the CUFTA method of determining insolvency "mirrors the balance sheet test for insolvency under the Bankruptcy Code." *CB Richard Ellis,* 251 P.3d at 532 (quoting *Krol v. Unglaub (In re Unglaub),* 332 B.R. 303, 317 (Bankr. N.D. Ill. 2005)). In fact, the CUFTA definition of the term "insolvent" is "derived from" the Bankruptcy Code. COLO. REV. STAT. § 38-8-103 Official Comment (1). Importantly, the balance sheet test for insolvency requires that the Court must determine "the fair value of [the debtor's] assets and the extent of its liabilities at the time of each contested transfer." *CB Richard Ellis,* 251 P.3d at 534 (quoting *Sheffield Steel Corp. v. HMK Enter., Inc. (In re Sheffield Steel Corp.*), 320 B.R. 423, 443 (Bankr. N.D. Okla. 2004)).

In any event, both the Defendants and the Chapter 7 Trustee appear to accept the general methodology. Motion to Exclude at 6-8 (citing the Colorado statutory definition

and noting that the Colorado "balance sheet" test "mirrors" the Bankruptcy Code balance sheet test); Response at 6 (noting that Mark Dennis relied on insolvency method of Section 101(32)(A)).  The authors of *Valuation Practical Guide* (a publication upon which the Chapter 7 Trustee relies) also endorse the fair value balance sheet method although they use slightly different terminology: the "asset-accumulation [AA] method" which is one of the methods used in the "asset-based approach" for valuing businesses.  *Valuation Practical Guide* at 227-259.  According to such source:

> In the first procedure, the analyst identifies all of the company's assets . . . .  Also, in this first procedure, the analyst identifies all of the debtor company's liabilities . . . .  The second procedure in the AA method is to value all of the identified asset and liability accounts.  The analyst will restate all of the recorded asset and liability accounts to the assignment standard of value [which Mark Dennis contends is fair market value] and will also record all of the previously unrecorded assets and liabilities at the assignment standard of value . . . .  The third procedure in the method is the mathematical subtraction of the total liabilities value from the total asset value.

*Id.* at 247.  Mark Dennis purports to have followed such method but modified slightly to exclude exempt assets of the Debtor.

The Court finds that the general methodology proposed by Mark Dennis for determining solvency (*i.e.,* preparing a balance sheet of assets and liabilities (except exempt assets) for the Debtor and adjusting the balance sheet so that it reflects fair market value as of the date of the alleged transfers) is both appropriate and reliable under Fed. R. Evid. 702, *Daubert*, 509 U.S. 579, Colorado law, and the Bankruptcy Code.

However, that is not the end of the story, the Chapter 7 Trustee must establish that Mark Dennis actually used "sufficient facts and data as required by the method" and that he "properly applied the method."  So, the Court turns to those issues.

2.   Facts and Data.

The proponent of expert testimony must show that "the witness gathered 'sufficient facts and data' to formulate the opinion."  *Crabbe*, 556 F. Supp. 2d at 1223.  Stated differently, to be reliable, expert testimony must be "based on actual knowledge, and not mere subjective belief or unsupported speculation [divorced from facts].'"  *Pioneer Centres Holding Co. Employee Stock Ownership Plan and Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341-42 (10th Cir. 2017) (quoting *Mitchell v. Gencorp., Inc.*, 165 F.3d 778, 780 (10th Cir. 1999)).  The assessment of the "sufficien[cy] of the facts and data relied upon by the witness is a *quantitative*, not a qualitative, analysis."  Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments; *Crabbe* 556 F. Supp. 2d at 1223 (emphasis in the original).  In performing its gatekeeping function under this part of the *Daubert* test, the Court need not assess whether the facts are accurate.  Instead, the

focus is on "whether the witness obtained the amount of data that the methodology itself demands."  *Crabbe* 556 F. Supp. 2d at 1223.  If there are not sufficient facts and data for the methodology, the expert testimony is inadmissible.

The fair value balance sheet methodology proposed by Mark Dennis required him to go back in time about seven years — to May 7, 2011.[5]  *CB Richard Ellis*, 251 P.3d at 534.  As this case demonstrates, the historical exercise can be difficult under optimal circumstances and virtually impossible without sufficient facts and data.  *See Valuation Practical Guide* at 228 ("Also, particularly in a retrospective controversy-related assignment, the debtor company data that the analyst needs . . . [may] simply no longer be available.  In many of these bankruptcy-related instances, it may simply be impractical for the analyst to perform some asset-based approach valuation methods [the fair value balance sheet method].")

Mark Dennis started his analysis by trying to identify the Debtor's assets as of May 7, 2011.  The balance sheet prepared by Mark Dennis contained 4 categories of assets: "Cash on Hand"; "Household Goods and Furnishings"; "Contingent and Noncontingent Interests in Decedent Estate"; and "Investments."  Expert Report, App. I.

With respect to the "Cash on Hand" category, Mark Dennis identified 13 financial accounts.  He states that five of the accounts were opened after May 7, 2011.  For the Wells Fargo account (Account No. X3363), he relied on balances from 2011 bank statements showing cash of $12,955.  For two other financial accounts (Pagoda QPRT and Treetops Trust QPRT), Mark Dennis listed specific amounts ($2,060 and $2,744).  The Court understands that such amounts were derived from either account statements or "Quicken" records located on a computer.  So far, so good.  But that left five more active financial accounts of the Debtor as of May 7, 2011:  "UBS X3623"; "Capital One Bank"; "Chase Credit Card"; "KeyBank Portland"; and "Gorham Savings Bank."  Next to each of these financial accounts on the balance sheet, Mark Dennis noted:  "No data available."  In the body of the Expert Report, Mark Dennis wrote:

> References were made in the materials to five additional
> accounts owned by Mr. Blair, however no data was available
> in the materials to show the balances of these accounts.

Expert Report at 3.  To his credit, Mark Dennis asked the Chapter 7 Trustee's counsel for data on the missing bank accounts.  Dennis Dep. at 19:1-21:16.  However, the Chapter 7 Trustee's counsel told him that the data was not available and instructed him "to proceed based on what I had."  *Id.* at 19:25-20:5.  So, what did Mark Dennis do in the absence of the bank account information?  He simply concluded that all five of the financial accounts with no data should be valued at "$ 0."  This was rank speculation.  Mark Dennis just as easily could have guessed that such financial accounts had $5, $5,000, $500,000, or

---

[5]    Technically, a new balance sheet must be prepared for the date of each transfer that is attacked under the CUFTA.  Mark Dennis did not do that.  But the subject transfers in this case are fairly close in time after May 7, 2011.  And the Defendants do not contest the Expert Report on the basis of the need for separate analysis for each transfer.

more.  But it is undisputed that he simply had no facts or data about the five bank accounts.

In the "Investments" category of the Expert Report, Mark Dennis listed two other assets of the Debtor: (1) his equity interest in Blair Oil Investments, LLC ("BOI"); and (2) his equity interest in BPI Partners LLC ("BPI Partners").  Expert Report at 3-4.  With respect to the Debtor's equity in BOI, Mr. Dennis apparently attempted to value such equity under a fair value balance sheet approach just as he had for the Debtor.  Expert Report at 3 ("a comparative balance sheet has been prepared for 2010 and 2011 [for BOI]"); Expert Report, App. III.[6]  At the Daubert hearing, he conceded that a proper equity valuation on a balance sheet method for BOI would require determining the fair market value of all of BOI's assets and then subtracting the entity's liabilities.  *See also* Dennis Dep. at 61-62.  But he was not able to follow such method because he had no information to do so.  Mark Dennis testified as follows:

> Q:      . . . if one is using the balance sheet approach to valuing an asset like BOI, one would use the market value of its assets, not the book value, correct.
>
> A:      Ideally, yes, if the information is available.
>
> Q.      Yes.  What information was made available to you about the market value of BOI's assets?
>
> A.      None.

*Id.* at 61:21-62:4;  *see also Id.* at 66:16-67:12 (Mark Dennis stated that he "used a balance sheet approach [for BOI] to make my judgment" but "didn't pursue trying to obtain" data on the market value of BOI's assets because "obtaining additional information in the context of this project was going to be very difficult").

---

[6]      But Mark Dennis was very inconsistent and confused in his testimony on the method of valuation he used for the debtor's equity in BOI.  At the *Daubert* hearing, he suggested again that he used a fair value balance sheet approach.  But, in cross-examination, Mr. Dennis acknowledged contrary testimony in his deposition as follows:

> Q.      So you mentioned earlier that there were three potential methods for valuing an asset like this [BOI]:  The discounted cash flow method, the balance sheet method and the market test.  And it appears you did not actually employ any of these, correct, with respect to BOI?
>
> A.      I considered them and determined that it was not worthwhile pursuing them.

Dennis. Dep. at 64:10-17.  In the end, the Court wonders whether Mr. Dennis himself knows what methodology he used.  However, to be most charitable to him, it seems that Mr. Dennis tried to use the fair value balance sheet method for valuing the Debtor' equity in BOI but was forced to abandon the method because he did not have sufficient facts and data to perform the required analysis.

With insufficient information, what did Mark Dennis do?  First, he created a balance sheet for BOI based on book values, rather than fair market values for assets.  He did this even though he acknowledged that at least "sometimes" book values bear little relationship with fair market values.  Dennis Dep. at 59:25.[7]  And then he departed from the accepted methodology and simply assumed that because BOI had suffered losses in 2010 and 2011 (and had total accumulated capital contributions of $4,935,699), the Debtor's equity in BOI should be valued at $0.  But, again, it is clear that Mr. Dennis lacked information to perform the fair market value balance sheet method that he himself had selected.  So, he altered the methodology.  Alteration of an established methodology is a "step that renders the analysis unreliable [and] renders the expert's testimony inadmissible."  *Goebel v. Denver and Rio Grande Western R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003)  (quoting *Mitchell*, 165 F.3d at 782).

In terms of other valuation methods for BOI, Mark Dennis agreed that other possible methodologies might include the "market approach" (sales of comparable companies) and a discounted cash flow analysis.  Dennis Dep. at 62:19-64:17.  But, at the *Daubert* hearing, Mr. Dennis acknowledged repeatedly that he did not have sufficient information to perform an analysis under such other methodologies either.  *See also* Dennis Dep. at 62:19-64:17.  Thus, Mark Dennis lacked sufficient information to satisfy the valuation methodology he himself identified for BOI and didn't pursue the other generally accepted methods of valuation because the exercise was "not worthwhile." Dennis Dep. at 64:10-17.

With respect to BPI Partners, Mark Dennis was required to value the Debtor's equity in the entity as of May 7, 2011.  But he had only two scraps of data about BPI Partners.  First, the Debtor valued his equity interest in BPI Partners at $156,164 in 2015 (*i.e.*, about 4 years after the May 7, 2011 valuation date).  Second, the Debtor showed no income or loss for the entity on his 2011 tax return.  Mr. Dennis confirmed that "no other information is available about this investment."  Expert Report at 4.  Again, Mark Dennis lacked the data required to perform the fair market balance sheet method he himself espoused.  He also did not utilize any other generally accepted methodology for valuing BPI Partners.  So, in the absence of sufficient information, he just used a number supplied by the Debtor four years later.

After Mark Dennis purported to identify and value assets, he did the same for the Debtor's liabilities.  In the Expert Report, he indicated that the Debtor's principal liability was $2,298,346 based upon the "ARB Trust Judgment."  The other liabilities identified by Mark Dennis paled in comparison to the "ARB Trust Judgment."  The ARB Trust Judgment is a judgment entered on March 27, 2015 by the Probate Court for the City and County of Denver, Colorado in the probate proceeding:  *In the Matter of The Audrey R. Blair Revocable Trust, GST-Exempt Marital Trust, and Non-Exempt Marital Trust*, Case No. 12-PR-2227.  Expert Report at 1.  In his analysis, Mr. Dennis used the ARB Trust

---

[7]    At the *Daubert* hearing, Mark Dennis acknowledged that a true fair market valuation of the assets of BOI would have required substantial work assessing the value of oil and gas assets including potentially visits to oil and gas properties and engaging subcontractors to assist in valuation.  However, Mr. Dennis did not have the resources to do a real fair market valuation of BOI's assets and that task "was not included in his assignment."  So, he did not perform the hard work that the methodology required.

Judgment and listed the following as liabilities on the adjusted fair value balance sheet that he created for the Debtor:

| | |
|---|---|
| ARB TRUST JUDGMENT — UBS BOI LOC | $1,000,000 |
| ARB TRUST JUDGMENT — PERSONAL INCOME TAXES | $ 501,048 |
| ARB TRUST JUDGMENT — TRANSFER TO PERSONAL TRUST | $ 255,000 |
| ARB TRUST JUDGMENT — LEGAL AND ACCOUNTING | $ 37,848 |
| ARB TRUST JUDGMENT — TAX BENEFITS | $ 504,450 |

In other words, to identify the Debtor's liabilities as of May 7, 2011, Mark Dennis relied on a judicial decision issued about four years later in a case that had not even been filed as of the May 7, 2011 valuation date. He conceded that as of May 7, 2011, the Debtor's liability was a "contingent liability" (*i.e.*, the judgment had not entered). Dennis Dep. at 121:8-121:20. Furthermore, he confirmed that the proper approach to value a contingent liability was as follows:

> You would still put it in on the balance sheet as a liability. You would attach a probability perhaps to that judgment or different components of the judgment. So maybe it would be a smaller number [than the judgment issued four years later].

*Id.* at 121:21-122:6. He testified the same way at the *Daubert* hearing. *See also*, *Valuation Practical Guide* at 239 (confirming that for contingent liabilities such as litigation claims, the analyst must consider the "probabilities associated with the debtor company's future contingent liability payments.") Ignoring these general principles, Mark Dennis just assumed that the amount of a judgment issued four years after the May 7, 2011 date used in his Expert Report should be inserted as a liability. Why did he do so? Perhaps because Mark Dennis lacked sufficient data or information to value the contingent liability as of May 7, 2011. He testified as follows:

> Q.    Without the benefit of hindsight of the judgment . . . , do you have sufficient information that would allow you to make a reasonable estimate of the loss as of [May 7, 2011]?
>
> A.    No. I don't have sufficient information to do that.

Dennis Dep. at 140:20-25. So, he had no information with which to perform the normal method of valuing the contingent liability as of May 7, 2011. Mark Dennis reconfirmed the foregoing lack of information in his Affidavit where he stated:

> [T]he Debtor passed away in 2015. Thus, I did not have access to the Debtor or any of his sworn testimony regarding the allegations in the Probate Court Judgment. Accordingly, any discount factor that I applied to the likelihood of the Probate Court Judgment becoming a reality would have been entirely speculative.

Dennis Aff. ¶ 10.

As demonstrated by the foregoing examples concerning assets and liabilities, Mark Dennis simply did not have adequate information or data to reach a conclusion using his fair value balance sheet method for either assets or liabilities.  During the *Daubert* hearing, he acknowledged the lack of information problem.  He testified:

- I gathered data "substantial in volume, not necessarily in usefulness."

- "Maybe not all the data that we would have liked was available."

- The asset based approach "seemed best" because "we had maybe not as much information as we would have liked."

- The asset based approach was the "best we could do."

- "Mr. Blair's financial records were hard to reconstruct."

- We had "limited availability on information."

- There was "limited information."

Bottom line: the entire Expert Report and proffered balance sheet for the Debtor are unreliable.  Neither Rule 702 nor *Daubert* "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Etherton*, 829 F.3d at 1218 (quoting *Gen Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997)).

        3.    <u>Application</u>.

Admissibility of the Expert Report also depends on whether the Chapter 7 Trustee satisfied his burden to show that the proffered expert reliably applied the asserted methodology to the facts and data obtained.  *Crabbe*, 556 F. Supp. 2d at 1223.  After carefully considering the Expert Report, the Affidavit, Mark Dennis' deposition, and Mark Dennis' testimony at the *Daubert* hearing, the Court concludes that Mr. Dennis failed in numerous ways to reliably apply the facts and data in accordance with his own selected methodology.  At least in part, the shortcomings of the Expert Report can be traced to the lack of facts and data.

As noted previously, Mark Dennis purported to use a fair market value balance sheet methodology for determining the Debtor's solvency as of May 7, 2011.  While such methodology is entirely proper, Mark Dennis failed to follow it.

With respect to "Cash on Hand," Mark Dennis identified five financial accounts of the Debtor (open as of May 7, 2011) for which there was no data.  He asked for data and was told that it was not available.  So, he just assumed that all of the financial accounts were worth nothing.  That is not an acceptable application of methodology.  The same is

true for valuing the Debtor's equity in BOI.  Mark Dennis chose the fair value balance sheet method for valuing BOI.  But he had no information concerning the fair market value of BOI's assets so could not value BOI under his own methodology.  He also had no information with which to perform any of the other generally accepted valuation methodologies for BOI.  So, Mark Dennis shifted to use historical cost basis balance sheets that do not show fair market values at all.  And then he abandoned his methodology entirely to assert that because BOI had suffered losses of income and filed for bankruptcy four years later, it should be valued at zero.  The unsupported theory that historical income losses must mean lack of any enterprise equity may come as a surprise to many large American business (such as Google and Tesla) that have operated at a loss for years.  But the point for now is only that Mark Dennis did not apply his own methodology to reach his conclusion regarding BOI.  And he was unable to point to any generally accepted accounting principles, in the *Valuation Practical Guide* that he endorsed or otherwise, to support his position.[8]  The same for BPI Partners.  Rather than truly assess value on a fair market value basis, Mark Dennis just punted and inserted the Debtor's valuation from many years later.  Again, that is not proper application of a methodology.

The liabilities side of the Expert Report is every bit as suspect, and probably more so.  Mark Dennis' own proposed methodology required him to identify liabilities as of May 7, 2011.  *See CB Richard Ellis*, 251 P.2d at 534 (in order to apply the balance sheet test, the court must determine the value of assets and liabilities "at the time of each contested transfer").  The only significant liability Mr. Dennis identified was the ARB Trust Judgment that was issued four years later.  The lawsuit against the Debtor was filed in 2012 (more than a year after the May 7, 2011 valuation date).  Response Ex. 2.  Mark Dennis conceded that the claims against the Debtor, even on an informal basis, were first made after May 7, 2011.  Dennis Dep. at 44:8-12 (Mr. Dennis' "best information" was that "claims with dollar amounts on them" were not made until after May 7, 2011).  So, at best, there was an unasserted contingent liability.  Mark Dennis agreed that the liability was contingent in 2011 and that the generally accepted approach is that such contingent liabilities must be valued by applying a probability of success factor to the amount of the claim.  *Id.* at 121:21-122:6; *See also Valuation Practical Guide* at 239.

Colorado law on insolvency follows the generally accepted methodology for valuing contingent liabilities.  Under Colorado law, contingent liabilities (such as pending litigation that has not been reduced to judgment) must be discounted by the probability of the contingency's becoming non-contingent (*i.e.,* by the likelihood that a judgment will actually enter) as of the date of the alleged fraudulent transfer.  *CB Richard Ellis* is the seminal case.   Therein, the Colorado Court of Appeals held:

---

[8]        There is a serious question whether Mark Dennis really relied on the *Valuation Practical Guide* at all when he rendered his Expert Opinion.  Although he intimated that he did, he was unable to confirm that he had actually reviewed the publication before rendering the Expert Opinion.  Instead, Mr. Dennis could only say that the *Valuation Practical Guide* was on his shelf.  And then he mischaracterized the publication.  For example, in his Affidavit, he stated:  "As to the Hy Blair counterclaim, according to [Valuation Practical Guide] contingent assets are not considered for bankruptcy valuation purposes . . . ."  Dennis Aff. ¶ 15.  But the passage of the *Valuation Practical Guide* cited by Mr. Dennis in his testimony says no such thing.

While an insolvency determination measures a debtor's assets against its liabilities at a "fair valuation," section 38–8–103(1), such determination will depend on whether the liability is certain or contingent.  There is no dispute that here, at the time of the transfer, the broker had a "claim" under section 38–8–102(3), C.R.S. 2009 (definition of "claim"), against the LLC.  However, no judgment existed at the time of the transfer, and the trial court found that the parties had a bona fide dispute over whether the claim should be paid at all.  Hence, the nature of the broker's claim was contingent.  *See In re Advanced Telecomm. Network, Inc.,* 490 F.3d 1325, 1335 (11th Cir. 2007) (a pending lawsuit is a "prototypical" contingent liability); *Paratransit Risk Retention Group Ins. Co. v. Kamins,* 160 P.3d 307, 316 (Colo. App. 2007) (observing that a disputed debt was contingent because it was not owed until resolution of the legal action). "[A] contingent liability is not certain—and often is highly unlikely—ever to become an actual liability." *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir. 1988).

According to the Eleventh Circuit,

> [t]he "fair value" of a contingent liability, of course, should be discounted according to the possibility of its ever becoming real.  Thus in this case the bankruptcy court should have estimated the expected value of a judgment against [the debtor], and then multiplied that value by the chance that [the debtor] would face such a judgment.

*In re Advanced Telecomm.,* 490 F.3d at 1335.

Liabilities "must be reduced to [their] present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Id.* (quoting *In re Xonics Photochemical,* 841 F.2d at 200); *see generally* Richard M. Cieri & Michael J. Riela, *Protecting Directors and Officers of Corporations that are Insolvent or in the Zone or Vicinity of Insolvency: Important Considerations, Practical Solutions,* 2 DePaul Bus. & Com. L.J. 295, 309–10 (2004) ("Some courts have valued contingent liabilities at their full face value.  However, most courts rightly discount contingent liabilities by their probability of success."); John E. Sullivan III, *Future Credits and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When Fraud Doesn't Stay Fraudulent, and Other Important Limits to*

> *Fraudulent Transfers Law for the Asset Protection Planner,*
> 22 Del. J. Corp. L. 955, 1007–08 (1997) (explaining how
> insolvency's "fair valuation" test is rooted in reasonableness).

*C.B. Richard Ellis*, 251 P.3d at 533-34.  Again, Mark Dennis, acknowledged that the method endorsed by *C.B. Richard Ellis*, 251 P.3d 523, is the right way to do the solvency analysis job.  But, as explained previously, Mr. Dennis had no information with which to perform such analysis.  Dennis. Dep. at 140:20-25.  As a result, he did not apply his own methodology.

So, Mark Dennis engaged in some hindsight time travel to assume that the 2015 ARB Trust Judgment should be applied in full as a liability in 2011.  However, neither the Chapter 7 Trustee nor Mr. Dennis was able to provide any support for such hindsight assumption and failure to follow standard protocol from the accounting or solvency fields. Mr. Dennis' own primary solvency source is to the contrary.  *Valuation Practical Guide* at 50 ("The analyst's use of hindsight in the bankruptcy valuation is typically discouraged. Judicial finders of fact seem to adopt the so-called 'known or knowable principle' with regard to the analyst only using information that was knowable as of the defined valuation date.")  Instead of following the accepted methodology, it seems Mr. Dennis and the Chapter 7 Trustee's counsel just decided it would be a helpful assumption for their case to retroactively apply the ARB Trust Judgment to a period more than four years earlier when no claim had even been asserted.  Dennis Dep. at 113:25-114:10 ("I did verify the approach with [Chapter 7 Trustee's legal counsel] . . . .  I asked him if I should make that assumption, and he confirmed yes.").

What Mr. Dennis did with respect to the ARB Trust Judgment is not an application of methodology to facts.  Instead, it is just an improper hindsight assumption that makes Mark Dennis' expert conclusions inadmissible.  *See Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010) ("Hindsight is wonderfully clear, but in determining the [debtor's] solvency in mid-1997 it was necessary to determine the expected value of this liability as of mid-1997, not the actual value as of 1999 or 2000.  Hindsight bias is to be fought rather than embraced."); *Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.)*, 92 F.3d 139, 155 (3rd Cir. 1996*); Valuation Practical Guide* at 50.

D.    The Cash Flow Insolvency Methodology.

In the Expert Report, Mark Dennis also added a short "Cash Flow Insolvency" analysis "to supplement a balance sheet test for determining insolvency."  Expert Report at 1 and 6.  It is somewhat unclear if Mark Dennis intended to present his cash flow insolvency test as some sort of independent or alternative method of proving insolvency. Mr. Dennis did not mention the "Cash Flow Insolvency" portion of the Expert Report at the *Daubert* hearing.  But, if he really is advancing such position, Mr. Dennis has presented no basis for such methodology nor has he shown that such methodology is reliable. Furthermore, Mr. Dennis did not have sufficient facts to complete such analysis.  Finally, he did not apply the methodology but instead invented a new approach.  So, Mark Dennis' "Cash Flow Insolvency" method and conclusions are rejected as inadmissible.

1.    <u>Methodology</u>.

The fair value balance sheet approach is the only methodology for determining insolvency of the Debtor in this case under both the governing CUFTA and the similar provisions of the Bankruptcy Code.  COLO. REV. STAT. § 38-8-103; 11 U.S.C. § 101(32). As explained earlier, COLO. REV. STAT. § 38-8-103 states:

> (1)    A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
> (2)    A debtor who is generally not paying his debts as they become due is presumed to be insolvent . . . .

Mark Dennis seems not to have accepted the statutory mandate and instead proposed an alternative "Cash Flow Insolvency" analysis.[9]  He explained it as follows:

> Q.    Where did you get the idea that this cash flow insolvency analysis was relevant at all?
>
> A.    Although it's not specifically articulated in the definition of insolvency that I include on page 1 of my report, I drew upon our experience as a firm in this being an additional piece of supplementary evidence of insolvency in terms of being unable to pay bills as they become due.
>
> Q.    Unable to pay bills as they become due, is that the issue you looked at?
>
> A.    Yes.  Unable to meet his obligations in a timely fashion, another way of putting it.

Dennis Dep. at 166:19-167:5.

What Mark Dennis seems to have done is to misapprehend the meaning of the Colorado statute.  COLO. REV. STAT. § 38-8-103(1) establishes the fair value balance sheet methodology for determining insolvency.  On the other hand, COLO. REV. STAT. § 38-8-103(2) provides for a presumption that arises if a party proves that the debtor "is generally not paying his debts" as of the date of an alleged fraudulent transfer. The statutory Official Comment is instructive.  COLO. REV. STAT. § 38-8-103(2):

---

[9]    The Chapter 7 Trustee cites *Love v. Olsen*, 645 P.2d 861, 863 (Colo. App. 1982) for the proposition that there are multiple tests for insolvency.  But *Love* is inapposite since it was issued prior to the enactment of the CUFTA in 1991.  The Chapter 7 Trustee's fraudulent transfer claims are based only on the CUFTA. The text of the CUFTA supplies the substantive law on insolvency.  And the only insolvency test under the CUFTA is the fair value balance sheet methodology.

> Establishes a rebuttable presumption of insolvency from the fact of general nonpayment of debts as they become due . . . .
>
> In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness.  The court should also take into account such factors as the number of debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes . . . .
>
> A presumption of insolvency does not arise from nonpayment of a debt as to which there is a genuine bona fide dispute, even though the debt is a substantial part of the debtor's indebtedness.

COLO. REV. STAT. § 38-8-103 Official Comment (2).

The COLO. REV. STAT. § 38-8-103(2) presumption appears to be based only on a simple factual inquiry:  At the time of the alleged fraudulent transfers, was the Debtor paying his debts as they became due, or not?  It is a factual question and not really the province for an expert analysis.  No expert "knowledge, skill, experience, training, or education" seems needed to ascertain whether someone is paying their debts.

As a result, there is no real expert methodology that bears on the issue.  And Mark Dennis has not suggested any specific expert methodology except "our experience as a firm."  But, again, even if an expert analysis were required to ascertain whether someone was paying their debts, that simply is not the mandatory statutory insolvency test under Colorado law or the Bankruptcy Code.

2.    Facts and Data.

Mark Dennis did not have sufficient data to determine whether the Debtor was "generally not paying his debts as they became due" on May 7, 2011.  In his Expert Report, he stated:  "An analysis of Mr. Blair's primary bank account statements for the months of January through July of 2011 was carried out and summarized in Appendix XII."  Expert Report at 6.  Mr. Dennis then generated a graph showing the Debtor's income and expenses from January 2011 to May 2011.  *Id.*  Notably, the entire analysis is based on only one of the Debtor's bank accounts (Wells Fargo X3363).  As explained earlier, the Debtor had numerous financial accounts including at least five other active bank accounts during the time period for which Mark Dennis had "No available data."  Expert Report, App. I.  So, it was a very strange exercise to examine one bank account only and then try to reach a conclusion about whether someone was paying his bills when due.

       3.    <u>Application</u>.

If the issue is whether the Debtor "generally was paying his debts as they became due" as of May 7, 2011, Mark Dennis conceded that the Debtor was.  He testified:

> Q.    Was Peter Blair [the Debtor] actually able to pay his debts as they became due in 2011?
>
> > A.    Drawing on both exempt and non-exempt assets?
>
> Q.    Right.
>
> > A.    Yes.

Dennis Dep. at 173:4-10.  So, that would seem to be the end of the inquiry on the "paying his debts as they become due" presumption.[10]

But Mark Dennis departed from this rather simple exercise and manufactured an entirely novel framework.  The odd idea seems to be that even though the Debtor actually paid all his bills on time in 2011, none of that should count because some of the Debtor's income was not regular (such as a monthly pay check), some of the Debtor's income might have been derived from exempt assets, and Mark Dennis did not have data on the source of some of the income.  For example, some of the Debtor's non-regular income during the time period (about $117,702) was from distributions from a trust which might have been an exempt asset.  And there were three other deposits for which Mark Dennis had insufficient information so he just subtracted them too:  $40,400 (from "an unidentified generic 'deposit'"); $12,748 (from "Aud Rock"); and $255,000 (from a source "not known [to Mark Dennis]").[11]  Mr. Dennis hypothesizes that if all of the Debtor's foregoing income were deleted, then the Debtor actually would not have been able to pay his bills in 2011.  Or something like that.

This is the worst sort of made up "expert" analysis and has no place in an insolvency determination.  Such approach is not supported by either generally accepted accounting principles or law.  All Mr. Dennis' approach really does is serve to discredit Mark Dennis as an expert.  But for purposes of admissibility, the central point is that Mark Dennis did not apply a generally accepted methodology to known facts.  Instead, he is apparently proposing a "generally paying his debts as they become due" methodology for insolvency that runs contrary to the applicable Colorado statute.  Then, after conceding

---

[10]    There was a hint that perhaps the Debtor was "not paying his debts as they became due" since he did not pay the ARB Trust Judgment on or before May 7, 2011.  The suggestion is nonsense.  As Mark Dennis conceded, no demand had been asserted before May 7, 2011.  The lawsuit was not even filed until 2012.  And it took another three years of litigation before entry of the ARB Trust Judgment.  Debts in bona fide dispute are not deemed to be "due" under the "generally [] paying his debts as they became due" framework.  *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543-44 (10th Cir. 1988) (the test for a bona fide dispute is whether "there is an objective basis for either a factual or a legal dispute as the validity of debt.")

[11]    Mark Dennis had no facts or data to suggest that the last three deposits were from exempt assets.

that the Debtor actually was paying his debts as they became due, he manufactured the novel idea of subtracting "extraordinary" or non-recurring income or income for which he did not have data or income from possibly exempt assets — or really whatever income he chose to delete.  Obviously, such an approach is inadmissible and unreliable.

E.  <u>No Help to the Court</u>.

The base-line for admissibility is whether the proposed expert testimony would assist the Court in any meaningful way.  The Expert Report proffered by Mark Dennis and the Chapter 7 does not.  It is unreliable, irrelevant, and inadmissible.

III.  <u>Conclusion</u>.

For the reasons set forth above, the Court determines that the Chapter 7 Trustee failed to meet his burden to establish grounds for admission of Mark Dennis' expert opinion under Fed. R. Evid. 702, *Daubert*, 509 U.S. 579, and *Kumho*, 526 U.S. 137. Thus, the Court GRANTS the Motion to Exclude.[12]  Mark Dennis will not be permitted to provide expert testimony on the issue of solvency at the trial.

DATED this 2nd day of August 2018.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge

---

[12]  In addition to the foregoing, the Defendants contend that Mark Dennis made numerous errors in his Expert Report including, for example, double counting a $1 million liability.  Reply at 15.  Whilst the Defendants' argument seems sound, the Court does not consider mathematical errors or the like as a basis for exclusion of expert testimony under Fed. R. Evid. 702 and *Daubert*, 509 U.S. 579.  Instead, the focus is limited only to "principles and methodology, not the conclusions that they generate."  *Id.* at 595.  Errors and conclusions are more appropriately addressed in cross-examination if the proposed expert testimony passes muster under Fed. R. Evid. 702.  In this case, the proposed expert opinion is inadmissible as unreliable based upon principles and methodology.  Thus, the Court has no need to adjudicate the arguments about errors in the Expert Report.