## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>PETER H. BLAIR,<br><br>Debtor. | Bankruptcy Case No. 15-15008 TBM<br>Chapter 7 |
| JEFFREY A. WEINMAN,<br>Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>SUELLA M. CROWLEY,<br>FIRST CLASS PRINTING, INC.,<br><br>Defendants. | Adv. Pro. No. 17-1195 TBM |

---

## MEMORANDUM OPINION AFTER TRIAL

---

### I.   Introduction.

This is a true Shakespearean tragedy — but written in dry legal prose.  The main character, Peter H. Blair, Sr., served as the patriarch of his family.  Married to an heiress for almost 60 years, they were the beneficiaries of great wealth.  He managed the money and served as an investment counselor for his extended family as well as other families of means.  Peter H. Blair, Sr. and his wife sought to protect their wealth and provide for their three children by creating a series of trusts funded mostly by her inheritance.  Together, they served as co-trustees. They lived in privilege for decades until she died after a long illness.

By the time his wife died, Peter H. Blair, Sr. was retired.  He moved to a luxury retirement community but was very lonely.  Enter Suella Crowley.  She worked as a caregiver for his friend.  He became enamored with her even though they didn't really know each other.  He skipped the courting and moved to a surprise and unconventional proposal of marriage in March 2011.  She had suffered some hard times including several divorces and debt.  They came from very different backgrounds and circumstances.  He promised to take care of her financially and otherwise.  She agreed and felt like Cinderella.  They started to plan their life together.

1

When they informed Peter H. Blair, Sr.'s three children, there were no "congratulations" or "well wishes." There was only conflict. His eldest son seemed to despise her from the start. It got worse as their father professed his love and intention to support his fiancé. They investigated her and engaged in a campaign trying to convince their father not to marry her. She was not right for him, they thought. Perhaps he was deranged or mentally unstable? And, if their elderly father really was going to support her, well, then there would be less inheritance for them.

They investigated their father and accused him of misappropriating money from the trusts. Bitterly, he denied it; but he did all they asked. He transferred $4.5 million back to the trusts, he signed over a house to one son, and he resigned as co-trustee of the trusts allowing his children to manage them instead. He thought he bought peace by settling with his children and the trusts. He still had more than $700,000 in bank accounts plus another $6,000,000 in IRAs. Now, he could marry his new-found love and live his golden years. But he was wrong. Perhaps it was all preordained.

Peter H. Blair, Sr. started to make good on his promises to his fiancé. He gave her and her small printing company about $70,000. He started to pay her mortgage. They got married in September 2011. They remodeled her house to make it more comfortable for him. He moved in. And, then he paid off her entire mortgage: more than $350,000. He wanted her to be stress-free and financially secure. All the while, he continued to pay his other bills: rent (until he moved), country clubs, church pledges, life insurance, health insurance, credit cards, accountants, and attorneys.

Estranged from his children, he carried on his new life. But about a year later, one of his sons and the trusts made new demands against him. They accused him of mismanagement and breach of trust. They sued their father. The litigation was acrimonious. But, the trusts emerged victorious. In March 2015, they won a judgment in excess of $2.3 million against Peter H. Blair, Sr. It destroyed him. He filed for bankruptcy. And, then he died a broken man.

The Chapter 7 Trustee came in to pick up the pieces of what remained. The Debtor's children and the trusts filed 95% of the claims. There really were no other significant creditors. Armed with the fruits of the children's investigation of their father's financial affairs and the $2.3 million judgment, the Chapter 7 Trustee sued the Debtor's wife, Suella Crowley, and her printing company to recover money for the bankruptcy estate. He accused the Debtor of engaging in actual and constructive fraud when the Debtor paid her and her company the $70,000 many years earlier. He sought to disallow her claim against the bankruptcy estate. And, he demanded one-half of the house that she had owned for more than 20 years because her husband had paid off the mortgage.

Another year of litigation and the final act played out in this Court. A trial. The Court heard from an assortment of characters: Suella Crowley, one of the Debtor's sons, one of Suella Crowley's sons, an attorney, some friends, and an accountant. The Court listened to the lawyers and their arguments. And, now the final curtain closes. Although one party will win, and one will lose, the truth is a tragedy.

2

## II.     Jurisdiction and Venue.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  The avoidance, fraudulent transfer, claim disallowance, and declaratory judgment causes of action are core proceedings under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(B) (allowance or disallowance of claims against the estate), (b)(2)(H) (proceedings to determine, avoid, or recover fraudulent conveyances), and (b)(2)(O) (other proceedings affecting liquidation of assets of the estate).  This Court also has jurisdiction over the declaratory judgment claim under 28 U.S.C. § 2201 *et seq.*  Accordingly, the Court may enter final judgment on all causes of action and defenses in the Adversary Proceeding.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  All of the parties repeatedly have acknowledged and consented to the Court's exercise of jurisdiction and the propriety of venue in the Court.[1]

## III.     Procedural Background.

## A.     The Bankruptcy Case, Adversary Proceeding, and Causes of Action.

The Debtor, Peter H. Blair (the "Debtor"), filed for protection under Chapter 11 of the Bankruptcy Code[2] on May 7, 2015 in the case captioned:  *In re Peter H. Blair*, Case No. 15-15008 TBM (Bankr. D. Colo.) (the "Bankruptcy Case").[3]  Shortly after initiating the Bankruptcy Case, the Debtor died.[4]  Thereafter, the Court converted the Bankruptcy Case from a Chapter 11 reorganization to a Chapter 7 liquidation.[5]  On August 20, 2015, the United States Trustee appointed Jeffrey A. Weinman as the Chapter 7 Trustee for the Debtor's estate in the Bankruptcy Case.[6]

About two years after the commencement of the Bankruptcy Case, on May 5, 2017, the Chapter 7 Trustee initiated this Adversary Proceeding against Suella M. Crowley ("Crowley"), the Debtor's widow, and First Class Printing, Inc. ("First Class"), an entity affiliated with Crowley.  (Docket No. 1, the "Original Complaint.")[7]  In the Original Complaint, the Chapter 7 Trustee alleged that the Debtor: (1) gave at least $8,144 in cash

---

[1]     Docket No.  6 ¶¶ 1 and 2; Docket No. 24 ¶¶ 1 and 2; Docket No. 32 ¶ 15.  Unless otherwise indicated, the Court will refer to particular documents contained in the CM/ECF docket for this Adversary Proceeding using the convention: "Docket No. ___."  If documents are contained in the CM/ECF docket for the main Bankruptcy Case, the Court refers to such records using the convention: "Docket No. ___ in Bankruptcy Case."

[2]     11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[3]     Docket No. 1 in Bankruptcy Case; "Stipulated Facts and Exhibits" (Docket No. 165, hereinafter "Stip. Fact No.___) Fact No. 1.

[4]     Docket No. 106 in Bankruptcy Case; Stip. Fact. No. 2.

[5]     Docket No. 141 in Bankruptcy Case; Stip. Fact. No. 3.

[6]     Docket No. 143 in the Bankruptcy Case.

[7]     At the same time the Chapter 7 Trustee filed this Adversary Proceeding, he also initiated eight additional adversary proceedings against other parties.  The other lawsuits present many of the same types of fraudulent conveyance claims and defenses.  At the suggestion of the parties, the Court selected this Adversary Proceeding as the lead case.  It is the first to proceed to trial.

to Crowley (the "Cash Transfers"); and (2) transferred at least $55,762 to Crowley "through her business First Class . . ." (the "Business Transfers"). The Chapter 7 Trustee claimed that the Debtor made the Cash Transfers and the Business Transfers with actual intent to defraud in violation of Colorado Uniform Fraudulent Transfer Act (the "CUFTA").[8] He also asserted that the Cash Transfers and Business Transfers constituted constructive fraud under the CUFTA.[9] Further, the Chapter 7 Trustee sought to "preserv[e] any and all avoided transfers" and to disallow Crowley's claim in the Bankruptcy Case.[10] The Defendants did not respond to the Original Complaint.

Instead, on May 24, 2017, the Chapter 7 Trustee filed an Amended Complaint. (Docket No. 6, the "Amended Complaint.") The Amended Complaint is the operative pleading and is virtually identical to the Original Complaint except that the Chapter 7 Trustee added: (1) a series of new allegations concerning Crowley's home located at 2777 South Elmira Street, Denver, Colorado (the "Real Property"); and (2) a new cause of action for declaratory relief.[11] The Chapter 7 Trustee asserted that "between June 7, 2011 and January 19, 2012, the Debtor made payments in the amount of not less than $358,593" to pay off Crowley's mortgage on the Real Property (the "Mortgage Payoff Transfers").[12] Based upon the alleged Mortgage Payoff Transfers, the Chapter 7 Trustee requested a declaratory judgment determining that he is entitled "to not less than one-half of the [Real] Property."[13] The Chapter 7 Trustee did not assert that the Mortgage Payoff Transfers were fraudulent under the CUFTA. The Defendants answered the Amended Complaint and denied any liability. (Docket No. 15, the "Answer.") The Court set the case for a three-day trial commencing on August 6, 2018.

## B.    The Pre-Trial Proceedings and Evidentiary Rulings.

In the run-up to trial, the parties engaged in unusually extensive discovery skirmishes and motions practice including, motions to compel, motions to quash, a motion to seal documents, a motion to redact documents, motions for summary judgment, and motions to limit or exclude evidence. During the pre-trial jockeying, the Court made two key rulings on evidentiary issues that ultimately had an impact on the trial.

On June 13, 2018, the Court issued its "Order Regarding Defendants' Motion *In Limine*." (Docket No. 136, the "*In Limine* Order.") The Chapter 7 Trustee intended to rely heavily at trial in this Adversary Proceeding on certain factual findings made by the Probate Court for the City and County of Denver (the "Probate Court") in its "Findings of Fact, Conclusions of Law and Order" issued on March 27, 2015 (the "Probate Judgment") in the probate proceeding: *In the Matter of The Audrey R. Blair Revocable Trust, GST-Exempt Marital Trust, and Non-Exempt Marital Trust*, Case No. 12-PR-2227 (the "Probate Case"). The Defendants argued that the findings of fact in the Probate Judgment constituted inadmissible hearsay which should be excluded from evidence at trial under

---

[8]     Complaint (Docket No. 1, "Compl."). First and Fifth Claims and COLO. REV. STAT. § 38-8-105(1)(a).
[9]     Compl. Second and Sixth Claims and COLO. REV. STAT. § 38-8-105(1)(b).
[10]    Compl. Third, Fourth and Seventh Claims.
[11]    Amended Complaint (Docket No. 6, "Am. Compl.") Eighth Claim and ¶¶ 48-54 and ¶¶ 105-111.
[12]    Am. Compl. ¶ 49.
[13]    Am. Compl. Eighth Claim.

Fᴇᴅ. R. Eᴠɪᴅ. 801 and 802, and because the Defendants were not parties to the Probate Case, the Probate Court excluded Crowley from observing the trial, and the Probate Court suppressed virtually the entire record of the Probate Case. The Chapter 7 Trustee conceded that the findings of fact in the Probate Judgement constituted hearsay but proposed the application of various hearsay exceptions under Fᴇᴅ. R. Eᴠɪᴅ. 803, 804, or 807. In the *In Limine* Order, the Court granted the relief requested by the Defendants and ordered:

> For purposes of trial (and also for all remaining dispositive motions), the entire Probate Judgment, except the Damages Order portion of the Probate Judgment, is excluded from evidence as inadmissible hearsay. The Court will consider only the Probate Judgment's legal effect: on March 27, 2015, the Probate Court entered the Probate Judgment and held the Debtor liable for a total of $2,372,688.29 in damages for breach of fiduciary and trust duties as set forth in the Damages Order portion of the Probate Judgment.

*In Limine* Order at 14. The Chapter 7 Trustee did not seek interlocutory appeal of the *In Limine* Order. So, the *In Limine* Order governed use of the Probate Judgment at trial.

The second important pre-trial evidentiary ruling concerned an expert witness. As set for the below, the Debtor's financial position (*i.e.,* whether solvent or insolvent) at the time of the allegedly fraudulent transfers was an important issue in this Adversary Proceeding. *See e.g.,* Cᴏʟᴏ. Rᴇᴠ. Sᴛᴀᴛ. § 38-8-105(2)(i) ("consideration may be given" to whether "the debtor was insolvent or became insolvent shortly after the transfer was made"). Accordingly, the Chapter 7 Trustee engaged Mark Dennis as an expert witness on solvency issues. Mark Dennis prepared an expert report opining that the Debtor was insolvent as of May 7, 2011. The Defendants sought exclusion of expert testimony from Mark Dennis under Fᴇᴅ. R. Eᴠɪᴅ. 702 and seminal appellate precedent concerning expert witness issues: *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Chapter 7 Trustee contested such exclusion and requested an evidentiary *Daubert* hearing. After conducting a *Daubert* hearing, the Court entered its "Memorandum Opinion and Order Granting Defendants' Motion to Exclude Expert Testimony." *Weinman v. Crowley (In re Blair)*, 588 B.R. 605 (Bankr. D. Colo. 2018) (the "Expert Exclusion Order"). The Court ruled:

> . . . the Chapter 7 Trustee failed to meet his burden to establish grounds for admission of Mark Dennis' expert opinion under Fed. R. Evid. 702, *Daubert*, 509 U.S. 579, and *Kumho*, 526 U.S. 137. Thus, the Court GRANTS the Motion to Exclude. Mark Dennis will not be permitted to provide expert testimony on the issue of solvency at the trial.

*Blair*, 588 B.R. at 625. Subsequently, the Chapter 7 Trustee sought reconsideration of the Expert Exclusion Order and also appealed the Expert Exclusion Order to the United States Bankruptcy Appellate Panel for the Tenth Circuit Court of Appeals (the "Tenth

5

Circuit BAP"). The Court denied reconsideration.[14] And, the Tenth Circuit BAP dismissed the appeal for lack of jurisdiction based upon its interlocutory nature.[15] The BAP further observed that such dismissal was "without prejudice to [the Chapter 7 Trustee's] right to file a notice of appeal after a final order is entered."[16]

So, as a consequence of the *In Limine* Order and the Expert Exclusion Order, the Chapter 7 Trustee proceeded to trial without the ability to rely on the factual findings contained in the Probate Judgment and without an expert witness on solvency issues.

**C.    The Trial.**

The Court conducted a trial on the issues raised in the Amended Complaint and the Answer on August 6, 7, and 8, 2018. Prior to the trial, the parties submitted joint "Stipulated Facts and Exhibits."[17] At trial, the parties presented their opening statements, witnesses, and exhibits. The Court heard testimony from: the Chapter 7 Trustee; Crowley; Peter Hy Blair; Karen Hart; Esther LaRue; Heidi Mourning; Leonard Higdon; and Todd Searles. Notably, and consistent with the Expert Exclusion Order, Mark Dennis did not testify. Further, the Court admitted Exhibits 13, 14, 15, 17, 25, 38 40-43, 45-47, 49, 51, 53-57, 59-63, 65-67 offered by the Chapter 7 Trustee and Exhibits A, C-F, I-K, M, N1-N13, O1-8, P-Q, V, Y-Z, DDD, EEE, and FFF offered by the Defendants. The exhibits were extremely voluminous. The Chapter 7 Trustee did not introduce the Probate Judgment into evidence even for the limited purpose permitted under the *In Limine* Order. However, the Stipulated Facts do refer to the Probate Judgment and its legal effect in a manner consistent with the *In Limine* Order.[18]

At the conclusion of the evidence, both parties presented oral closing arguments. Subsequently, the record of the trial was transcribed.[19] The Court appreciates the very able and professional advocacy of counsel for both the Chapter 7 Trustee and the Defendants during the pre-trial process and at the trial. The matter is fully submitted and ripe for decision by the Court as the trier of fact.

## IV.    Findings of Fact.

Based upon the evidence presented at the trial and the Stipulated Facts and Exhibits, the Court makes the following findings of fact under FED. R. CIV. P. 52(a)(1), as incorporated by FED. R. BANKR. P. 7052.

---

[14]    Docket No. 195.
[15]    Docket Nos. 210 and 211.
[16]    Docket No. 210.
[17]    Docket No. 165.
[18]    Stip. Fact No. 9.
[19]    Docket Nos. 201, 203, and 205, cited hereinafter as "Trans. [Vol.] at ___."

## A.    The Debtor.

The Debtor, Peter H. Blair, Sr., filed for bankruptcy in the twilight of his life — and then died a few months later.[20]  In many ways, the Debtor's end was incongruous with most of his long life.  He married his first wife, Audrey R. Blair, in 1950.  She inherited great wealth.  Together, the Debtor and Audrey Blair had three children: Peter Heyliger Blair, Jr. ("Hy Blair"), Audrey B. Black ("Audie Black"), and Christopher B. Blair ("Christopher Blair").   The Debtor was a "very accomplished financial planner and counselor" who worked for over 28 years at an investment counseling firm where he "managed huge amounts of money" for his family and others.[21]  Although he retired from his investment counseling firm in 1991, the Debtor continued to manage his and his family's financial affairs including his ownership of an oil and gas company:  Blair Oil Investments, LLC ("BOI").  The Debtor was the patriarch of his family.

The Debtor and Audrey Blair created a trust and sub-trusts to protect their wealth and ensure their estate plan:  the Audrey R. Blair Revocable Trust, GST-Exempt Marital Trust, and Non-Exempt Martial Trust (together, the "ARB Trust").[22]  Audrey Blair's inheritance largely funded the ARB Trust.  Together, Audrey Blair and the Debtor were the initial trustees of the ARB Trust.  Their three children were beneficiaries.  After a long illness, Audrey Blair passed away in October 2007.[23]  Having lost his wife of almost 60 years, the Debtor was lonely and a bit adrift.

The Debtor moved from the home he shared with his wife to a luxury retirement community in Denver, Colorado:  Brookdale Parkplace ("Parkplace").  He rented a two-bedroom apartment for more than $8,000 per month.[24]  Suffice it to say that he had substantial financial resources at his disposal.  In addition to his own assets, the Debtor continued to manage the ARB Trust as a co-trustee.  Upon Audrey Blair's death, Hy Blair joined his father as the other co-trustee of the ARB Trust.  Together, the Debtor and Hy Blair managed BOI, the Debtor's wholly-owned oil and gas company.  An elderly, well-heeled, mostly-retired gentleman, the Debtor's days were spent at Parkplace, doctor's appointments, advisor's offices, and with his family in Denver and other locations.

## B.    Suella Crowley and First Class.

Enter Suella Crowley.  The Debtor first met Crowley in December 2009 when she was working at the Parkplace retirement community as a care giver for other residents.[25]  She came from an entirely different background than the Debtor.  Crowley was a long-time Denver native who graduated from South High School in 1962.[26]  Unlike the Debtor,

---

[20]     Docket No. 106 in Bankruptcy Case; Stip. Fact. No. 2.
[21]     Trans. I at 156-57.
[22]     Trans. I at 156.  There were three trusts.  But, for ease of reference, the Chapter 7 Trustee and the Defendants both grouped the trusts together under rubric of the "ARB Trust."  The Court follows the same convention.
[23]     Trans. I at 156.
[24]     Ex. O-1, O-2, and O-3.
[25]     Trans. I at 65.
[26]     Trans. I at 107; Trans. III at 171.

she did not attend college.  Instead, she worked all her life in a wide variety of positions including in retail, banking, childcare, computer supplies, and printing.[27]  She was largely self-sufficient but sometimes had trouble making ends meet.  In 2000, she started her own small business, First Class, as a custom printing company focusing on the financial industry.[28]  She was the sole owner of First Class and ran the company for more than a decade.[29]  First Class did fairly well for a number of years but suffered from the economic downturn in 2008 and also because custom printing was slowly declining as an industry.  By 2009, Crowley took a second job as a caregiver at Parkplace to earn more income.[30]  Crowley worked for Parkplace only a short period of time before she was hired by one of the residents to provide for her exclusive care.

Meanwhile, Crowley was somewhat unlucky in love.  She married Bill Searles when she was only 19 years old.  They had four children together but divorced after 15 years of marriage.[31]  Next, Crowley married Jim Southern.  But, that relationship also ended in divorce after almost a decade.[32]  She tried again with George Crowley.  They married in approximately 1991 and stayed together until 2011.[33]

## C.   The Debtor's Engagement and Marriage to Crowley.

For about a year and a half, Crowley continued to work part-time as the care giver for a resident at Parkplace on the same floor as the Debtor.  During that time, she met the Debtor occasionally.  Since Crowley was providing exclusive care for someone else, her initial interactions with the Debtor were few — they exchanged pleasantries in the elevator, they saw each other from time to time in the lunch room, they bumped into each other occasionally in other locations.[34]  Crowley testified that she and the Debtor were not particularly close friends, but they spoke together briefly most days at Parkplace during the time she worked there.  They liked each other.

But, it was a big surprise to Crowley when the Debtor proposed marriage to her almost out of the blue.  The day was March 9, 2011.  When Crowley arrived at work, her employer — a neighbor and friend of the Debtor — told her that the Debtor had asked to meet with Crowley.[35]  Crowley went to his apartment.  The Debtor greeted her, showed her around, and started to talk.  It was their first long conversation.  The Debtor told Crowley the "history of his life" including his family, upbringing, and education so that she really got to know him.[36]  Then, without further delay, the Debtor proposed marriage.  Cutting straight to the point, he said:

---

27   Trans. I. at 109-11.
28   Trans. I at 64 and 110.
29   Trans. I at 64.
30   Trans. I at 111-12.
31   Trans. I. at 108.
32   Trans. I at 109.
33   Trans. I at 109.
34   Trans. I at 114-15.
35   Trans. I at 115.
36   Trans. I at 115.

> I've been observing you [Crowley] the last several years and
> you're the woman I want to spend the rest of my life with.  Will
> you marry me?[37]

Crowley hesitated at first and explained that she was separated from her husband (George Crowley), but not yet divorced.  She indicated that she planned to get a divorce when she had enough money to go through the process.  Not taking "no" for an answer, the Debtor asked Crowley if she would marry him if he paid for the divorce.  Crowley said "Yes" and they hugged.[38]

It was an unconventional and surprising proposal to say the least.  But the Debtor made Crowley feel "like Cinderella."[39]  The Debtor promised to take care of Crowley financially and otherwise.  Crowley was attracted to the Debtor because he could take care of her and also because he was "such a gentleman."[40]  Reversing the typical sequence, they really got to know each other after they agreed to marry.  Over the next weeks, they spent their lunches and evenings together and talked about their lives and future plans together.

Crowley committed that she would take care of the Debtor (who was 83 years old at the time) "physically and emotionally and spiritually" to the best of her ability.[41]  She promised that the Debtor would never have to go to a nursing home, which was a very important commitment for him.  She told him that she would "love and obey" him.[42]  The Debtor stated to Crowley that he wanted to "start our marriage off level" by paying off her debts for credit cards, her car, and her home so that they could live stress-free and "could go through this part of our life just enjoying each other."[43]  He also asked her to stop working so that she could be with him.  She agreed.

Since Crowley had a comfortable home already (with a large backyard and pool), they agreed that the Debtor would pay off the mortgage for the Real Property as a gift and he would move into Crowley's house.  The Debtor thought that would also make financial sense since he would no longer have to pay rent at Parkplace, which was more than $8,000 per month.  And Crowley would have the security of owning the Real Property.[44]  According to Crowley, the Debtor did not want to own any part of the Real Property.  "He wanted it [the Real Property] to be for [her] entirely."[45]

During the late spring and summer of 2011 and thereafter, the Debtor continually expressed his love for Crowley — privately and publicly.  And, she reciprocated.[46]  The

---

| 37 | Trans. III at 156. |
|----|----|
| 38 | Trans. III at 156-57. |
| 39 | Trans. III at 157. |
| 40 | Trans. III at 158. |
| 41 | Trans. III at 160-61. |
| 42 | Trans. III at 161. |
| 43 | Trans. III at 163. |
| 44 | Trans. III at 164-65. |
| 45 | Trans. III at 165. |
| 46 | Trans. III at 177-78. |

Debtor was completely taken with Crowley.  After announcing his intention to marry Crowley, the Debtor explained to his children that he was "head over heels in love [with Crowley] and he had found the woman of his dreams."[47]  He thought his relationship with Crowley was "incredibly beautiful and special and lovely."[48]  The Debtor told Hy Blair that Crowley "was a gorgeous thing that had been sent to him from on high."[49]  Hy Blair observed that his father "gushed like a schoolboy" over his relationship with Crowley.[50]  And, the closeness of the relationship between the Debtor and Crowley was repeatedly confirmed by multiple witnesses including Karen Hart[51] and Esther Larue.[52]  The evidence demonstrates that the Debtor was very much in love with, and even infatuated with, Crowley.

Perhaps not surprisingly given the depth of his feelings for Crowley, the Debtor made no secret that he intended to financially support Crowley and "to help her as much as he could."[53]  The Debtor told Hy Blair that he was going to leave Crowley financial assets (including a personal trading account and IRA) as well as pay off her house.[54]  Over time, the Debtor repeatedly reiterated his intention to support Crowley financially.[55]

In August 2011, Crowley moved into the Debtor's apartment at Parkplace on a temporary basis while they remodeled Crowley's house to better accommodate the Debtor.[56]  The Debtor married Crowley on September 14, 2011.[57]  After they married, and the remodeling work was completed, the Debtor moved into Crowley's house in January 2012.  But it was not to be all happily ever after for the Debtor.

**D.**     **The Reaction of the Debtor's Children and the Intervention.**

Shortly after the Debtor's unconventional proposal to Crowley, he announced the engagement to his children.  They were not pleased.  There were no "congratulations" or "well wishes."  Instead, the Debtor's children rejected Crowley almost from the get-go.[58]  After they were informed that the Debtor intended to support Crowley financially, their opposition intensified.  About a month after the Debtor made his announcement, Hy Blair wrote a letter to the Debtor explaining his opposition to the Debtor's relationship with Crowley based on a perceived need to "protect" the Debtor.[59]  A while later, Hy Blair accused his father, the Debtor, of being "under mental disability and/or undue influence or

---

47       Trans. II 145-46.
48       Trans. II at 146.
49       Trans. II at 144.
50       Trans. II at 142.
51       Trans. III at 45-46 ("I observed a loving couple . . . .  [The Debtor] loved Sue so much.")
52       Trans. III at 55 ("they [the Debtor and Crowley] were . . . very generous, very sweet, as a couple"; "They were very doting with each other"; "Peter [the Debtor] said he was very proud to have Sue.  He never thought he'd have a wife like her.  He was very generous with . . . her.")
53       Trans. II at 144.
54       Trans. II at 147.
55       Trans. II at 154.
56       Trans. II at 78.; Trans. III at 192.
57       Stip. Fact No. 5.
58       Trans. I at 200-01.
59       Ex. C.

duress."[60]  Hy Blair identified the alleged "undue influence" as "newly introduced non-family individuals who have already taken financial advantage of his impairment."[61]  The Court received no evidence whatsoever suggesting that the Debtor was "under mental disability and/or undue influence or duress" in 2011 or 2012.  The Court concludes from the evidence that the Debtor's children (especially Hy Blair) were concerned about their father and the unconventional engagement to Crowley — but even more concerned about the potential diminishment of their own inheritance from their father.  Whatever would be given to Crowley would not be available for them.

So, in the spring of 2011, Hy Blair started to pursue a "full-on investigation" of the Debtor and Crowley in order to stop the marriage.[62]  The investigation was extremely intrusive.  For example, Hy Blair contacted Crowley's former employers, a former husband, and even high school classmates.[63]  He also communicated with the Debtor's long-time friends trying to convince them to intercede.  It was all very offensive to the Debtor.

Within a month of the Debtor announcing his intention to marry and support Crowley, his children invited him on a family vacation to Hawaii.  But it was not a typical vacation.  Instead, the Debtor's family staged a surprise multi-day "intervention" with the Debtor in an effort convince him that "[i]t was a big mistake" to marry Crowley.[64]  The intervention was not well-received.  The Debtor was angry with the gambit and he remained committed to Crowley.

## E.    The May 2011 Meeting, Demands, and Settlement.

The intervention having failed, the Debtor's children (led by Hy Blair) took another tack in an attempt to protect their own interests.  The Debtor's family staged another meeting with him on May 11, 2011 in Stamford, Connecticut at the offices of the Blair & Potts law firm (the "May 2011 Meeting").  The Debtor, his three children, and Nancy Blair (an attorney at Blair & Potts) attended.  Hy Blair surprised the Debtor at the meeting by accusing the Debtor of having improperly transferred money to himself from the ARB Trust.[65]  The Debtor denied it.  But, based upon such assertion, the Debtor's children requested that the Debtor immediately: (1) transfer $4.5 million from his revocable trust back to the ARB Trust; (2) transfer a house in San Luis Obispo, California to Christopher Blair; (3) repay some other small amounts to the ARB Trust; and (4) resign as co-trustee of the ARB Trust.[66]  The Debtor was apoplectic.  However, he ultimately agreed to all of such demands and complied so as to avoid any dispute with his children.[67]

---

[60]    Ex. E.
[61]    Ex. E.
[62]    Trans. II at 148.
[63]    Trans. II at 148.
[64]    Trans. I at 200.
[65]    Trans. I at 202-03.
[66]    Trans. II at 156-58.
[67]    Trans. I at 203.

The Chapter 7 Trustee contends that there was another important demand made at the May 2011 Meeting: a claim by the ARB Trust against the Debtor for an additional $1.1 million[68] for alleged malfeasance based on other withdrawals from the ARB Trust orchestrated by the Debtor.  The Chapter 7 Trustee relied exclusively on the testimony of Hy Blair.  On direct examination, Hy Blair testified:

> There was [sic] innumerable transfers out of the ARB Trusts, amounting to $1.1 million that were transferred to people that weren't entitled to that money under the ARB trusts.  We asked him [the Debtor] to return all of that [at the May 11, 2011 meeting].  He refused to do it.[69]

The Court discounts Hy Blair's testimony on this crucial point.  Throughout the trial, Hy Blair demonstrated his extreme animus — even blind hatred — toward Crowley and counsel for the Defendants.  His testimony seemed colored by his admitted self-interest: Hy Blair, his siblings, and the ARB Trust stand to receive about ninety-five percent (95%) of any net recovery from Crowley and her business in this Adversary Proceeding.  But, most importantly, the Court concludes that Hy Blair's testimony on this issue and many other issues lacks credibility because of repeated inconsistencies, contradictions, failures of recollection (when cross-examined during his deposition and at trial), and lack of corroboration.

When cross-examined about the May 2011 Meeting, Hy Blair admitted that the Debtor "did or agreed to do everything that you [Hy Blair] asked of him in Connecticut."[70] There was, at first, no mention of a claim for another $1.1 million that the Debtor refused. But just minutes after confirming that the Debtor has done "everything that [Hy Blair] asked of him," Hy Blair backtracked and testified to the exact opposite.[71]  His explanation for the contradictory testimony was: "I might have misspoken."[72]  Defendant's counsel sought to impeach by use of Hy Blair's deposition testimony.  During his deposition, Hy

---

[68]     Inconsistently, both the Chapter 7 Trustee and Hy Blair sometimes referred to a "$1.4 million" claim instead of a "$1.1 million" claim.  Although there was no certainty about the specific amount, it is clear that the Chapter 7 Trustee and Hy Blair were trying to refer to the same basic claim.

[69]     Trans. I at 204.

[70]     Trans. II at 156.  In his testimony, Hy Blair attempted to also assert an exception but then acknowledged that the exception did not occur.  The specific testimony was:

> Q.  And it's true, isn't it, that Peter did or agreed to do everything you asked of him in Connecticut?
>      A.  Except not payoff Suella's house with money from the trust. That would be the exception.  Yes.
> Q.  Well, he never paid off Suella's house with money from the trust did he?
>      A.      No, he didn't.

Trans. II at 156.

[71]     Trans. II at 157.

[72]     Trans. II at 157-58.

Blair was asked to identify what funds he had demanded from the Debtor at the May 2011 Meeting other than the $4.5 million. Hy Blair asserted that he demanded "[w]hatever other monies he [the Debtor] owed us" but then admitted that "[w]e just didn't know about them. I just didn't find out about them until later."[73] In the portion of his deposition testimony used for impeachment at trial, Hy Blair never mentioned a demand for an additional $1.1 million. On re-direct examination, Hy Blair's story changed yet again with respect to the May 2011 Meeting. This time, he was asked: "But you specifically made an agreement with your father [the Debtor] at that May meeting that he return about $1.4 million, correct?" Hy Blair's answer was unequivocal: "Correct."[74]

So, during his trial testimony Hy Blair testified inconsistently that during the May 2011 Meeting: (1) he had demanded that the Debtor return $1.1 million but the Debtor refused; (2) the Debtor did everything he requested (without any reference to an exception for the $1.1 million demand); (3) he demanded the Debtor return some unspecified amount of money since he did not find out a specific dollar amount until later; and (4) he demanded that the Debtor return $1.4 million (not $1.1 million) and the Debtor agreed. Harmonizing these accounts is impossible. At best, Hy Blair's testimony is an utterly contradictory mess. And, it wasn't only on this issue. Hy Blair repeatedly contradicted himself throughout the trial and testified differently in his deposition testimony.[75] The Court finds that Hy Blair, as a witness, fundamentally lacked credibility.

Given the inconsistencies in Hy Blair's testimony, the Court has evaluated other evidence that might corroborate or contradict Hy Blair's story. None of the other participants in the May 2011 meeting testified. So, the Court is left to consider written records. A month and a half after the meeting, on July 1, 2011, Hy Blair wrote two lengthy letters to the Debtor.[76] In the first letter, Hy Blair explained, in very terse terms, his new requirements for distributions to the Debtor from the ARB Trust.[77] The lengthy correspondence makes no reference to any demand against the Debtor that was unfulfilled nor any suggestion that the Debtor was obligated to return $1.1 million or any other amount to the ARB Trust.[78] The second July 1, 2011 letter is somewhat more personal and constitutes, in the main, a lengthy accusation that the Debtor "abandon[ed] [his] family for another related set of people [Crowley]" to the financial detriment of Hy Blair and his siblings. With respect to the May 2011 Meeting in Connecticut, Hy Blair stated only the following:

> First, I want to congratulate you and thank you for attending
> the meeting with Nancy Blair on May 11, 2011 in Stamford,
> CT. Chris, Audie and I will be forever grateful to you for

---

[73]     Trans. II at 161-62.
[74]     Trans. II at 219
[75]     The trial transcript is replete with Hy Blair's inconsistent testimony. As another example, Hy Blair initially testified that he prepared Exhibit 21. Trans. I at 216. Then, on *voir dire* examination he changed his account to: "I have made imports and transfers like this [Exhibit 21] in the past. I don't know whether this is the same one or not. I will stand by that." Trans. I at 230. And, then Hy Blair testified that Exhibit 21 was "inaccurate." Trans I. at 230.
[76]     Ex. 25 and F.
[77]     Ex. 25.
[78]     Ex. 25.

> recognizing the importance of maintaining Mom's trust as
> separate property from your estate and for voluntarily
> resigning as trustee of Mom's trusts.  Additionally, we are very
> grateful that you returned the $4.2 million improperly
> transferred to your personal revocable trust from Mom's
> revocable trust.  You are a total gentleman and a loving father
> to recognize the importance of these acts to us.[79]

In other words, Hy Blair made no suggestion in his correspondence that he had demanded $1.1 million or some other amount from the Debtor which the Debtor refused to pay.  Instead, the tenor of the correspondence suggests that the Debtor did everything that was asked of him at the May 2011 Meeting: returning $4.2 million[80] of transfers and resigning as trustee of the ARB Trust.  In the balance of the letter, Hy Blair describes in detail a series of other interactions with the Debtor in May and June 2011.  Again, there was no intimation whatsoever that Hy Blair or the ARB Trust had made any additional demand or claim against the Debtor.[81]

Hy Blair wrote numerous other letters to the Debtor throughout the rest of the summer of 2011 and the ensuing months.[82]  However, Hy Blair never mentioned that either he or the ARB Trust had demanded that the Debtor pay $1.1 million or some other amount to the ARB Trust.  Given the character and detail of the communications, the Court is convinced that had such demand actually been made, it would have featured quite prominently in such letters.  Put another way, the absence of any reference in Hy Blair's correspondence to any demand for reimbursement of $1.1 million from the Debtor suggests that no such claim was made at the May 2011 Meeting.

Further, the Debtor never acknowledged any such claim from the ARB Trust.  In fact, the Debtor's own correspondence indicates that no additional demand for $1.1 million had been made by Hy Blair and refused at the May 2011 Meeting.  For example, on March 9, 2012, the Debtor wrote an emotional letter to his son, Hy Blair chronicling the breakdown of their relationship:

> It is with disgust and sadness that I write to you this day.
> From the moment you heard about my love for Sue you have
> conspired to prevent our marriage orchestrating the

---

[79]     Ex. F at 1.
[80]     Hy Blair's testimony at trial referred to return of $4.5 million, not $4.2 million.  The Court is unable to reconcile the discrepancy.
[81]     Ex. F.
[82]     Ex. Y (July 8, 2011 letter from Debtor to Hy Blair); Ex. Z (August 24, 2011 e-mail exchange between Debtor and Hy Blair); Ex. I (November 8, 2011 letter from Hy Blair to Debtor); Ex. J (November 10, 2011 letter from Hy Blair to Debtor); Ex. K (March 9, 2012 letter from Debtor to Hy Blair); M (September 19, 2012 letter from Hy Blair to Debtor).

intervention in Hawaii and stooping to the level of hiring private
detectives to pry into all of her family affairs.

You deliberately planned and executed a meeting with Nancy
Blair for the ex[p]ress purpose of getting me to turn over all of
my rightful inheritance from Audrey to you and your siblings.
In the mistaken belief that, being as generous as I could to you
all I could win your approval of Sue, I went along with it. None
of you ever made any gesture in that direction.

. . . .

I find it almost impossible to believe that you could have been
so disrespectful of me as your father, so uncaring about how I
wished to spend the rest of my life, so unjustifiably
disapproving of the woman I love.[83]

It is apparent from the correspondence that the Debtor believed he had generously
acceded to all of Hy Blair's requests at the May 2011 Meeting in order to buy peace and
to "win approval" of Crowley.  That is why he "went along with it."

Other testimony establishes that the Debtor believed that he had resolved
everything at the May 2011 Meeting.  For example, Karen Hart, a non-party witness,
testified that the Debtor had told her that he thought he had "settled with his children and
that he could just enjoy his life with Sue and get on with that."[84]  Similarly, Ester Larue,
another non-party witness, confirmed that the Debtor told her that he believed he had
"settled" disputes with his children and "thought he had everything handled to the
satisfaction that he would have the freedom to do what he wanted to do.  He felt like he
had kind of a clean slate . . . ."[85]  Also, the Debtor explained to her that he  "regretted"
settling because he no longer had any leverage.[86]  The Debtor also told Crowley's son,
Todd Searles that the Debtor had "appeased" his children in the spring or summer of
2011 by giving back funds "even though [the Debtor] didn't believe there was any
justification for it."[87]  Searles testified that the Debtor "was merely trying to make peace
with the family.  He wanted to be married.  He wanted to be in love.  He didn't want to
have this [family dispute] as part of his life."[88]  Crowley also confirmed the same: that the
Debtor told her that he had satisfied his children at the May 2011 Meeting by returning "in

---

[83]     Ex. K at 1-2.  The text of the letter was written entirely in capital letters for emphasis.
[84]     Trans. III at 49.
[85]     Trans. III at 57.
[86]     Trans. III at 57.
[87]     Trans. III at 121-22.
[88]     Trans. III at 122.

the neighborhood of $4 some million dollars" and transferring a house to Christopher Blair.[89]

Based upon the foregoing, including the contradictory nature of Hy Blair's testimony, the available documentary evidence (*i.e.,* letters from both the Debtor and Hy Blair), and the testimony from multiple witnesses (Crowley, Todd Searles, Karen Hart, and Ester Larue), the Court finds that neither Hy Blair nor the ARB Trust made a demand to the Debtor for an additional $1.1 million (or $1.4 million) at the May 2011 Meeting. Instead, the Debtor's children requested that the Debtor: (1) transfer $4.5 million from his revocable trust back to the ARB Trust; (2) transfer a house in San Luis Obispo, California to Christopher Blair; (3) repay some other small amounts to the ARB Trust; and (4) resign as co-trustee of the ARB Trust. And, the Debtor satisfied all these requests. The Court finds that the Debtor was not on notice at any time between May 2011 and January 2012 that Hy Blair and the ARB Trust demanded anything more. The Debtor genuinely believed that he had settled with his children and the ARB Trust at the May 2011 Meeting. Three months later he married Crowley. There was no evidence introduced at trial that the Debtor's children attended the nuptials.

## F.   **The Allegedly Fraudulent Transfers**.

### 1.   **The Cash Transfers to Crowley**.

After the May 2011 Meeting but before he married Crowley, the Debtor made a series of fairly modest transfers to Crowley — totaling just a little more than the Debtor paid for monthly rent to Parkplace. The Debtor transferred a total of $10,704.05 to Crowley by checks during the period from June 6, 2011 through August 30, 2011. The proven Cash Transfers are as follows:

| Check Date | Honored Date | Transfer Amount |
|---|---|---|
| 06/06/2011 | 06/06/2011 | $ 1,020.00 |
| 06/23/2011 | 06/23/2011 | $ 2,540.95 |
| 06/23/2011 | 06/23/2011 | $ 2,500.00 |
| 07/09/2011 | 07/11/2011 | $    300.00 |
| 08/05/2011 | 08/08/2011 | $ 2,500.00 |
| 08/20/2011 | 08/23/2011 | $    360.00 |
| 08/29/2011 | 08/30/2011 | $ 1,484.00 |
| | Total: | $10,704.95[90] |

Each of the checks was signed by the Debtor and drawn on the Debtor's bank account at Citywide Banks (Account No. XXX 8916). A few of the checks bear additional descriptions such as "Cash" and "Personal." Notably, the dollar amount does not match

---

[89]   Trans. III at 176-77.
[90]   Ex. 41, 45, 46, 49, 56, 60, and 63.

the Amended Complaint.  In the Amended Complaint, the Chapter 7 Trustee asserted that the Debtor gave Crowley cash of "at least $8,144.00" in alleged fraudulent transfers.[91] And, in closing argument, the Chapter 7 Trustee asserted that there were $10,684.95 in transfers.  Although the multiple discrepancies were never explained, the Court accepts that the Chapter 7 Trustee proved a total of $10,704.95 in transfers from the Debtor to Crowley.   And, at trial, Crowley acknowledged that she cashed the checks and received the Cash Transfers.

Crowley testified that the Cash Transfers were "gifts" and that the Debtor was "very generous."[92]  She conceded that she did not provide any economic value to the Debtor in return for the Cash Transfer gifts.[93]  However, she reiterated throughout the trial that she provided her "love and affection" to the Debtor during their relationship as an engaged couple.  The Court finds that the Cash Transfers were gifts by the Debtor to his fiancé for which Crowley provided no economic value.

## 2.    The Business Transfers to First Class.

The Debtor transferred a total of $57,733.81 to First Class by checks during the same time period from June 6, 2011 through August 30, 2011.  The Debtor was never an employee of First Class and never managed the entity.  He was not an officer, director, or equity security holder of First Class.[94]  Instead, Crowley managed and controlled First Class.  The proven Business Transfers to First Class are as follows:

| Check Date | Honored Date | Transfer Amount |
|---|---|---|
| 06/06/2011 | 06/06/2011 | $11,800.00 |
| 06/14/2011 | 06/14/2011 | $ 2,036.00 |
| 07/01/2011 | 07/01/2011 | $18,372.24 |
| 07/20/2011 | 07/21/2011 | $ 3,000.00 |
| 07/21/2011 | 07/22/2011 | $ 1,000.00 |
| 08/05/2011 | 08/08/2011 | $ 2,500.00 |
| 08/16/2011 | 08/16/2011 | $ 3,000.00 |
| 08/17/2011 | 08/17/2011 | $ 1,972.12 |
| 08/22/2011 | 08/23/2011 | $14,053.45 |
| | Total: | $57,733.81[95] |

Each of the checks was signed by the Debtor and drawn on the Debtor's bank account at Citywide Banks (Account No. XXX 8916).  A few of the checks bear additional descriptions such as "Business Consulting," "Consulting," "Plumbing," and "All American, Nordstroms, Kendra."  Again, the dollar amount does not match the Amended Complaint. In the Amended Complaint, the Chapter 7 Trustee asserted the Debtor made alleged

---

[91]    Am. Compl. ¶ 42.
[92]    Trans. I at 76.
[93]    Trans. I at 76-80.
[94]    Trans. I at 66-67.
[95]    See Ex. 40, 43, 47, 53, 54, 55, 57, 59, and 61.

fraudulent transfers to Crowley through First Class Printing in an amount of "not less than $55,761.99."[96]  Although the discrepancy was never explained, the Court accepts that the Chapter 7 Trustee proved a total of $57,733.81 in transfers from the Debtor to First Class.

Crowley conceded in her testimony that First Class did not provide any material economic value to the Debtor in return for the Business Transfers.[97]  First Class, through Crowley, used the Business Transfers to pay for costs incurred by First Class.[98]  Crowley characterized the Business Transfers as gifts from the Debtor relating again to Crowley's "love and affection."[99]  The Court finds that the Cash Transfers were gifts by the Debtor to his fiancé's company, First Class, for which neither First Class nor Crowley provided any economic value.

## G.     The Mortgage Payoff Transfers.

The Chapter 7 Trustee does not allege that the Mortgage Payoff Transfers were fraudulent under the CUFTA.  But the Chapter 7 Trustee contends that the Debtor's payments on the Real Property entitle the Chapter 7 Trustee to half of the Real Property.  The evidence established that Crowley owned the Real Property for the last 21 years and is "the only person that's ever been on title [to the Real Property]."[100]  The Debtor was never obligated — as a borrower or guarantor —on the note and mortgage associated with the Real Property.[101]  The Debtor did not take title to the Real Property.[102]

The Debtor transferred a total of $356,052.05 — by check and wire transfer — to pay off the mortgage on the Real Property owned by Crowley before the Debtor moved in.  The proven transfers by check are as follows:

---

| 96  | Am. Compl. ¶¶ 44, 83 and 94. |
| 97  | Trans. I at 91-104. |
| 98  | Trans. I at 93. |
| 99  | Trans. I at 98-104. |
| 100 | Trans. I at 64. |
| 101 | Stip. Fact No. 6. |
| 102 | Stip. Fact No. 7. |

| Check Date | Honored Date | Transfer Amount | Payee |
|---|---|---|---|
| 06/03/2011 | 06/07/2011 | $ 2,540.95 | Litton Loan Servicing LP |
| 07/19/2011 | 07/26/2011 | $ 2,540.95 | Litton Loan Servicing LP |
| 08/22/2011 | 08/30/2011 | $ 2,540.95 | Litton Loan Servicing LP |
| 09/29/2011 | 10/06/2011 | $ 3,398.13 | Ocwen[103] |
| 11/12/2011 | 11/17/2011 | $ 2,540.95 | Ocwen |
| 12/05/2011 | 12/13/2011 | $ 2,540.95 | Ocwen |

Total:    $16,102.88[104]

Each of the checks was signed by the Debtor and drawn on the Debtor's bank account at Citywide Banks (Account No. XXX 8916). A few of the checks bear additional descriptions such as "Payment" and "Suella Crowley." The Court accepts that the Chapter 7 Trustee proved a total of $16,102.88 in transfers by check from the Debtor to Crowley's mortgage lenders from June through December 2011. In her testimony, Crowley conceded that the transfers were for her benefit as the owner of the Real Property.[105]

In addition to such transfers, the Chapter 7 Trustee also established that the Debtor paid Ocwen Loan Servicing LLC $339,949.17 by wire transfer from the Debtor's bank account at Citywide Banks (Account No. XXX 8916) on January 19, 2012.[106] Following the transfers for payoff of the mortgage, Crowley did not provide the Debtor with any sort of interest in the Real Property by deed or otherwise.[107] However, the Debtor moved into the Real Property and lived there together with Crowley — for about 43 months — from January 2012 until the Debtor's death in July 2015.[108] As a result of changing his living arrangement, the Debtor saved monthly rent for his apartment at Parkplace. Further, he did not pay any rent to Crowley for living at the Real Property.

## H.    The Probate Case and Probate Judgment.

After the Cash Transfers, Business Transfers, and Mortgage Payoff Transfers, Hy Blair and the Debtor's children continued to investigate the Debtor and his historical performance as co-trustee of the ARB Trust. Hy Blair testified that he didn't "get a handle on everything until late 2012."[109] In October 2012, Hy Blair presented the Debtor with an "interim accounting" and "requested the money that was outlined in the accounting as being missing or improperly distributed."[110] Based on the evidence at trial, that was the first time since the May 2011 Meeting that the ARB Trust had demanded any additional

---

[103]    It appears that the servicer for the mortgage on the Real Property changed from Litton Loan Servicing LP to Ocwen as of September 2011. The checks do not use Ocwen's full corporate name.
[104]    See Ex. 42, 51, 62, 65, 66 and 67; see also Trans. I at 81-87.
[105]    Trans. I at 81-88.
[106]    Ex. 38; Trans. I at 88.
[107]    Trans. I at 90-91.
[108]    Trans. I at 106.
[109]    Trans. I at 195.
[110]    Trans. I at 205.

compensation from the Debtor.  The Debtor declined.  He contended that he had never done anything wrong when he was co-trustee of the ARB Trust.

So, on November 6, 2012, Hy Blair (on behalf of the ARB Trust) filed a "Petition for Accounting and Surcharge of Former Trustee Peter H. Blair, Sr." commencing the Probate Case against the Debtor.[111]  The Probate Case proceeded to trial some years later.  On March 27, 2015, the Probate Court entered Judgment against the Debtor and held him liable for a total of $2,372,688.29 in damages for breach of fiduciary and trust duties.[112]  Immediately thereafter, on the motion of the ARB Trust, the Probate Court froze all the Debtor's assets including those of BOI. The Probate Judgment against the Debtor and the order freezing his assets drove him into bankruptcy.  He died shortly afterward.  But the contentious dispute still lived on in the Bankruptcy Court and other fora.

**I.    The Composition of the Creditor Pool in the Bankruptcy Case.**

According to the Claims Register, the following creditors filed claims against the Debtor's bankruptcy estate:[113]

| Claim No. | Claimant | Claim Amount |
|---|---|---|
| No. 1 | IRS | $ 0.00 |
| No. 2 | Capital One Bank | $ 2,492.70 |
| No. 3 | Audrey (Blair) Black | $ 194,526.05 |
| No. 4 | Hy Blair | $ 517,459.00[114] |
| No. 5 | ARB Trust | $3,464,699.00 |
| No. 6 | UST | $ 975.54 |
| No. 7 | Blair Probate Estate | $ 0.00 |
| No. 8 | Suella Crowley | $ 210,587.76 |
| No. 9 | Portfolio Recovery Assoc. | $ 757.88 |
|  | Total: | $4,391,497.93 |

So, the claims of the Debtor's children and the ARB Trust (in which they are the beneficiaries) make up ninety-five percent (95%) of the entire creditor pool.  Crowley's claim constitutes almost five percent (5%) of the remaining creditor pool.  All the other claims are nominal, thus suggesting that the Debtor generally paid his creditors during his lifetime.[115]  Accordingly, the Adversary Proceeding is essentially a two-party dispute between the Debtor's children (albeit through the Chapter 7 Trustee) and Crowley.

---

[111]    Stip. Fact No. 8; Trans. I at 205.
[112]    Stip. Fact No. 9.
[113]    Ex. EEE; *see also* Trans. I at 39.
[114]    Ex. DDD.
[115]    Trans. I at 44.

**J.     The Debtor's Financial Condition During the Summer of 2011.**

In connection with his claims under the CUFTA, the Chapter 7 Trustee sought to establish that the Debtor was insolvent (or became insolvent) when the Cash Transfers and Business Transfers were made.  COLO. REV. STAT. §§ 38-8-103 and 105(1)(b); *see also Blair*, 588 B.R. at 609 ("The Debtor's financial position . . . at the time of the allegedly fraudulent transfers is a central issue in this Adversary Proceeding.")  The Chapter 7 Trustee attempted to prove the Debtor's insolvency, at least in part, through use of expert testimony from an accountant, Mark Dennis.  However, as previously noted, the Court excluded Mark Dennis as an expert witness primarily because he did not have adequate information or data and he failed to properly apply a reliable methodology to the facts and data.  *Blair*, 588 B.R. at 616-25.  Thus, the Chapter 7 Trustee proceeded to trial without any expert testimony.

Nevertheless, the Chapter 7 Trustee and the Defendants presented some evidence concerning the Debtor's financial condition during the summer and fall of 2011.  The evidence was quite incomplete and limited.[116]

**1.     The Debtor's Assets During the Period.**

The Chapter 7 Trustee and the Defendants introduced admissible evidence concerning only three categories of the Debtor's assets: (1) bank accounts; (2) IRA accounts; and (3) ownership of BOI.  No witness testified that these were all of the Debtor's assets as of the summer of 2011.

**a.     The Debtor's Bank Accounts.**

During the period in which the Debtor made the allegedly fraudulent transfers, the Debtor had substantial assets in a combination of three financial institution accounts: UBS Account No. XXXX3623[117] ("UBS No. 3623"); Well Fargo Account No. XXX3363 ("WF No. 3363"); and Citywide Banks Account No. XXX8916 ("CW No. 8916").  The evidence

---

[116]     The Court sustained many evidentiary objections to exhibits proffered by the Chapter 7 Trustee.
[117]     For financial accounts, the Court lists the financial institution and identifies the account by the designator "XXXX" (to signify that certain digits have been redacted) and the last four digits of the account number.

established that the Debtor had "ending balances," "closing balances" or "cost basis totals" in such accounts as follows for the period from May 2011 through January 2012:

| Month | UBS No. 3623[118] | WF No. 3363[119] | CW No. 8916[120] | Total |
|-------|-------------------|------------------|------------------|-------|
| May 2011 | $662,914.29 | $ 56,650.07 | Account not open. | $719,564.36[121] |
| June 2011 | $694,336.43 | $     501.00 | $ 20,741.21 | $715,578.64[122] |
| July 2011 | $687,674.73 | $     276.21 | $ 30,167.36 | $718,118.30[123] |
| Aug. 2011 | $659,017.78 | $     624.78 | $ 21,656.27 | $681,298.83[124] |
| Sept. 2011 | $635,565.42 | $   1,013.35 | $313,000.57 | $949,579.34 |
| Oct. 2011 | $633,704.20 | $   1,361.92 | $255,948.98 | $891,015.10 |
| Nov. 2011 | $633,079.98 | $   1,710.49 | $225,903.33 | $860,693.80 |
| Dec. 2011 | $640,393.96 | $   2,059.06 | $138,272.60 | $780,725.62 |
| Jan. 2012 | (No evidence) | $   2,417.59 | $102,138.03 | (Incomplete evidence) |

Accordingly, the Court finds that the Debtor had very substantial cash assets in the three financial institution accounts as shown on the preceding chart prepared by the Court based upon the account statements. As of the end of May 2011, the Debtor had at least $719,564.36 in the three financial institution accounts. By the end of December 2011, the Debtor had even more in such accounts than he had started with: $780,725.62. And, because the Defendants advocated for use of a "cost basis" for UBS No. 3623, the fair market value of the Debtor's bank accounts actually was materially higher.

### b.   The Debtor's IRA Accounts.

In addition to the Debtor's bank accounts, the Debtor also held substantial additional assets in four Individual Retirement Accounts at UBS:  UBS IRA Account No.

---

[118]    Ex. O-4 at 1-99.  For the amounts in UBS No. 3623, the Defendants proposed that the Court consider only the "cost basis."  *See* Ex. P and Q prepared as summaries by Heidi Mourning.  The Court received no explanation from the Defendants why the "cost basis" should be used as a value for UBS No. 3623 rather than the fair market value listed in the account statements.  The fair market values are significantly higher than the "cost basis" values.  For example, the closing fair market value of UBS No. 3623 for June 2011 was $841,370.89 as compared to a "cost basis" value of only $694,336.43.  *See* Ex. O-4 at 83-87.  Although the Court is uncertain why the Defendants advocated for the lower "cost basis" value (which would seem to be contrary to their interests in this Adversary Proceeding), the Court nevertheless accepts the Defendants' position.  Thus, all the amounts listed by the Court for UBS No. 3623 are for the lower "cost basis" value only.  The use of the "cost basis" value substantially decreases the actual fair market value of Debtor's financial institution accounts.

[119]    Ex. O-1 at 20-56.

[120]    Ex. O-2 at 1-8; Ex. O-3 at 8-21.  The Debtor opened CW No. 8916 on June 2, 2011.  Thus, there was no closing account balance for May 2011.

[121]    This amount is consistent with the summaries prepared by Heidi Mourning and introduced into evidence as Ex. P and Q.

[122]    This amount is consistent with the summaries prepared by Heidi Mourning and introduced into evidence as Ex. P and Q.

[123]    This amount is slightly different than the summaries prepared by Heidi Mourning and introduced into evidence as Ex. P and Q.  The discrepancy appears to be that Heidi Mourning failed to include the small balance in the WF No. 3363 account for July 2011.

[124]    This amount is slightly different that the summaries prepared by Heidi Mourning and introduced into evidence as Ex. P and Q.  The discrepancy appears to be that Heidi Mourning failed to include the small balance in the WF No. 3363 account for August 2011.

XXXX3633 ("IRA No. 1"); UBS IRA Account No. XXXX3627 ("IRA No. 2"); UBS IRA Account No. XXX3624 ("IRA No. 3"); and UBS IRA Account No. XXX5364 ("IRA No. 4"). The Defendants presented summaries of the "IRA fair market value" prepared by Heidi Mourning.  Ex. P and Q.  The Court carefully reviewed Exhibits P and Q and then compared such summaries to the underlying account statements for IRA Nos. 1, 2, 3, and 4.  Regrettably, the Court concludes that Exhibits P and Q are so replete with errors that they are virtually worthless for assessing the value of IRA Nos. 1, 2, 3, and 4.

For example, Exhibits P and Q both state that the aggregate "fair market value" or "monthly account balances" of IRA Nos. 1, 2, 3, and 4 was as follows:

| Month | Aggregate Balance |
| --- | --- |
| January 2011: | $5,859,681.42 |
| February 2011: | $6,029,966.69 |
| March 2011: | $5,859,681.42 |
| April 2011: | $6,029,966.69 |
| May 2011: | $5,859,681.42 |
| June 2011: | $6,029,966.69 |
| July 2011: | $5,859,681.42 |
| August 2011: | $6,029,966.69 |

The anomaly is apparent after scanning the numbers for just a moment.  Heidi Mourning's summaries assert that the total "fair market value" of IRA Nos. 1, 2, 3 and 4 was $5,859,681.42 every odd month and $6,029,966.69 every even month over an eight-month analysis period.  Since the four financial accounts held significant money market balances (generating interest) and equities (generating dividends and subject to daily price fluctuations) is seems wildly improbable that the value of IRA Nos. 1, 2, 3, and 4 could seesaw back and forth between identical numbers for the better part of a year. Perhaps not surprisingly, the underlying account statements (O-5, O-6, O-7, and 0-8) show that the summaries are wrong.  So, the Court disregards Exhibits P and Q.

The Defendants did provide the voluminous underlying account statements for all of IRA Nos. 1, 2, 3, and 4.  Accordingly, the Court has itemized the aggregate fair market

value balances as follows based on the "closing account values" listed on the account statements:

| Month | IRA No. 1[125] | IRA No. 2[126] | IRA No. 3[127] | IRA No. 4[128] | Total |
|-------|------------|------------|------------|------------|-------|
| May 2011 | $1,652,806.61 | $2,228,844.80 | $2,086,337.28 | $121,146.38 | $6,089,135.07 |
| June 2011 | $1,588,891.38 | $2,151,605.80 | $2,013,242.83 | $118,318.23 | $5,872,058.24 |
| July 2011 | $ 774,668.71 | $2,826,344.54 | $1,951,216.89 | $114,375.38 | $5,666,605.52 |
| Aug. 2011 | $ 675,927.86 | $2,582,259.02 | $1,758,208.11 | $103,054.54 | $5,119,449.53 |
| Sept. 2011 | $ 567,969.23 | $2,290,766.92 | $1,511,349.12 | $ 89,867.12 | $4,459,952.39 |
| Oct. 2011 | $ 654,797.34 | $2,628,168.78 | $1,646,277.62 | $104,578.22 | $5,033,821.96 |
| Nov. 2011 | $ 651,244.73 | $2,632,133.22 | $1,648,266.51 | $104,940.89 | $5,036,585.35 |
| Dec. 2011 | $ 614,966.54 | $2,554,424.02 | $1,581,152.17 | $ 0.00 | $4,750,542.73 |
| Jan. 2012 | $ 627,215.54 | $2,624,088.55 | $1,619,363.32 | $ 0.00 | $4,870,667.41 |

###   c.      The Debtor's Ownership of BOI.

The Debtor wholly-owned BOI, an oil and gas company, between June 2011 and January 2012 (*i.e.*, the period of the Cash Transfers, Business Transfers, and Mortgage Payoff Transfers).[129]  With respect to the value of the Debtor's interest in BOI, the evidence presented at trial was quite sketchy and incomplete.  The Chapter 7 Trustee introduced into evidence BOI Profit and Loss Statements for 2010 and 2011.  He also provided a BOI Balance Sheet for 2010.  The BOI Profit and Loss Statement for 2010 shows that BOI had total income of $673,584.97, total expenses of $977,443.85, and (after some minor adjustments) a resulting net loss of $304,252.20.[130]  The BOI Profit and Loss Statement for 2011 states that BOI had total income of $698,959.67, total expenses of $850,946.49, and (after some minor adjustments) a resulting net loss of $155,270.95.[131]  The BOI Balance Sheet for 2010 shows that BOI had "total assets" of $971,318.71 and "total liabilities" of $906,137.18 resulting in "total equity" of $65,181.53.[132]  The BOI Balance Sheet for 2010 also listed "retained earnings of $4,549,757.37.[133]  The BOI Balance Sheet identified assets on a book value basis rather than a fair market value basis.[134]

The Defendants introduced an e-mail from Hy Blair, dated May 24, 2010, that states:  "We have an engineering, computer program that generated [a] $4.8 million value [for BOI] . . . ."[135]  The same e-mail also acknowledged, consistent with the BOI Profit and Loss Statements for 2010 and 2011, that "BOI and its predecessors have generally not

---

| | |
|---|---|
| [125] | Ex. O-7 at 13-116. |
| [126] | Ex. O-6 at 11-114. |
| [127] | Ex. O-5 at 11-114. |
| [128] | Ex. O-8 at 1-88. |
| [129] | Ex. V ("Dad has 100% of the units in BOI."); Ex. Y ("I am the sole owner of [BOI] . . . ."). |
| [130] | Ex. 13; *see also* Trans. I at 165-66 (confirming that BOI did not operate at a profit in 2010). |
| [131] | Ex. 14; *see also* Trans. I at 169 (confirming that BOI did not operate at a profit in 2011). |
| [132] | Ex. 15. |
| [133] | Ex. 15. |
| [134] | Trans. II at 233; Ex. O-1 at 25. |
| [135] | Ex. V at 1. |

made [] money . . . ."[136] The $4.8 million value was not based on "the net of assets and liabilities [of BOI]" and instead was some sort of "cash flow tool."[137]

In terms of other evidence about the value of BOI, Hy Blair confirmed that the Debtor's equity in BOI was about $70,000 on a book value basis as of December 2010.[138] Further, Hy Blair testified that he had tried to sell certain BOI oil and gas assets in 2011 for about $900,000 (the approximate amount of an outstanding loan to BOI); but he was unsuccessful and only received an offer of about $500,000.[139]

## 2.    The Debtor's Liabilities and Payments.

The Court received almost no admissible evidence concerning the Debtor's liabilities during the summer of 2011.[140]  However, both Hy Blair and Crowley confirmed that the Debtor was generally paying his bills during such period.  The Debtor's bank account records during the summer of 2011 do not show any overdrafts or checks returned for insufficient funds.  Instead, the Debtor appears to have been making many regular monthly payments.  For example, the Debtor paid Parkplace in excess of $8,000 per month during the entire period.  He satisfied his membership dues and bills at the Denver Country Club.[141]  He generally contributed more than $3,000 per month to the collection at his church.[142] He made very large estimated payments for his federal and state taxes.[143]  And, he paid all manner of other charges for telephone, cable, life insurance, health insurance, credit cards, country clubs, attorneys, and accountants. There was no evidence that the Debtor's obligations were anything other than current all through the summer of 2011.

## V.    Conclusions of Law.

## A.    The Actual Fraud Claims Under COLO. REV. STAT. § 38-8-105(1)(a):  First and Fifth Claims.

In his First Claim for Relief in the Amended Complaint, the Chapter 7 Trustee asserted that the Cash Transfers are recoverable from Crowley using the Chapter 7 Trustee's "strong arm powers" under 11 U.S.C. § 544 combined with Colorado's "actual fraud" statute: COLO. REV. STAT. § 38-8-105(1)(a).  In his Fifth Claim for Relief, the Chapter 7 Trustee asserted that the Business Transfers are recoverable from First Class

---

[136]     *Id.*

[137]     Trans. II at 134.

[138]     Trans. II at 233; *see also* Ex. 15.

[139]     Trans. II at 232-35,

[140]     The Chapter 7 Trustee contends that the $2,372,688.29 Probate Judgment entered by the Probate Court on March 27, 2015, somehow should be retroactively applied as a liability of the Debtor for the summer of 2011 when the Cash Transfers and Business Transfers were made.  That is a legal argument and does not require further factual finding.

[141]     *See* Ex. O-2 at 13

[142]     *See* Ex. O-2 at 12.

[143]     *See* Ex. O-2 at 14, 39 and 40 ($30,000 payment to the IRS; $8,000 payment to the Colorado Department of Revenue; another $30,000 payment to the IRS).

based upon the same statutes.  Since the statutory framework is the same, the Court analyzes both the causes of action together.

Section 105(1)(a) of the CUFTA states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With *actual intent to hinder, delay, or defraud any creditor* of the debtor . . . .

COLO. REV. STAT. § 38-8-105(1)(a) (emphasis added).

The Colorado statute is virtually identical to the Uniform Fraudulent Transfer Act adopted in most States and very similar to Section 548(a)(1) of the Bankruptcy Code. *See Lewis v. Taylor*, 375 P.3d 1205 (Colo. 2016) ("CUFTA is nearly identical to the Uniform Fraudulent Transfer Act . . . .").  From the historical perspective, the "actual intent to hinder, delay or defraud" text of Section 105(1)(a) of the CUFTA can be traced back centuries to the Statute of Elizabeth in medieval England.  13 Eliz. c. 5 (1570); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 539 (1994) (tracing United States fraudulent transfer law to England).  The Statute of Elizabeth invalidated "covinous and fraudulent" transfers devised with "purpose and intent to delay, hinder or defraud creditors . . . ." 13 Eliz. c. 5.

In legal vernacular, a cause of action for "actual intent to hinder, delay, or defraud" commonly is referred to as a claim for "actual fraud."  *Coder v. Arts*, 213 U.S. 223 (1909) ("This form of expression is familiar to the law of fraudulent conveyances, and was used at the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud . . . ."); *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec., LLC)*, 773 F.3d 411, 416 (2d Cir. 2014) ("actual intent to hinder, delay, or defraud" is "often referred to as 'actual fraud'").

As the plaintiff, the Chapter 7 Trustee bears the burden to prove the Cash Transfers and Business Transfers were fraudulent under the CUFTA.  *Schempp v. Lucre Mgmt. Group, LLC*, 75 P.3d 1157, 1165 (Colo. App. 2003) (*Schempp II*); *Fifth Third Bank v. Morales*, 2017 WL 6492108, at *2 (D. Colo. Dec. 19, 2017).  But, actual intent" can be quite hard to prove.  *Fifth Third Bank*, 2017 WL 6492108, at *2 ("'actual intent' under [CUFTA] is seldom susceptible to direct proof.")  In this case, as in almost all cases alleging actual fraud, there is no direct "smoking gun" evidence that the Debtor had "actual intent to hinder, delay, or defraud any creditor."  For example, he did not announce aloud that he was making the Cash Transfers to Crowley and the Business

Transfers to First Class for the express purpose of hindering, delaying, or defrauding anyone.  And, he did not say such magic words in writing either.

Of course, that is not the end of the analysis.  It is only the starting place.  "Actual fraud" can be established circumstantially.  And Section 105(2) of the CUFTA provides a menu of circumstantial "factors" that the Court may consider and states:

> In determining actual intent under paragraph (a) of subsection (1) of this section, consideration may be given, among other factors, to whether:
>
> (a) The transfer or obligation was to an insider;
>
> (b) The debtor retained possession or control of the property transferred after the transfer;
>
> (c) The transfer or obligation was disclosed or concealed;
>
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (e) The transfer was of substantially all the debtor's assets;
>
> (f) The debtor absconded;
>
> (g) The debtor removed or concealed assets;
>
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The foregoing often are referred to as "badges of fraud."  *Schempp v. Lucre Mgmt. Group, LLC*, 18 P.3d 762, 764 (Colo. App. 2000) (*Schempp I*); *Fifth Third Bank*, 2017 WL 6492108, at *2-3.  Just like the "actual intent to hinder, delay or defraud" language, many of the "badges of fraud" also can be traced back centuries to English law.  *Twyne's Case*

(1601) 76 Eng. Rep. 809; 3 Co. Rep. 80 b (identifying "signs and marks" of fraud and convicting Twyne "of fraud, and he and all the others of a riot").

Notably, Section 105(2) of the CUFTA makes clear that the Court has wide discretion.  The Court "may" consider the listed factors as well as other indicia of actual fraud.  COLO. REV. STAT. § 38-8-105(2).  The list is not exhaustive or exclusive.  *Schempp II*, 75 P.3d at 1162.  Nor is there any requirement that a plaintiff prove every listed badge of fraud.  Instead, "several badges of fraud considered together may infer intent to defraud."  *Id.* at 1161; *Schempp I*, 18 P.3d at 764.  The exercise is holistic, and the Court should consider "all the relevant circumstances" including "indicia negativing and well as those suggesting fraud . . . ."  *Schempp II*, 75 P.3d at 1162 (quoting COLO. REV. STAT. § 38-8-105 cmt. 6).  It is a flexible exercise.  The Court assesses the relevant "badges of fraud" and the general circumstances as follows:

### 1.     Were the Cash Transfers and Business Transfers to an Insider?

Regarding the first "badge of fraud" inquiry, the Cash Transfers were all made to Crowley after she and the Debtor were engaged but before they married.  The Business Transfers were all made to First Class, a business owned and operated by Crowley, during the same time frame.  But, were Crowley and First Class "insiders" of the Debtor?  The answer lies within the definitions used in the CUFTA.

Section 102(8) of the CUFTA contains a definition of the term "insider":

"Insider" *means*:

(a) If the debtor is an individual:

(I)     A *relative* of the debtor or of a general partner of the debtor;
(II)    A partnership in which the debtor is a general partner;
(III)   A general partner in a partnership described [in the proceeding subsection]; or
(IV)   A corporation of which the debtor is a director, officer, or person in control . . . .

COLO. REV. STAT. § 38-8-102(8) (emphasis added).     As noted previously, the CUFTA is based on the model Uniform Fraudulent Transfer Act promulgated by the National Conference of Commissions on Uniform State Laws.  *Lewis*, 375 P.3d 1205.  Section I(7) of the model Uniform Fraudulent Transfer Act defines the term "insider" as follows:

"Insider" *includes*:

(i) If the debtor is an individual:

| | | |
|---|---|---|
| (A) | A *relative* of the debtor or of a general partner of the debtor; | |
| (B) | A partnership in which the debtor is a general partner; | |
| (C) | A general partner in a partnership described [in the preceding subsection]; or | |
| (D) | A corporation of which the debtor is a director, officer, or person in control . . . . | |

The two definitions are nearly identical.  But the Colorado legislature restricted the definition of "insider" under the CUFTA by substituting the word "*means*" in place of the word "*includes.*"

Although the Colorado legislature chose to change only one word (switching the word "includes" to "means"), the change in verbs has substantive implications.  As the United States Supreme Court has held repeatedly in construing a wide variety of statutes:

> The terms 'means' and 'includes' are not necessarily synonymous . . . The natural distinction would be that where "means" is employed, the term and its definition are to be interchangeable equivalents, and that the verb 'includes' imports a general class, some of whose particular instances are those specified in the definition.

*Helvering v. Morgan's Inc.,* 293 U.S. 121, 125 n.1 (1934); *see also Burgess v. U.S.*, 553 U.S. 124, 131 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation.") (quoting N. Singer and J. Singer, 2A Sutherland on Statutory Construction § 47:7 p. 305 (7th ed. 2007)); *First Nat'l Bank in Plant City, Florida v. Dickinson*, 396 U.S. 122, 135 (1969) (use of the word "include" in statute "suggests a calculated indefiniteness with respect to the outer limits of the term."); *Groman v. Comm'r*, 302 U.S. 82, 86 (1937) ("[W]hen an exclusive definition is intended the word 'means' is employed, . . . whereas here the word used is 'includes.'"). The United States Supreme Court put the concept slightly differently in *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012):

> [T]he definition [in the statute] is introduced with the verb "includes" instead of "means."  This word choice is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive. . . .  Indeed, Congress used the narrower word "means" in other provisions [of the statute] when it wanted to cabin a definition to a specific list of enumerated items."

*Id.* at 162 (internal citations omitted).

29

Colorado law also makes the same distinctions between the words "includes" and "means." *See Colorado Common Cause v. Meyer*, 758 P.2d 153, 163-64 (Colo. 1988) ("The word 'includes' has been found by the overwhelming majority of jurisdictions to be a term of extension or enlargement when used in a statutory definition."); *Lyman v. Bow Mar*, 533 P.2d 1129, 1133 (Colo.1975) ("the word 'include' is ordinarily used as a word of extension or enlargement . . . To hold otherwise here would transmogrify the word 'include' into the word 'mean.'"); *People v. James*, 40 P.3d 36, 47 (Colo. App. 2001) (making the distinction between the words "means" and "includes" in Colorado statutes); *Dawson v. State Comp. Ins. Auth.*, 811 P.2d 408, 409 (Colo. App. 1990) ("[T]he phrase 'means and includes' is self-contradictory inasmuch as the term 'means' restricts and the term 'includes' extends the meaning . . . .").

So, under the plain meaning of Section 102(8) of the CUFTA, the term "insider" is restricted exclusively to those narrow categories of persons that are listed.  The first category includes a "relative of the debtor."  COLO. REV. STAT. § 38-8-102(8)(a)(I).  Section 102(12) of the CUFTA defines that term:

> "Relative" means an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree.

COLO. REV. STAT. § 38-8-102(12).

Based upon such definition, as of the summer of 2011, Crowley did not qualify as a "relative" of the Debtor.  All the Cash Transfers and Business Transfers were made before the Debtor married Crowley.  So, she was not a "spouse" and not related by blood to the Debtor.  And, First Class, as a company, was not a relative of the Debtor.  Turning to the other exclusive categories of "insiders" listed in Section 102(8) of the CUFTA, neither Crowley nor First Class qualify as "insiders" under those provisions either because neither was: (1) a partnership in which the debtor is a general partner; (2) a general partner in such a partnership; or (3) a corporation of which the debtor is a director, officer, or person in control.  COLO. REV. STAT. § 38-8-102(8).

The Chapter 7 Trustee suggests that the term "insider" should be read expansively to include Crowley because Crowley had a very close relationship with the Debtor at the time of the Cash Transfers and Business Transfers — after all, she was the Debtor's fiancé.[144]  The Chapter 7 Trustee's argument has strong allure but is not supported by CUFTA case law.[145]

As counsel for the Chapter 7 Trustee correctly argued, courts construing the Bankruptcy Code definition of the term "insider" uniformly have determined that the term should be given an expansive meaning beyond the statutory list of "insiders" under

---

[144]   Trans. III at 220-21 (arguing that Crowley was a "non-statutory insider").
[145]   Both the Chapter 7 Trustee and the Defendants concede that there is no reported case law extending the CUFTA definition of "insider" to "non-statutory insiders" such as fiancés.  Trans. III at 221.

Section 101(31) of the Bankruptcy Code.  Under the Bankruptcy Code, fiancés and even girlfriends or boyfriends frequently qualify as "insiders."  But that is because the Bankruptcy Code definition is different and broader than the CUFTA definition.  The Bankruptcy Code definition is virtually the same as the model Uniform Fraudulent Transfer Act and uses "insider *includes*" rather than "insider *means*."  11 U.S.C. § 101(31).[146]  And Section 102(3) of the Bankruptcy Code provides guidance for construing the word "includes:"  "In this title [the Bankruptcy Code] . . . 'includes' and 'including' are not limiting."  11 U.S.C. § 102(3).

Earlier this year, the United States Supreme Court explained that the use of the verb "includes" in the Bankruptcy Code definition is the key reason why the term "insider" must be interpreted to include categories beyond the statutory list (*i.e.* "non-statutory insiders"):

> The [Bankruptcy] Code enumerates certain insiders, but courts have added to that number.  According to the Code's definitional section, an insider of a corporate debtor "includes" any director, officer, or "person in control" of the entity. §§ 101(31)(B)(i)-(iii).  *Because of the word "includes" in that section, courts have long viewed its list of insiders as non-exhaustive.*  See § 102(3) (stating as one of the Code's "[r]ules of construction" that " 'includes' and 'including' are not limiting"); 2 A. Resnick & H. Sommer, Collier on Bankruptcy ¶ 101.31, p. 101–142 (16th ed. 2016) (discussing cases). Accordingly, courts have devised tests for identifying other*, so-called "non-statutory" insiders.*  The decisions are not entirely uniform, but many focus, in whole or in part, on whether a person's "transaction of business with the debtor is not at arm's length."  *Ibid.* (quoting *In re U.S. Medical, Inc.,* 531 F.3d 1272, 1280 (C.A.10 2008)).

*U.S. Bank N.A. v. Village at Lakeridge, LLC*, 138 S.Ct. 960, 963-64 (2018) (emphasis added).  *See also*, *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 805 F.3d 888, 894 (10th Cir. 2015) ([T]he statutory categories of insiders "are illustrative rather than exhaustive, and thus, even someone not specifically listed in the statute can be

---

[146]   Section 101(31) of the Bankruptcy Code provides:

The term "insider" *includes* —
  (A)   if the debtor is an individual--
    (i)   relative of the debtor or of a general partner of the debtor;
    (ii)   partnership in which the debtor is a general partner;
    (iii)   general partner of the debtor; or
    (iv)   corporation of which the debtor is a director, officer, or person in control . . . .

(emphasis added).

considered an insider . . . ."); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1276 (10th Cir. 2008) (same); *Rupp v. United Security Bank (In re Kunz)*, 489 F.3d 1072, 1078-79 (10th Cir. 2007) (same).

Courts in those States that have adopted the model Uniform Fraudulent Transfer Act definition of the term "insider" verbatim (*i.e.*, "insider includes") also have determined that the scope of the term "insider" extends beyond the enumerated list in the model Uniform Fraudulent Transfer Act to include non-statutory insiders.  *See e.g., Bloom v. Camp*, 785 S.E.2d 573, 578 n. 6 (Ga. App. 2016) (under Georgia UFTA, same sex spouse joint tenant of debtor was insider even though Georgia did not recognize same sex marriage at the time); *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 376-78 (Bankr. N.D. Ill. 2005) (under Illinois UFTA, daughter and son in law of debtors were insiders); *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482 490 (N.J. 1999) (under New Jersey UFTA, defendant was an insider even though she did not "technically" fall within list of enumerated insiders); *Morris v. Nance*, 888 P2d 571, 576 n. 8 (Or. App. 1994) (under Oregon UFTA, former spouse of debtor was a non-statutory insider).

If the Court were construing the Bankruptcy Code definition of the word "insider" or the definition used in the model Uniform Fraudulent Transfer Act, the Court would construe the term expansively and include "non-statutory insiders."  Indeed, the Court would be bound to do so by appellate precedent.  *U.S. Bank,* 138 S.Ct. at 963-64; *Adam Aircraft Indus.*, 805 F.3d at 894; *Carl Zeiss Meditec*, 531 F.3d 1272; *Kunz*, 489 F.3d 1072. So, the Chapter 7 Trustee has a point.  But, his argument is fatally flawed for the simple reason that it is not tethered to the actual text of the CUFTA.  The text of the CUFTA is substantively different and more restrictive.  This Court may not rewrite the statutory text enacted by the Colorado legislature.  *People v. Swain*, 959 P.2d 426, 429 (Colo. 1998) ("If the [Colorado] General Assembly has defined a statutory term, a court must apply that definition.")  Neither of the Defendants is an "insider" under the CUFTA definition.[147]

---

[147]    The Chapter 7 Trustee made one other plausible argument relying on the Official Comment to Section 102 of the CUFTA.  The Official Comment states:

> The definition of "insider" is derived from § 101(28) of the Bankruptcy Code . . . .  As in the Bankruptcy Code (see 11 U.S.C. § 102(3)), *the word "includes" is not limiting*, however. Thus, a court may find a person living with an individual for an extended time in the same household or as a permanent companion to have the kind of close relationship intended to be covered by the term "insider."

Colo. Rev. Stat. § 38-8-102 cmt. 7 (emphasis added).  The Official Comment for the CUFTA definition of "insider" is exactly the same as the Official Comment circulated with the model Uniform Fraudulent Transfer Law.  As noted by the Chapter 7 Trustee, the Official Comment certainly suggests that the term "insider" under the CUFTA should be construed broadly and consistent with the Bankruptcy Code.

Ordinarily, under both Colorado and Federal law, the official commentary accompanying a statute is "instructive and persuasive in helping [] discern the meaning" of a statute.  *Green Tree Acceptance, Inc. v. Wyoming Nat'l Bank*, 1 F.3d 1249, at *8 (10th Cir. 1993) (unpublished) (citing *Int'l Minerals and Chemical Corp. v. Llano, Inc.*, 770 F.2d 879, 885 n. 2 (10th Cir. 19861985)); *see also Miller v. Deutsche Bank Nat'l Trust Co. (In re Miller)*, 666 F.3d 1255, 1263 (10th Cir. 2012) (referring to official commentary to Colorado Uniform Commercial Code); *Osborn v. Packard*, 117 P.3d 77, 80 (Colo. App. 2005) ("The official

Accordingly, based upon a statutory analysis, this "badge of fraud" cuts against the Chapter 7 Trustee.

**2.     Did the Debtor Retain Possession or Control of the Cash Transfers and Business Transfers?**

The Debtor made the Cash Transfers to Crowley.  The Court did not receive solid evidence concerning the use of the funds after the transfers.  But one of the transfers (for $2,540.95) matched exactly with Crowley's mortgage payment on the Real Property.  And, two of the other payment ($2,500) are of a very similar size.  The Court infers that it is likely at least some of the Cash Transfers went to pay Crowley's mortgage on the Real Property.  Certainly, there is no evidence that the Debtor kept control over such funds after making the transfers.

The Debtor made the Business Transfers to First Class.  Crowley testified that, for the most part, the funds were used to pay corporate costs and expenses of the entity promptly after they were received.  As with the Cash Transfers, there is no evidence that the Debtor kept control over the Business Transfers after making the transfers.  Accordingly, this factor does not help the Chapter 7 Trustee.

**3.     Did the Debtor Conceal the Cash Transfers and Business Transfers?**

Hiding transfers may be indicative of fraud.  "This factor, by its plain language, addresses whether the transaction was concealed generally."  *Schempp II*, 75 P.3d at 1162.  In the Court's assessment, the Debtor did not conceal the Cash Transfers or Business Transfers from anyone.  Instead, after the Debtor's engagement with Crowley, he was very upfront with everyone about his financial intentions.  He made no secret that he intended to financially support Crowley and "to help her as much as he could."[148]  The Debtor told Hy Blair that he was going to leave Crowley financial assets (including a personal trading account and IRA) as well as pay off her house.[149]  Over time, the Debtor

---

commentary of the Uniform Arbitration Act on which the Colorado act is modeled clarifies that this section was intended . . . .").

However, the issue is not so simple in this case because the Official Comment to Section 102 of the CUFTA is contrary to the text of the statute.  The Official Comment references the Bankruptcy Code definition of "insider" and notes that "the word 'includes' is not limiting."  Based upon the broad nature of the term "includes", the Official Comment concluded that a long-term household companion may qualify as an "insider."  However, the problem with this is obvious: the definition of the term "insider" in Section 102(8) of the CUFTA does not use the word "includes" at all.  As discussed previously, the Colorado legislature departed from both the model Uniform Fraudulent Transfer Law, the Bankruptcy Code, and the similar statutes adopted in almost every other State by excising the word "includes" and narrowing the definition of the term "insider" by using the verb "means."  So, the Official Comment is commenting on something that is not part of the Colorado statute at all.  And the Official Comment is not the governing law — only the statute is.  The Court rejects deference to the Official Comment to Section 102 of the CUFTA because commenting on something not in the statute is not "instructive or persuasive" in ascertaining the meaning of the statutory text.

[148]     Trans. II at 144.
[149]     Trans. II at 147.

repeatedly reiterated his intention to support Crowley financially.[150]  He confirmed again and again his desire to pay off Crowley's mortgage on the Real Property.  Not only did the Debtor not conceal his general intention to support Crowley, his disclosure of such intended support was the impetus for the Debtor's children to oppose his marriage and to commence an investigation of the Debtor and Crowley.

The Chapter 7 Trustee argues that the Debtor concealed the Cash Transfers and Business Transfers because "[t]here was no discussion, no disclosure, to any of the creditors at the time the transfers were made" and "[t]hese transfers were not known to Hy Blair, to the estate, at the time or shortly thereafter when they were made."[151] These contentions are very contrived.  The Chapter 7 Trustee has not demonstrated that the Debtor even had any creditors during the summer of 2011 and there was no "[bankruptcy] estate" until four years later when the Debtor filed for bankruptcy.  So, the Debtor could not have been concealing transfers from the estate.  That leaves Hy Blair who, at the time, was not a creditor of the Debtor.  It is true that Hy Blair had held a power of attorney from the Debtor and so had been able to directly access some of the Debtor's financial accounts prior to the summer of 2011.  But after the May 2011 Meeting and the vitriolic correspondence from Hy Blair, the Debtor revoked the power of attorney he had given to his son.[152]  Further, the Debtor moved some funds from WF No. 3363 to establish a new account at Citywide Banks:  CW No. 8916.  But, the Chapter 7 Trustee did not prove concealment.  Instead the evidence demonstrates that the Debtor had had enough of Hy Blair's attacks and did not wish for him to have free rein over the Debtor's bank accounts.  The Chapter 7 Trustee seems to suggest that the Debtor should have sent his estranged son and siblings copies of each of the 16 checks constituting the Cash Transfers and the Business Transfers.[153]  The argument is nonsense.  The Debtor was very upfront with his children that he was supporting Crowley financially.  He had no obligation to send a copy of his checkbook to his children, especially after their demands and the settlement made at the May 2011 Meeting.  The Chapter 7 Trustee failed in his burden to show concealment as a "badge of fraud."

**4.      Had the Debtor been Sued or Threatened with Suit Prior to the Cash Transfers and Business Transfers?**

The Debtor had not been sued before the Cash Transfers and Business Transfers.  The only evidence of a lawsuit is that Hy Blair and the ARB Trust initiated the Probate Case against the Debtor on November 6, 2012.[154]  The month before filing the Probate Case, Hy Blair and the ARB Trust presented the Debtor with an "interim accounting" and "requested the money that was outlined in the accounting as being missing or improperly distributed."[155]  Although the Court did not receive any direct testimony that a lawsuit was

---

[150]      Trans. II at 154.
[151]      Trans. III at 222.
[152]      Ex. D.
[153]      Trans. II at 70-78 (the Chapter 7 Trustee's counsel spent substantial time in his examination of Hy Blair eliciting testimony that the Debtor had not "disclosed" checks to his son).
[154]      Stip. Fact No. 8.
[155]      Trans. I at 205.

threatened at that time, the Court accepts that was the unstated implication of the request.  But that was well over a year *after* the Cash Transfers and Business Transfers.

The Chapter 7 Trustee argued that prior to the Cash Transfers and the Business Transfers — during the May 2011 Meeting in Connecticut — Hy Blair had demanded that the Debtor pay an additional $1.1 million and that such demand constituted a threat of suit.[156]  The Trustee acknowledged that the only evidence of such demand was Hy Blair's testimony.[157]  The Court already has determined that Hy Blair was not a credible witness.  And, specifically in regard to the alleged demand for $1.1 million, Hy Blair's testimony was riddled with inconsistencies, contradictions, and failures of recollection.  Further, the Chapter 7 Trustee offered no corroboration.

On the other hand, the documentary record negates Hy Blair's testimony.  Hy Blair wrote many letters to the Debtor in the summer of 2011.  But none of such correspondence ever mentioned an additional demand for $1.1 million that had been refused.  Instead, the import of Hy Blair's contemporaneous correspondence was that his father had done everything that had been requested of the Debtor at the May 2011 Meeting.  Similarly, the Debtor's correspondence with Hy Blair established that the Debtor thought he had settled any disputes with his children and the ARB Trust.  He thought he had "bought peace."  Four witnesses (Crowley, Todd Searles, Ester Larue, and Karen Hart) confirmed that the Debtor had told them that he believed he had settled any disputes at the May 2011 Meeting.

Notably, in his closing argument, counsel for the Chapter 7 Trustee acknowledged that the $4.5 million payment made by the Debtor as part of the May 2011 Meeting:

> . . . *was made for a settlement* . . . to bring peace as all of the witnesses had discussed.  To bring peace to the family and to resolve a dispute.  That's what the payment was for.  The return of the money to resolve a dispute that had arisen in May.[158]

(Emphasis added.)  The Chapter 7 Trustee's concession guts his argument that there was some lingering demand or claim constituting a threatened lawsuit at the May 2011 Meeting.  The Court finds that the Debtor had no notice of any such thing.  At the time he made the Cash Transfers and the Business Transfers, he thought he had resolved the demands made by his children and the ARB Trust.  It turns out he was sadly mistaken; but he did not come to that realization until October 2012 — well after the Cash Transfers and Business Transfers.  The Chapter 7 Trustee failed in his attempt to prove a lawsuit or threatened lawsuit before the Cash Transfers and Business Transfers.

---

[156]     Trans. III at 228-29.
[157]     Trans. III at 229.
[158]     Trans. III at 227-28.

5.      **Did the Cash Transfers and Business Transfers Constitute Transfers of Substantially All of the Debtor's Assets?**

The Chapter 7 Trustee and the Defendants provided only very incomplete information concerning the Debtor's assets during the summer of 2011.  No witness, for either side, gave a complete listing of the Debtor's assets and the value of such assets.  Similarly, no admitted exhibits itemized and valued all of the Debtor's assets.  Since the Court only has an incomplete picture of the Debtor's assets, it follows that the Chapter 7 Trustee failed his burden to show that the Cash Transfers and Business Transfers constituted transfers of substantially all of the Debtor's assets.

Nevertheless, the Court has attempted to assess the incomplete information admitted at the trial.  Section 102(2) of the CUFTA defines the "assets" that should be considered:

> "Asset" means property of the debtor.  "Asset" shall not include: (a) Property to the extent it is encumbered by a lien; (b) Property to the extent it is generally exempt immediately prior to the time of transfer under nonbankruptcy law . . . .

COLO. REV. STAT. § 38-8-102(2).

The Court received evidence concerning only three categories of the Debtor's assets: (1) bank accounts; (2) IRA accounts; and (3) ownership of BOI.

a.      **The Bank Accounts.**

During the summer of 2011, the Debtor's "ending balances," "closing balances" or "cost basis totals" for UBS No. 3623, WF No. 3363, and CW No. 8916 ranged between $715,578.64 to $949,579.34.[159]  Thus, the Debtor's remaining assets clearly were substantial.  However, in his closing argument, the Chapter 7 Trustee argued that the significant amounts in UBS No. 3623 should not be considered in assessing the Debtor's financial condition because such account was encumbered by a valid lien during the relevant time period.  Each of the account statements for UBS No. 3623 does bear the notation "Pleg'd Coll Acct-FBO UBS Bank USA."[160]  The Court supposes that such designation means: "Pledged Collateral Account for the benefit of UBS Bank USA."  Each of the account statements for UBS No. 3623 also states:  "This account has been pledged to secure an obligation or is guaranteeing the obligations of another account."[161]  However, none of the account statements identify any obligation or guarantee made by the Debtor for the benefit of UBS.  The Court received no evidence that the Debtor actually owed anything to UBS.

In closing argument, the Chapter 7 Trustee stated that a "Credit Line Account Application and Agreement for Trust and Estate Accounts" (the "Credit Application")

---

[159]    Ex. O-1, O-2, O-3, O-4.
[160]    See e.g., Ex. O-4 at 3.
[161]    See e.g., Ex. O-4 at 6.

entered into evidence as Exhibit 17 proved that UBS had a lien on UBS No. 3623 in 2011. The contention is wrong. The Credit Application (which is extensively redacted) is an application made by the ARB Trust: "Audrey R. Blair Rev. Trust Peter H. Blair and Peter H. Blair, Jr. Trustees." The Credit Application refers to an ARB Trust "Variable Credit Line Account" and an ARB Trust "Fixed Credit Line Account." There is one "Collateral Account" identified apparently in the name of "Audrey R. Blair Rev. Trust Peter H. Blair and Peter H. Blair, Jr. Trustees." The account number has been redacted. The Debtor and Hy Blair signed the Credit Application as co-trustees of the ARB Trust on February 18, 2009. Suffice to say that nothing in the Credit Application shows that the Debtor pledged UBS No. 3623 as collateral to UBS.

To the extent that the Chapter 7 Trustee wished to argue that UBS No. 3623 should not count as the Debtor's asset in a solvency analysis, the Chapter 7 Trustee had the obligation to show that there was a valid lien against UBS No. 3623 and "the extent" to which UBS No. 3623 was encumbered. He did not do so.[162]  Since the Chapter 7 Trustee failed to meet his evidentiary burden, the Court will not eliminate UBS No. 3623 from consideration as an asset of the Debtor. So, the Debtor had substantial assets in his bank accounts even after the Cash Transfers and Business Transfers.

### b.   The IRA Accounts.

During the summer of 2011, the Debtor's "closing account values" for the Debtor's IRA Nos. 1, 2, 3, and 4 ranged from $6,089,135.07 to $4,459,952.39.[163] Significant would be an understatement for characterizing such accounts. However, as the Chapter 7 Trustee has correctly observed, the Court should not include as "assets" "property to the extent it is generally exempt immediately prior to the time of transfer under nonbankruptcy law." COLO. REV. STAT.§ 38-8-102(2)(b). Although the Court received no evidence on the issue during the trial, both the Chapter 7 Trustee and the Defendants appeared to acknowledge that IRA Nos. 1, 2, 3, and 4 all were generally exempt assets. Thus, the Court will not count these very substantial amounts in the Debtor's IRA Accounts for purposes of determining the Debtor's remaining assets under the CUFTA. However, the significant balances in the Debtor's IRA Accounts may bear on other legal issues.

### c.   Value of BOI.

The Debtor wholly-owned BOI, an oil and gas company, both before and after the Cash Transfers and Business Transfers. He did not divest himself of the entity. The Chapter 7 Trustee and the Defendants presented only very sketchy and incomplete information concerning the value of the Debtor's interest in BOI in 2011. The low end of the value range was $65,181.53 in equity based upon the book value from a December 2010 BOI Balance Sheet. However, in a 2010 e-mail from Hy Blair, he presented a $4.8 million valuation for BOI based upon a computer model. At this juncture, the Court need

---

[162]     The Court is limited to the evidence presented by the parties at trial. Perhaps UBS No. 3623 was fully pledged as collateral for a substantial debt owed to UBS in excess of the amount in UBS No. 3623. Or, perhaps not. The Court simply has no way of knowing based on the incomplete evidence presented by the Chapter 7 Trustee.

[163]     Ex. O-5, O-6, O-7, and O-8.

not decide the value of the Debtor's interest in BOI.  It is enough to say that the Debtor's interest was at least $65,181.53 and that the Debtor retained such interest.

Based upon the foregoing, the Cash Transfers and the Business Transfers did not constitute transfers of substantially all the Debtor's assets.  The Debtor retained significant assets after such transfers.  Thus, the Chapter 7 Trustee failed to prove this "badge of fraud" factor.

### 6.    Did the Debtor Abscond or Remove or Conceal Assets?

The Debtor did not secretly leave Colorado after making the Cash Transfers and Business Transfers.  Instead, he recommitted to staying in the Centennial State.  He married Crowley who was a long-time Denver resident.  Together, they remodeled a portion of the Colorado house that she had owned for more than two decades.  And then the Debtor moved in with his new wife.  He continued to live with her for the rest of his life.  Suffice it to say that he did not abscond.

The Court already has determined that the Debtor did not conceal the Cash Transfers and Business Transfers.  Further, he did not remove assets from the jurisdiction or conceal them either.  Neither party provided the Court with a full inventory of the Debtor's assets at the time of the Cash Transfers and the Business Transfers — or afterward.  Instead, the Court only received evidence about three categories of assets: bank accounts; IRA accounts; and the Debtor's ownership of BOI.  The Debtor continued to wholly own BOI (which itself filed for protection under Chapter 11 of the Bankruptcy Code) until he died.  The Court received no evidence suggesting that the Debtor concealed the bank accounts and IRA accounts.  Thus, this factor cuts against the Chapter 7 Trustee.

### 7.    Did the Debtor Receive Reasonably Equivalent Value in Return for the Cash Transfers and Business Transfers?

"Reasonably equivalent value" under the CUFTA means some sort of economic benefit.  *Lewis v. Taylor*, 427 P.3d 796, 799-800 (Colo. 2018) (construing "reasonably equivalent value" in economic terms); *Schempp I*, 18 P.3d at 765-66.  It can encompass direct or indirect consideration.  *Fifth Third Bank*, 2017 WL 6492108, at *4.  While reasonably equivalent value is not "synonymous with market value," market value is a good yardstick by which to measure reasonably equivalent value.  *Schempp I*, 18 P.3d at 765.  How do the Cash Transfers and Business Transfers measure up?

Crowley confirmed that neither she nor First Class gave any economic benefit to the Debtor in return for the Cash Transfers and Business Transfers.  She characterized the transfers as "gifts" that stemmed from their relationship.  Throughout the trial, Crowley acknowledged repeatedly that she gave the Debtor only "love and affection" — which is a very important intangible value, but cannot be measured in economic terms.  However, "[i]ntangible, non-economic benefits, such as preservation of marriage, do not constitute reasonably equivalent value." *Fifth Third Bank*, 2017 WL 6492108, at *4 (quoting *In re Erlewine,* 349 F.3d 205, 212 (5th Cir. 2003)); *see also Tavenner v. Smoot,* 257 F.3d 401,

38

408–09 (4th Cir.2001) ("[C]ourts have consistently held that a transfer motivated by love and affection does not constitute reasonably equivalent value for the purposes of 11 U.S.C. § 548.").

To her credit, Crowley has never suggested that she gave economic value to the Debtor in return for the Cash Transfers and Business Transfers.  Instead, in closing argument, Crowley's counsel stated:

> We conceded . . . that the Debtor did not receive reasonably equivalent value for these transfers.  We've been very up-front about that.  It does require some monetary, financial, tangible benefit.[164]

The Court agrees.  Thus, the Chapter 7 Trustee proved this very important "badge of fraud" hands down.

### 8.   Was the Debtor Insolvent or Did the Debtor Become Insolvent Shortly After the Cash Transfers and Business Transfers?

The Debtor's financial condition is a key "badge of fraud" factor.  Section 103 of the CUFTA defines the term "insolvent":

> (1)   A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
>
> (2)   A debtor who is generally not paying his debts as they become due is presumed to be insolvent . . . .
>         . . . .
>
> (4)   Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this article.

COLO. REV. STAT. § 38-8-103.  As detailed previously, another statute explains the meaning of the term "assets."  Section 102(2) of the CUFTA states that "'assets' means property of the debtor"; but the statutory definition excludes "[p]roperty to the extent encumbered by a lien" and "[p]roperty to the extent that it is generally exempt immediately prior to the time of transfer under nonbankruptcy law." COLO. REV. STAT. § 38-8-102(2).

The Court starts its analysis of this "badge of fraud" factor by considering whether a presumption of insolvency has arisen under Section 103(2) of the CUFTA — thus, potentially shifting the burden to the Defendants.  To establish such a presumption, the Chapter 7 Trustee was required to prove that the Debtor was "generally not paying his debts as they become due" at the time of each of the Cash Transfers and Business

---

164     Trans. III at 253.

Transfers.  The Chapter 7 Trustee provided no such evidence.  In fact, in a rare area of agreement, both Hy Blair and Crowley testified that the Debtor generally was paying his bills when they became due.  The Debtor's bank account records confirm as much and detail all manner of monthly payments during the summer of 2011.  The issue is so clear that the Chapter 7 Trustee effectively conceded the point by not arguing for such presumption.

Since no presumption of insolvency came into play, the Chapter 7 Trustee tried to demonstrate actual insolvency.  The statutory definition of insolvency (*i.e.,* "sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation) is another way of saying that the fair value balance sheet method is required to show insolvency.  *CB Richard Ellis, Inc. v. CLGP, LLC,* 251 P.3d 523, 532 (Colo. App. 2010) (identifying the balance sheet method for determining solvency under Colorado law).  The CUFTA method of determining insolvency "mirrors the balance sheet test for insolvency under the Bankruptcy Code."  *Id.* (quoting *Krol v. Unglaub (In re Unglaub)*, 332 B.R. 303, 317 (Bankr. N.D. Ill. 2005)); *see also Sharp v. Chase Manhattan Bank USA, N.A. (In re Comm. Fin. Serv. Inc.)*, 350 B.R. 520, 531 (Bankr. N.D. Okla. 2005) (accepting the fair value balance sheet method as the proper method for assessing solvency under the Bankruptcy Code).  In fact, the CUFTA definition of the term "insolvent" is "derived from" the Bankruptcy Code.  COLO. REV. STAT. § 38-8-103 cmt. 1.  The balance sheet test for insolvency requires that the Court must determine "the 'fair value' of [the debtor's] assets and the extent of its liabilities at the time of each contested transfer."  *CB Richard Ellis*, 251 P.3d at 534 (quoting *Sheffield Steel Corp. v. HMK Enter., Inc.* (*In re Sheffield Steel Corp.*), 320 B.R. 423, 443 (Bankr. N.D. Okla. 2004)).  To do this, there must be sufficient evidence so that the Court can "re-create the financial condition of [the debtor] at the time when the transfer[s] took place."  *CB Richard Ellis*, 251 P.3d at 534 (quoting *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 591 (Bankr. N.D. Cal. 1994)).

The Chapter 7 Trustee failed to provide sufficient evidence to prove that the Debtor was insolvent in the summer of 2011 (let alone on the date of each specific alleged fraudulent transfer).  On the assets side of the balance sheet the Court received evidence concerning only three categories of assets: (1) bank accounts; (2) IRA accounts; and (3) ownership of BOI.  As previously explained, the Debtor's "ending balances," "closing balances" or "cost basis totals" for UBS No. 3623, WF No. 3363, and CW No. 8916 ranged between $715,578.64 to $949,579.34 during the summer of 2011.  The Chapter 7 Trustee failed to show that UBS No. 3623 should have been excluded because it was "encumbered by a lien."  Furthermore, the aggregate bank account balances appear to be understated since the Defendants proposed using "cost basis totals" rather than fair market values for UBS No. 3623.  With respect to the IRA accounts, the "closing account values" for the Debtor's IRA Nos. 1, 2, 3, and 4 ranged from $6,089,135.07 to $4,459,952.39 during the period.  However, the Court excludes the IRA accounts from the balance sheet since both the Chapter 7 Trustee and the Defendants seemed to concede that the IRA accounts were "generally exempt" immediately prior to the Cash Transfers and Business Transfers under nonbankruptcy law.  With respect to the value of the Debtor's equity interest in BOI, the Chapter 7 Trustee failed to produce sufficient evidence for the Court to determine the actual fair market value of the Debtor's interest in BOI during the summer of 2011.  The Chapter 7 Trustee seemed to concede that the Debtor's

interest was at least $65,181.53 based on the book value from a December 2010 BOI Balance Sheet. But, this value suggestion was not based upon fair market value as required by Section 103(1) of the CUFTA. As a counter, the Defendants offered a $4.8 million valuation for BOI based upon an e-mail from Hy Blair in which he referenced a computer valuation model. The actual computer valuation model was not introduced into evidence. Hy Blair's testimony indicated that the calculation was based upon some sort of cash flow analysis rather than fair market value as required by Section 103(1) of the CUFTA. So, the Court is left with no definitive evidence to assess the value of the Debtor's interest in BOI. The Court also notes that the Chapter 7 Trustee failed to establish that the three categories of assets constituted all of the Debtor's assets during the relevant time period.

At the end of it all, the Chapter 7 Trustee did not prove up the assets side of the balance sheet. The best the Court can conclude is that the Debtor had bank accounts worth in excess of $715,578.64 to $949,579.34, an interest in BOI worth a minimum of $65,181.53 (but probably much more), and perhaps other assets. Because the Chapter 7 Trustee did not prove the Debtor's assets during the relevant time period, he cannot show that the Debtor was insolvent.

Even though the Chapter 7 Trustee lost this "badge of fraud" factor for failure to prove the Debtor's assets, the Court also briefly addresses the liabilities side of the balance sheet. The Chapter 7 Trustee introduced no evidence of the Debtor's liabilities during the summer of 2011. And, because the Debtor was generally paying his current debts as they became due, it does not appear that the Debtor had any material creditors.

However, the Chapter 7 Trustee contends that somehow the $2,372,688.29 Probate Judgment entered against the Debtor on March 27, 2015 should fly back in time and be counted as a liability of the Debtor during the summer of 2011. This is hindsight nonsense. The Court already has determined that Hy Blair and the ARB Trust did not raise any additional claim for $1.1 or otherwise at the May 2011 Meeting. The first inkling the Debtor had that Hy Blair and the ARB Trust were demanding more was the "interim accounting" presented during October 2012 which then formed the basis for Hy Blair and the ARB Trust commencing the Probate Case on November 6, 2012. The Probate Case was hotly disputed and resulted in years of litigation before the Probate Court entered the Probate Judgment against the Debtor. Nevertheless, the Chapter 7 Trustee suggests that a contingent claim somehow should be included on the Debtor's balance sheet a year before it was first asserted and four years before the entry of judgment. This proposition is directly contrary to Colorado appellate precedent.

Colorado law on insolvency follows the generally accepted methodology for valuing contingent liabilities. Under the CUFTA, contingent liabilities (such as pending litigation that has not been reduced to judgment) must be discounted by the probability of the contingency's becoming non-contingent (*i.e.,* by the likelihood that a judgment will actually enter) as of the date of the alleged fraudulent transfer. *CB Richard Ellis* is the seminal case. Therein, the Colorado Court of Appeals held:

While an insolvency determination measures a debtor's assets against its liabilities at a "fair valuation," section 38–8–103(1), such determination will depend on whether the liability is certain or contingent.  There is no dispute that here, at the time of the transfer, the broker had a "claim" under section 38–8–102(3), C.R.S. 2009 (definition of "claim"), against the LLC.  However, no judgment existed at the time of the transfer, and the trial court found that the parties had a bona fide dispute over whether the claim should be paid at all.  Hence, the nature of the broker's claim was contingent.  *See In re Advanced Telecomm. Network, Inc.,* 490 F.3d 1325, 1335 (11th Cir. 2007) (a pending lawsuit is a "prototypical" contingent liability); *Paratransit Risk Retention Group Ins. Co. v. Kamins,* 160 P.3d 307, 316 (Colo. App. 2007) (observing that a disputed debt was contingent because it was not owed until resolution of the legal action).  "[A] contingent liability is not certain—and often is highly unlikely—ever to become an actual liability." *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir. 1988).

According to the Eleventh Circuit,

> [t]he "fair value" of a contingent liability, of course, should be discounted according to the possibility of its ever becoming real.  Thus in this case the bankruptcy court should have estimated the expected value of a judgment against [the debtor], and then multiplied that value by the chance that [the debtor] would face such a judgment.

*In re Advanced Telecomm.,* 490 F.3d at 1335.

Liabilities "must be reduced to [their] present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."  *Id.* (quoting *In re Xonics Photochemical,* 841 F.2d at 200); *see generally* Richard M. Cieri & Michael J. Riela, *Protecting Directors and Officers of Corporations that are Insolvent or in the Zone or Vicinity of Insolvency: Important Considerations, Practical Solutions,* 2 DePaul Bus. & Com. L.J. 295, 309–10 (2004) ("Some courts have valued contingent liabilities at their full face value.  However, most courts rightly discount contingent liabilities by their probability of success."); John E. Sullivan III, *Future Credits and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When Fraud Doesn't Stay Fraudulent, and Other Important Limits to*

*Fraudulent Transfers Law for the Asset Protection Planner,*
22 Del. J. Corp. L. 955, 1007–08 (1997) (explaining how
insolvency's "fair valuation" test is rooted in reasonableness).

*C.B. Richard Ellis*, 251 P.3d at 533-34.  The Chapter 7 Trustee cannot refute the *C.B. Richard Ellis* holding.  As of the time of the Cash Transfers and Business Transfers, no demand had been asserted against the Debtor and the Probate Case was not filed until more than a year later.  The Chapter 7 Trustee introduced no evidence to show how the unasserted and contingent liability (eventually adjudicated in the Probate Case) should have been valued and discounted as of the summer of 2011.  Accordingly, the Chapter 7 Trustee failed to prove the Debtor's liabilities.

Ultimately, since Chapter 7 Trustee was unable to establish both the Debtor's assets (at "a fair valuation") and the Debtor's liabilities, the Court cannot adjudicate the Debtor as insolvent at the time of the Cash Transfers and Business Transfers.  This "badge of fraud" factor favors the Defendants.

### 9. Did the Cash Transfers and Business Transfers Occur Shortly Before or Shortly After a Substantial Debt Was Incurred?

The Debtor made the Cash Transfers and Business Transfers during the short time window between June 6 and August 30, 2011.  This period follows closely after the May 2011 Meeting.  As noted previously, the Chapter 7 Trustee argued that during the May 2011 Meeting, Hy Blair and the ARB Trust asserted a claim against the Debtor for $1.1 million, which the Debtor refused.  The argument raises an interesting legal issue:  Is a debt "incurred" simply by assertion of a demand?  But, the Court need not delve too deeply into the legal part of the argument because it is contrary to the facts.  The Court already has determined — and the Chapter 7 Trustee's counsel conceded in closing argument — that the May 2011 Meeting resulted in a settlement.  The Debtor "bought peace" with his children by performing all that was asked of him.  The Court scrutinized Hy Blair's inconsistent testimony and the documentary record (correspondence between the Hy Blair and the Debtor).  The Court also considered the testimony of many other witnesses.  Based upon such assessment, Court concluded that there was no additional demand for $1.1 million against the Debtor made at the May 2011 Meeting.  The Debtor thought he has resolved all issues.  Only afterward did he make the Cash Transfers and Business Transfers.  So, he did not make the transfers right after incurring a substantial debt.

Then, more than another year passed before Hy and the ARB Trust asserted a new demand against the Debtor through the presentation of an "interim accounting" during October 2012.  That led to filing of the Probate Case the following month.  Many more years of contentious litigation followed before the Probate Court issued the Probate Judgment against the Debtor on March 27, 2015.  The Cash Transfers and Business Transfers were not "shortly before" the new demand, the start of the Probate Case, or the Probate Judgment.  Thus, the Chapter 7 Trustee failed to prove this "badge of fraud" factor.

10.    **The Chapter 7 Trustee Did Not Establish Actual Fraud**.

As noted previously, the Court must engage in a holistic analysis to determine whether the Debtor made the Cash Transfers and the Business Transfers with "actual intent to hinder, delay, or defraud" under Section 105(1)(a) of the CUFTA.  *Schempp II*, 75 P.3d at 1161.  The Chapter 7 Trustee provided no direct evidence of fraudulent intent.  So, the Court turned to circumstantial evidence and considered the extensive list of "badges of fraud" contained in Section 105(2) of the CUFTA.  Virtually all the "badges of fraud" negate a finding a fraudulent intent.  Only a single factor favors the Chapter 7 Trustee — the Debtor did not receive reasonably equivalent value from Crowley and First Class in return for the Cash Transfers and Business Transfers.  This "badge of fraud" factor is one of the most important of the statutory factors; but it is not dispositive.

In addition to assessment of the "badges of fraud" list, the Court also has considered the unique context of this case.  Before making the Cash Transfers and Business Transfers, the Debtor settled (or at a very minimum, the Debtor believed that he had settled) the demands made by Hy Blair and the ARB Trust.  The Debtor believed that he "bought peace."  During the summer of 2011, he was paying his bills as they became due and was not insolvent.  At the time, the Debtor had no creditors.  So, he had every right to use his funds however he saw fit, including making transfers to his fiancé.  Hy Blair and the ARB Trust first asserted additional claims against the Debtor more than a year after the Cash Transfers and Business Transfers.  The Probate Court did not issue the Probate Judgment until almost four years after the Cash Transfers and Business Transfers.  The Chapter 7 Trustee's position is nothing more than some hindsight *ipse dixit*.  After carefully weighing the evidence and the "badges of fraud," the Court concludes that the Chapter 7 Trustee failed to meet his difficult burden to prove the Debtor's "actual intent to hinder, delay, or defraud."

B.    **The Constructive Fraud Claims Under COLO. REV. STAT. § 38-8-105(1)(b): Second and Sixth Claims**.

The counterpart to "actual fraud" is "constructive fraud."  Constructive fraud connotes something less than actual fraud and does not require actual intent to defraud.  *See Neal v. Clark*, 95 U.S. 704, 706-7 (1877) (distinguishing between actual fraud and constructive fraud).  Instead, the statutory focus is on the debtor receiving less than reasonably equivalent value in exchange for the disputed transfer.  As with the actual fraud claims, the Chapter 7 Trustee also bears the burden to prove the constructive fraud causes of action.

In his Second Claim for Relief in the Amended Complaint, the Chapter 7 Trustee asserted that the Cash Transfers were recoverable from Crowley using the Chapter 7 Trustee's "strong arm powers" under 11 U.S.C. § 544 combined with Colorado's "constructive fraud" statute: COLO. REV. STAT. § 38-8-105(1)(b).  In his Sixth Claim for Relief, the Chapter 7 Trustee asserted that the Business Transfers are recoverable from First Class based upon the same statutes.  Since the statutory framework is the same, the Court analyzes both the causes of action together.

Section 105(1)(b) of the CUFTA states:

> A transfer made or obligation incurred by a debtor is fraudulent
> as to a creditor, whether the creditor's claim arose before or
> after the transfer was made or the obligation was incurred, if
> the debtor made the transfer or incurred the obligation: . . .
> (b) Without receiving a reasonably equivalent value in
> exchange for the transfer or obligation, and the debtor: (I) Was
> engaged or was about to engage in a business or transaction
> for which the remaining assets of the debtor were
> unreasonably small in relation to the business or transaction;
> or (II) Intended to incur, or believed or reasonably should have
> believed that he would incur, debts beyond his ability to pay as
> they became due.

Under the constructive fraud statute, the Court's analysis starts with the first
requirement: lack of reasonably equivalent value. The Court already has determined that
the Defendants did not provide reasonably equivalent value (*i.e.*, economic value) to the
Debtor in return for the Cash Transfers and the Business Transfers. *See Lewis*, 427 P.3d
796, 799-800; *Schempp I*, 18 P.3d at 765; *Fifth Third Bank*, 2017 WL 6492108, at *4.
And, the Defendants candidly conceded the point.[165] So, the Chapter 7 Trustee handily
wins this issue.

Having established lack of reasonably equivalent value, the Chapter 7 Trustee's
next requirement is to prove either Subsection 105(1)(b)(I) or Subsection 105(1)(b)(II) of
the CUFTA. The first alternative focuses on business: Was the Debtor engaged or about
be to be engaged "in a business or transaction for which the remaining assets of the
[D]ebtor were unreasonably small in relation to the business or transaction"? The test
"considers whether the transfer in question left the [d]ebtor with an 'inability to generate
sufficient profits to sustain operations.'" *C.B. Richard Ellis*, 251 P.3d at 531 (quoting
*Moody v. Sec. Pac. Bus. Credit, Inc.)*, 971 F.2d 1056, 1070 (3rd Cir. 1992)). Almost all
the reported decisions construing Subsection 105(1)(b)(I) of the CUFTA as well as its
Bankruptcy Code analog, 11 U.S.C. § 548(a)(1)(B)(ii)(II), appear to involve corporate
entities. So, there is a threshold legal question whether Subsection 105(1)(b)(I) may be
used against a retired individual like the Debtor. But, regardless of such theoretical issue,
the Chapter 7 Trustee did not plead the requirements of Subsection 105(1)(b)(I) of the
CUFTA in either the Second Claim or the Sixth Claim of the Amended Complaint. He did
not advance any argument under this Subsection of the CUFTA. And, he did not
introduce evidence to prove that the Debtor was engaged in a business or transaction for
which the remaining assets of the Debtor were unreasonably small in relation to the

---

[165]    Trans. III at 253.

business or transaction.  So, Subsection 105(1)(b)(I) of the CUFTA does not help the Chapter 7 Trustee.

Instead, the Chapter 7 Trustee relies on Subsection 105(1)(b)(II) of the CUFTA and asserted that the Debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."[166] "This test measures whether the debtor . . . would reasonably have been seen as able to pay [his] debts after making the questionable transfer."  *C.B. Richard Ellis*, 251 P.3d at 531-32 (quoting *Pajaro Dunes*, 174 B.R. at 593).  Notably, Subsection 105(1)(b)(II) of the CUFTA does not use the term "assets."  So, the assessment of ability of pay may include exempt property.  *See* COLO. REV. STAT. § 38-8-102(2) (defining "assets" as not including "[p]roperty to the extent that it is generally exempt immediately prior to the time of transfer under nonbankruptcy law").

What evidence is there that in the summer of 2011 the Debtor intended to incur (or reasonably thought he would incur) debts that he could not pay after the Cash Transfers and Business Transfers?  There is none.  The Cash Transfers added up to only $10,704.95 whilst the Business Transfers totaled $57,733.81.  Meanwhile, during the same period, the Debtor had about $715,578.64 to $949,579.34 (or more if UBS No. 3623 was valued at fair market value instead of only "cost basis") in liquid assets in his bank accounts (UBS No. 3623, WF No. 3363, and CW No. 8916).  If he ever ran low, the Debtor had access to substantial additional exempt assets including about $4,459,952.39 to $5,872,058.24 in his IRA accounts (IRA Nos. 1, 2, 3, and 4).  He continued to pay all his regular bills on time (*i.e.,* charges for apartment rental, country club dues, telephone, cable, life insurance, health insurance, credit cards, attorneys, and accountants).  The Cash Transfers and Business Transfers were a mere fraction of his available resources.

Blessed with such abundant financial resources, there also is no evidence that the Debtor intended to incur any new debt during the summer of 2011.  Instead, he was mostly retired (albeit he still owned BOI) and trying to enjoy his golden years with his fiancé.  The Debtor was looking forward to marrying Crowley and spending their lives together with no stresses while enjoying financial security.  He didn't believe that he would incur further debt either.  He had resolved disputes with his children and the ARB Trust at the May 2011 Meeting.  No additional demands were made until more than a year later and made quite unexpectedly.

After considering all the evidence, the Court concludes that the Chapter 7 Trustee failed to meet his burden to prove constructive fraud under Section 105(1)(b) of the CUFTA.  The Defendants conceded that the Debtor did not receive reasonably equivalent value for the Cash Transfers to his fiancé and the Business Transfers to her company.  But, the Chapter 7 Trustee failed to marshal evidence showing that Debtor intended to incur debt or reasonably thought he would incur debt that he could not satisfy.

---

[166]     Am. Compl. ¶¶ 70 and 97

C.      **The Preservation Claims:  Third and Seventh Claims**.

The Chapter 7 Trustee's Third Claim and Seventh Claim are for "preservation of avoided transfers" under 11 U.S.C. § 551 which provides:

> Any transfer avoided under section . . . 544 . . . is preserved
> for the benefit of the estate but only with respect to property of
> the estate.

In his Third Claim in the Amended Complaint, the Chapter 7 Trustee requested that "[t]o the extent that any transfers of the Debtor's property to Ms. Crowley are avoided, including the Cash Transfers and Business Transfers, the avoided transfers are preserved . . . ."[167]  The Seventh Claim is similar: "[t]o the extent that any transfers of the Debtor's property to First Class are avoided, including the Business Transfers, the avoided transfers are preserved . . . ."[168]

Avoidance of a transfer (such as an alleged fraudulent transfer) is a prerequisite for preservation under Section 551.  In this case, the Court already has determined that the Chapter 7 Trustee failed his burden to establish both kinds of alleged fraudulent transfers (actual fraud and constructive fraud) with respect to the Cash Transfers and Business Transfers.  Since the Court has not ordered avoidance of such transfers, the preservation claims under Section 551 also necessarily fail.

D.      **The Disallowance Claim:  Fourth Claim**.

The Chapter 7 Trustee's Fifth Claim is for disallowance of Crowley's Claim No. 8 against the bankruptcy estate in the amount of $210,587.76.  The asserted statutory basis for the Chapter 7 Trustee's position is 11 U.S.C. § 502(d) which provides:

> . . . the court shall disallow any claim of any entity from which
> property is recoverable under section . . . 550 . . . or that is a
> transferee of a transfer avoidable under section . . . 544,
> unless such entity or transferee has paid the amount, or
> turned over any such property, for which such entity or
> transferee is liable . . . .

As applied in this Adversary Proceeding, the predicate for the Fourth Claim is that Crowley already must have been adjudged liable for a fraudulent transfer under Section 544 and state law.  *Holloway v. IRS (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003); *Campbell v. U.S. (In the Matter of Davis),* 889 F.2d 658, 662 (5th Cir.1989) ("This section [502(d) of the Bankruptcy Code] is designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate."); *Sikirica v. US Foods, Inc. (In re Damon's Int'l, Inc.)*, 500 B.R. 729, 738 (Bankr. W.D. Penn. 2013) (court "agrees with the Defendant that the Defendant

---

[167]     Am. Compl. ¶ 77.
[168]     Am. Compl. ¶ 104.

must first be found liable for section 502(d) to operate").  The United States Court of Appeals for the Eighth Circuit explained Section 502(d) as follows:

> . . . the purpose of section 502(d) is to ensure compliance with judicial orders.  *See In re Davis,* 889 F.2d 658, 661 (5th Cir.1989).  The language of section 502(d) expressly provides that the entity's claim is not disallowed if the entity or transferee "paid the amount, or turned over any such property, for which such entity or transferee is liable."  11 U.S.C. § 502(d).  This language indicates section 502(d) should be used to disallow a claim after the entity is first adjudged liable; otherwise, the court could not determine if the exception applies.

*Holloway*, 340 F.3d at 708.

The Court has not found Crowley liable for any type of fraudulent transfer.  The Court has not ordered Crowley to turn over any estate property.  In fact, the Court determined that the Chapter 7 Trustee failed to prove his avoidance claims.  Accordingly, the Section 502(d) claim disallowance cause of action also falls.  Crowley's Claim No. 8 for $210,587.76 is not disallowed.

## E.   The Declaratory Judgment Claim:  Eighth Claim.

### 1.   The Shifting Nature of the Eighth Claim.

The Chapter 7 Trustee's last cause of action is for "declaratory relief" asserted for the first time in the Amended Complaint.  In the Eighth Claim, the Chapter 7 Trustee alleged that "the Debtor held at least a one-half legal or equitable interest in the [Real] Property on the Petition Date as tenants-in-common with Ms. Crowley."[169]  Then, he asserted that there is an "actual controversy as to the rights and interests" of the Chapter 7 Trustee and Crowley in the Real Property.[170]  And, finally the Chapter 7 Trustee demanded a declaratory judgment against Crowley determining that "the Debtor held a legal or equitable interest in not less than one-half of the [Real] Property on the Petition Date, and that interest in the Property is property of the Debtor's bankruptcy estate . . . ."[171]  Notably, the Chapter 7 Trustee never asserted that the Mortgage Payoff Transfers were fraudulent transfers recoverable under the CUFTA or the Bankruptcy Code.

In the Amended Complaint, the Chapter 7 Trustee acknowledged that "the Debtor never held title to the Property."[172]  But, somehow, the Chapter 7 Trustee concluded that the Debtor held "at least a one-half legal or equitable interest" in the Property.  How did that come to pass?  In the Amended Complaint, the Chapter 7 Trustee offered no clues and failed to articulate any legal basis for the shift in ownership of the Property.  For

---

[169]   Am. Compl. ¶ 106.
[170]   Am. Compl. ¶ 108.
[171]   Am. Compl. at 14.
[172]   Am. Compl. ¶ 52.

example, the Chapter 7 Trustee did not mention any legal theories such as: resulting trust; unjust enrichment; or constructive trust.

After initial pre-trial skirmishes, the Defendant's sought partial summary judgment on the Eighth Claim.[173]  In response, Chapter 7 Trustee explained his Eighth Claim as follows:

> The Trustee's legal theory is twofold.  First, that by paying off the mortgage against the [Real] Property, Ms. Crowley was unjustly enriched to the detriment of the Debtor's bankruptcy estate, creating an equitable interest in the [Real] Property in favor of the Debtor.  *See Salzman v. Bachrach*, 996 P.2d 1263 (Colo. 2000).  Second, that paying off the mortgage against the [Real] Property created a resulting trust in favor of the Debtor, creating a legal or equitable interest in the [real] Property in favor of the Debtor.  *Cortez Land & Securities Co. v. Stabler*, 268 P. 256 (Colo. 1928).
> . . . .
>
> . . . While the fact that the Debtor paid off the mortgage against the [Real] Property is the underlying act that created the Debtor's interest in the Property, neither of the Trustee's theories in the Eighth Claim for Relief rely upon avoiding the transfer.  Accordingly, 11 U.S.C. § 546 is not applicable to the Trustee's Eighth Claim for Relief . . . .[174]

The Chapter 7 Trustee's explanation, cursory as it was, appeared to provide at least some indication of his proposed legal theories.  He jettisoned the original claim for "declaratory judgment."  Instead, according to the Chapter 7 Trustee, the Eighth Claim became two new claims: (1) unjust enrichment; and (2) resulting trust.  The Chapter 7 Trustee also contended that he was not trying to avoid the Mortgage Payoff Transfers under 11 U.S.C. § 544.  Thus, he argued that the limitations period contained in 11 U.S.C. § 546 did not come into play.  The Chapter 7 Trustee seemed to contend that the Eighth Claim was some sort of free form theory existing under 11 U.S.C. § 541 (governing "property of the estate") but entirely independent of 11 U.S.C. § 544 and 546 (governing strong-arm powers to bring state law avoidance actions and establishing the limitations period for avoidance actions").  Based upon the Chapter 7 Trustee's express argument that the Eighth Claim was not an avoidance action governed by Sections 544 and 546, the Court denied summary judgment.[175]

Armed with this explanation supplementing the very sketchy allegations in the Eighth Claim, the Defendants tried for summary judgment again.[176]  This time, the

---

[173]   Docket No. 76.
[174]   Docket No. 82.
[175]   Docket No. 104.
[176]   Docket No. 112.

Chapter 7 Trustee had a different explanation of the Eighth Claim.  He reiterated that the Eighth Claim involved a "resulting trust theory" and the "unjust enrichment theory" morphed into a "constructive trust" theory.[177]  Contrary to representations made earlier in the litigation, the Chapter 7 Trustee now stated:  "The Trustee's unjust enrichment claim is properly construed as a claim on behalf of the Debtor's creditors pursuant to 11 U.S.C. § 544(a) . . . .  Because a constructive trust claim is a creditor claim, the Trustee's authority to bring the claim derives from 11 U.S.C. § 544(a)."[178]

At trial, the Chapter 7 Trustee's Eighth Claim continued to change like the wind. Whereas the Chapter 7 Trustee previously pushed a resulting trust theory, he abandoned it in closing argument as follows:

> Court:  Is there any evidence that the Debtor intended any kind of trust arrangement vis-à-vis the house to create a trust?
>
> Chapter 7 Trustee Counsel:  Your honor, I think you're referring to the resulting trust argument, which, if we were arguing it was a resulting trust, then yes, there had to be an intent to create a trust.  We are not arguing a resulting . . . trust theory.  We are arguing the constructive trust theory.
>
> Court:  Okay, I have been very, very confused in your arguments on claim eight and, in my estimation, they have shifted over time.  But, for now, and here we are at the end . . . what is your argument?  Are you saying that there was a resulting trust?
>
> Chapter 7 Trustee Counsel:  No, Your Honor.[179]

For both the Court and Crowley, pinning the Chapter 7 Trustee down to a specific legal theory was like squeezing jello.  But, the Court determines from the final dialogue that the Chapter 7 Trustee expressly and definitively waived and abandoned any resulting trust theory of recovery for the Eighth Claim.

Given such waiver and abandonment, the Court need not adjudicate a resulting trust theory.  And declaratory judgment is no longer in play either.  Instead, what remains for decision is only the Chapter 7 Trustee's contention that Crowley was unjustly enriched.  The Chapter 7 Trustee proposes a constructive trust remedy for such unjust enrichment.  Furthermore, as the Chapter 7 Trustee has conceded, such claim falls within the ambit of Section 544(a) of the Bankruptcy Code.[180]

---

[177]   Docket No. 129 at 6-11.
[178]   Docket No. 129 at 12.
[179]   Trans. III at 215-16.
[180]   Trans. III at 216.

## 2.    The Eighth Claim Is Barred By the Statute of Limitations.

In her Answer and throughout this litigation process, Crowley asserted the statute of limitations as a defense to the Eighth Claim.  She stated the rationale succinctly as follows:

> Under 11 U.S.C. § 546(a), the statute of limitation for the Trustee to bring an adversary proceeding expired on May 7, 2017.  The Amended Complaint was filed on May 24, 2017, and asserts new causes of action arising out of transactions and occurrences that were not set forth or attempted to be set forth in the original Complaint, and which therefore do not relate back under Fed. R. Civ. P. 15.[181]

Crowley's reference to 11 U.S.C. § 546(a) is spot on.  That statute is titled "Limitations on Avoiding Powers" and establishes a statute of limitation for certain actions by chapter 7 trustees:

> An action or proceeding under section 544 . . . of this title may not be commenced after the earlier of —
> (1) the later of —
>    (A)    2 years after the entry of the order for relief; or
>    (B)    1 year after the appointment of election of the first trustee under section 702 . . . of this title . . .; or
> (2) the time the case is closed or dismissed.

Applying Section 546(a) to the Eighth Claim in this Adversary Proceeding is a rather simple exercise.  The Bankruptcy Case has not been closed.  The Chapter 7 Trustee was appointed on August 20, 2015 — so the one-year deadline after his appointment was August 20, 2016.  But since the Bankruptcy Case was filed on May 7, 2015, the Chapter 7 Trustee enjoyed a longer, two-year period after the commencement of the Bankruptcy Case within which to bring actions under Section 544.  That extended limitations period expired on May 7, 2017.[182]

For reasons unknown, the Chapter 7 Trustee waited until almost the very end of the Section 546(a) limitations period to commence the Adversary Proceeding.  He filed on May 5, 2017.  So, he was timely with respect to those claims included in the original Complaint.  However, the original Complaint was narrowly tailored to the Cash Transfers

---

[181]    Answer at Aff. Defense 3.

[182]    Although this case was converted from Chapter 11 to a case under Chapter 7, the "order for relief" referred to in Section 546(a)(1)(A) from which the two-year period runs, is the date the case was filed and not the date of conversion.  11 U.S.C. § 348; *Bergquist v. Vista Dev., Inc. (In re Quality Pontiac Buick GMC Truck, Inc.)*, 222 B.R. 865, 868 (Bankr. D. Minn. 1998); *Sheehan v. Klein (In re Mountaineer Bulk Servs., Inc.)*, 2013 WL 620419, at *3 (Bankr. N.D. W.Va. Feb. 19, 2013) (unreported); *Rentas v. TRM, LLC (In re Malavet)*, 552 B.R. 24, 33 (Bankr. D. P.R. 2016)

and Business Transfers only.  The Chapter 7 Trustee made no factual allegations whatsoever concerning the Real Property or the Mortgage Payoff Transfers.  He did not assert an Eighth Claim for declaratory judgment.  All that came later in the Amended Complaint on May 24, 2017, which was a little more than two weeks after the expiration of the Section 546(a) statute of limitations.  And, the Chapter 7 Trustee has never established or even argued that the Eighth Claim somehow should relate back to the filing of the original Complaint under FED. R. CIV. P. 15(c)(1), FED. R. BANKR. P. 7015, or otherwise.  On its face, the brand-new allegations concerning the Real Property and the Mortgage Payoff Transfers do not arise out of "the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading."  *See* FED. R. CIV. P. 15(C)(1) and FED. R. BANKR. P. 7015.

How did the Chapter 7 Trustee respond to the statute of limitations argument?  First, the Chapter 7 Trustee contended that the Eighth Claim was not an avoidance claim under Section 544 at all.  Instead, he claimed to be standing in the Debtor's shoes and pursuing claims under Section 541, claims that the Debtor held when he filed his case.  Thus, the Chapter 7 Trustee argued that Section 546 was not applicable.  This worked temporarily while the exact nature of the Eighth Claim remained a mystery.  Emboldened by having narrowly escaped defeat of his Eighth Claim, the Chapter 7 Trustee reversed course completely and declared: "The Trustee's unjust enrichment claim is properly construed as a claim on behalf of the Debtor's creditors pursuant to 11 U.S.C. § 544(a)."[183]  Again at trial, the Chapter 7 Trustee maintained that his Eighth Claim was based on Section 544.[184]  The main case law authority bandied about by the Chapter 7 Trustee on the Eighth Claim also dictates that an unjust enrichment and constructive trust claim falls within the ambit of Section 544.  *Lofstedt v. Oletski-Behrends (In re Behrends)*, 2017 WL 4513071, at *24 (Bankr. D. Colo. Apr. 10, 2017) ("when a trustee brings a constructive trust claim he or she is acting under § 544(a).").

At this point, it is finally evident that the only theory being advanced by the Chapter 7 Trustee in the Eighth Claim is unjust enrichment and constructive trust under Section 544 and state law.  So, by its express terms, Section 546 bars the Eighth Claim.  *See Pernick v. Computershare Trust Co., Inc.*, 136 F.Supp.3d 1247, 1273 n.26 (D. Colo. 2015) ("Once the bankruptcy petition is filed, § 546 governs the time for bringing a CUFTA fraudulent transfer action."); *VMI Liquidating Trust v. The Harvey Maveal Trust (In re Valley Mortgage, Inc.)*, 2013 WL 5314412, at *2 (Bankr. D.Colo. Sept. 18, 2013) ("Where a statute of limitations for a state law action has not run before the debtor files for bankruptcy, section 546 provides the trustee in bankruptcy with some additional time to determine which actions . . . he or she would like to bring . . . ."); *Global Crossing Estate Rep. v. Winnick*, 2006 WL 2212776, at *6 (S.D.N.Y. Aug. 3, 2006) ("Section 546(a), by its very terms, applies to any 'action or proceeding under section 544' and it specifically states that any such action 'may not be commenced' after, at the very latest, two years after the entry of the order of relief."); *Rosania v. Haligas (In re Dry Wall Supply, Inc.)*, 111 B.R. 933, 936 (D. Colo. 1990) ("The trustee's action is not barred because the debtor filed

---

[183]     Docket No. 129 at 12.
[184]     Trans. III at 216.

for bankruptcy before the state law limitations period expired and the trustee commenced the action within two years of his appointment . . . .").

Still, the Chapter 7 Trustee declined to admit defeat.  Instead, he threw up a series of additional straw man arguments.  The Chapter 7 Trustee's main response is that the unjust enrichment and constructive trust claim did not really expire before the Debtor filed for bankruptcy.  Under Colorado law, "unjust enrichment is a form of relief in quasi-contract or contract implied in law [so] the time within which to assert such a claim ordinarily is assessed under the three-year statute of limitations for contract actions." *Sterenbuch v. Goss*, 266 P.3d 428, 437 (Colo. App. 2011).  The Mortgage Payoff Transfers occurred between June 2011 and January 2012, which was more than three years before the Bankruptcy Case was filed.  Thus, the unjust enrichment and constructive trust claim may have expired long before the bankruptcy.  However, the Chapter 7 Trustee suggested that the expired unjust enrichment and constructive trust claim might be resurrected under *Behrends*, 2017 WL 4513071.[185]

The Trustee's legal trial balloons are all very interesting.  But they have nothing to do with Crowley's specific statute of limitations defense under Sections 544 and 546. Crowley is not arguing that the Chapter 7 Trustee's unjust enrichment and constructive trust claim expired before the bankruptcy (although the claim may very well be barred on that basis).  Instead, Crowley makes only the simple point that whether lapsed or not before the bankruptcy, the Chapter Trustee had to bring the Eighth Claim by May 7, 2017 — and he did not.  That is what the Section 546(a) demands.

The Chapter 7 Trustee's last pitch is that somehow 11 U.S.C. § 108(c) may toll the unjust enrichment and constructive trust claim.  He asserts that because of Section 108(c): "the creditor's constructive trust claim — and by extension the Trustee's right to bring said claim under 11 U.S.C. § 544(a) — cannot expire until after the automatic stay has terminated, which it has not."[186]  To be charitable, the argument is misguided. Section 108(c) states:

> . . . if applicable nonbankruptcy law . . . fixes a period commencing or continuing a civil action in a court other than a bankruptcy court *on a claim against the debtor* . . . and such period has not expired before the date of the filing of the petition, then such period [is extended] . . . .

(emphasis added).  As the leading bankruptcy treatise observes, Section 108(c) "applies only to civil actions in courts on claims against the debtor, or against codebtors protected by the codebtor stay."  Alan N. Resnick and Henry J. Sommer, 2 COLLIER ON BANKRUPTCY ¶108.04[1] (Lexis/Nexis 16th ed. Supp. 2018).  The Chapter 7 Trustee is not suing the

---

[185]    The Chapter 7 Trustee sows more confusion with repeated references to the *Behrends* decision, 2017 WL 4513071.  That case involved the question whether a chapter 7 trustee's unjust enrichment and constructive trust claim had lapsed before the bankruptcy case had been filed.  But the key distinction is this: in *Behrends*, the chapter 7 trustee sued within two years after the July 19, 2013 bankruptcy filing.  So, the *Behrends* chapter 7 trustee simply did not run afoul of Section 546(a).

[186]    Docket No. 129 at 12.

Debtor — after all he died years ago.  The Chapter 7 Trustee's target is the Debtor's wife, Crowley.  Plainly, Section 108(c) has no bearing whatsoever in this dispute.

In this Adversary Proceeding, the Chapter 7 Trustee waited too late to file the unjust enrichment and constructive trust claim (whether lapsed or not before the bankruptcy).  Thus, the Eighth Claim is barred.

### 3.   The Chapter 7 Trustee's Eighth Claim Fails on the Merits.

As set forth previously, the Chapter 7 Trustee added the Eighth Claim in the Amended Complaint and sought a "declaratory judgment" concerning ownership of the Real Property.  The Chapter 7 Trustee never mentioned "unjust enrichment" or "constructive trust" in the Amended Complaint.  But, now the Chapter 7 Trustee contends that Crowley was unjustly enriched by the Mortgage Payoff Transfers and a constructive trust should be imposed pursuant to which the Chapter 7 Trustee takes one-half of Crowley's house.  Crowley has objected to the changes and the Court has effectively sustained her objections.  But, even assuming that the Chapter 7 Trustee can change to a new theory so late in the litigation process, he failed to prove the Eighth Claim at trial.

Under Colorado law, a claim of unjust enrichment "is a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another.  Unjust enrichment is based on principles commonly associated with restitution."  *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo. 2008) (citations omitted).  "Unjust enrichment is a form of quasi-contract or a contract implied in law" and is "an equitable remedy and does not depend on any contract, oral or written."  *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000).  In the case of *City of Arvada v. Denver Health, t*he Colorado Supreme Court recently reconfirmed the elements of an unjust enrichment claim as stated in *Lewis*:

> [A] plaintiff must prove three elements: "(1) [T]he defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation."

403 P.3d 609, 616 (Colo. 2017) (quoting *Lewis*, 89 P.3d at 1141); *see also Salzman*, 996 P.2d at 1266-67) (same); *Sterenbuch,* 266 P.3d at 437 (same).

*"*A constructive trust is a remedial device designed to prevent unjust enrichment." *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 737 (Colo. 1991).  Technically, it is not a separate claim — although it is often pled that way.  *Cf. Behrends*, 2017 WL 4513071, at *21 ("It is possible to view a request for a constructive trust as either a stand-alone claim or as a remedy for the substantive principle of liability known as unjust enrichment.").  "A constructive trust is imposed . . . because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property." *Mancuso*, 818 P.2d at 737 (quoting Restatement (Second) of Trusts, ch. 12 Intro. Note (Am. Law. Inst. 1959)).  Unjust enrichment and constructive trust are like two sides of the same coin.  In order to impose the constructive trust remedy "the claimant must establish the[] exact same elements or preconditions [necessary for an

unjust enrichment claim]." *Behrends,* 2017 WL 4513071, at \*21. The burden to prove unjust enrichment and entitlement to a constructive trust falls on the Chapter 7 Trustee. *Page v. Clark*, 592 P.2d 792, 801 (Colo. 1979) (party attempting to set aside transaction on equitable grounds must prove contentions by a preponderance of the evidence).

In this Adversary Proceeding, the Chapter 7 Trustee asserts that Crowley received a benefit at the Debtor's expense: the $356,052.05 Mortgage Payoff Transfers. The contention is self-evident and satisfies the first two elements of the unjust enrichment claim. So, it all comes down to the third element and the question: Were the Mortgage Payoff Transfers made in circumstances such that it would be unjust for Crowley to retain the benefit without repayment?

The Court determines that it would not be unjust for Crowley to retain the Real Property — the house that she has owned exclusively for at least 21 years — even though the Debtor paid off Crowley's lenders through the Mortgage Payoff Transfers between June 2011 and January 2012. The evidence established that the Debtor's action in paying off Crowley's mortgage was an extremely generous gift. He was never obligated (as a borrower or guarantor) on the note and mortgage associated with the Real Property. But he paid anyway. He did not take title to the Real Property because he did not want to do so. It was the Debtor's idea and intention to pay off the mortgage on the Real Property so that the Debtor and Crowley could "start their marriage off level" by eliminating Crowley's debts. The elimination of debts allowed Crowley to become financially secure so that the couple could live stress-free and "could go through this part of our life just enjoying each other." The Debtor asked Crowley to stop working so that she could be with him. She could not do so unless the Debtor paid her mortgage. Paying off the mortgage also was the Debtor's way of protecting Crowley in the event of his passing. Although the Debtor knew he was making a gift, the Debtor also thought it would make financial sense because the couple planned for him to move into the Real Property and thereafter save the very high monthly rent charged by Parkplace.

Colorado law suggests that a completed gift may not be recoverable under an unjust enrichment theory. In *Berenergy Corp. v. Zab, Inc.*, 94 P.3d 1232 (Colo. App. 2004), the Colorado Court of Appeals explained:

> . . . there is nothing unjust about retaining a benefit conferred gratuitously. *See Liautaud v. Liautaud,* 221 F.3d 981, 988 (7th Cir. 2000) ("a party may not recover damages for unjust enrichment pursuant to a gift relationship"); *In re Estate of Hill,* 492 N.W.2d 288, 295 n. 2 (N.D.1992) (a finding of a gift necessarily defeats a finding of unjust enrichment, absent circumstances of fraud, undue influence, and the like, for equity generally cannot force the repayment of a gift) . . . . [T]he amended complaint alleges nothing more than a series of completed gifts. Berenergy evidenced its intent to make a gift each month when it charged the below-market rate of $150, and this gift was completed each month when defendants paid the $150. *See Bunnell v. Iverson,* 147 Colo.

> 552, 557, 364 P.2d 385, 387 (1961) (gift is complete when
> there is (1) a clear and unmistakable intention to make the gift,
> and (2) the consummation of such intention by those acts
> which the law requires to divest the donor and invest the
> donee with the right of property).  Once a gift is completed, it
> cannot be revoked.  *Bunnell v. Iverson, supra,* 147 Colo. at
> 557, 364 P.2d at 388.

*Id.* at 1238; *see also Salzman*, 996 P.2d at 1266 n.5 (allowing unjust enrichment claim but noting: "the trial court explicitly found that the contribution was not a gift . . . and we are bound by that determination").

Construing Utah law, the United States Court of Appeals for the Tenth Circuit relied on similar reasoning.  *Taylor v. Rupp (In re Taylor),* 133 F.3d 1336, 1342 (10th Cir. 1998).  In *Taylor*, a chapter 7 trustee brought an adversary proceeding against the debtor's spouse claiming that prepetition asset transfers were void or voidable as fraudulent conveyances and requesting imposition of a constructive trust on the spouse's home.  The bankruptcy court imposed a constructive trust.  The Tenth Circuit reversed the imposition of a constructive trust focusing on the nature of the disputed transaction — a gift:

> We also must remember that we view the situation from [the
> debtor's] position — not his creditor's — to determine whether
> it would be a wrong to [the debtor] to let [his wife] keep the
> property. The bankruptcy judge already had found [the debtor]
> transferred the property while he was solvent and not in
> anticipation of litigation.  The trustee here stands in [the
> debtor's] shoes in claiming ownership of an equitable half of
> the real estate.
> . . . .
>
> [I]n the case before us the supposed equitable owner [the
> debtor] is the one who made the gift, and he manifested no
> intent that his wife not have the legal and equitable title to the
> home.

*Id.*  The appellate panel also noted the absence of any "badges of fraud," that the debtor was solvent, and "there was no indication that they were not paying their debts."  *Id.* at 1343.  The *Taylor* circumstances are very similar to this case and suggest the that it would be improper to impose a constructive trust against Crowley's Real Property.

Notwithstanding the foregoing, the Court is reticent to deny the unjust enrichment claim and constructive trust remedy in this Adversary Proceeding solely because the Mortgage Payoff Transfers were gifts.  Certainly, viewing the situation from the Debtor's perspective (if he were alive today) suggests that it would be unlikely the Debtor could or would recover back the completed gifts he made three and a half years before his

bankruptcy.  But, a more fulsome consideration of the circumstances surrounding the Debtor's generous gift to Crowley seems prudent and warranted.

The Chapter 7 Trustee did not assert claims against Crowley for fraud or fraudulent conveyances in relation to the Mortgage Payoff Transfers.  Perhaps because he did not sue on that basis, he did not establish that the Debtor or Crowley engaged in fraud.  The evidence showed that during the period when the Mortgage Payoff Transfers were made (June 2011 through January 2012), the Debtor continued to have substantial assets including: (1) about $715,578.64 to $780.725.62 in his bank accounts (UBS No. 3623, WF No. 3363, and CW No. 8916); (2) about $4,870,667.41 to $5,872,058.24 in his IRA accounts (IRA Nos. 1, 2, 3, and 4); and (3) the value of his interest in BOI.  As with the Cash Transfers and Business Transfers, the Chapter 7 Trustee failed to provide a comprehensive picture of the Debtor's assets.  During the same time period, the Debtor continued to pay his regular bills. The Chapter 7 Trustee failed to identify the Debtor's liabilities, except that the Debtor argued that the $2,372,688.29 Probate Judgment should be retroactively applied during the time period.  The Court already has rejected that legal argument as contrary to Colorado law because any such claim was contingent and unasserted.  *C.B. Richard Ellis*, 251 P.3d at 533-34.  The Chapter 7 Trustee failed to show that the Debtor had any creditors during the period from June 2011 through January 2012.  The Debtor had not been sued or threatened with suit.  He thought he had settled with Hy Blair and the ARB Trust.  So, the Debtor should have enjoyed the freedom to make whatever gifts he wished to whomever he wished at that stage of his life.  He did so using his own funds.

As the Court considers whether it would be unjust for Crowley to receive the benefit of the Mortgage Payoff Transfers, the Court also is cognizant of the economic benefit that she provided.  The Debtor and Crowley agreed that the Debtor would move into the Real Property with Crowley.  Part of the idea was that the Debtor would save rent at Parkplace, a luxury building which cost more than $8,000 per month.  The Debtor lived the last 43 months of his life with Crowley at the Real Property rent free.  Applying the Parkplace rental rates, the Debtor saved at least $344,000 ($8,000 monthly rent X 43 months) because of the arrangement.  The amount almost matches the Mortgage Payoff Transfers.

Short on facts helpful to his Eighth Claim, the Chapter 7 Trustee repeatedly referred to the Colorado Supreme Court's decision: *Shepler v. Whalen*, 119 P.3d 1084 (Colo. 2005).  The Chapter 7 Trustee contended that *Shepler* was "directly on point" and presented "facts almost identical to the facts in this matter."[187]  On the surface there are some similarities: the debtor's wife owned a townhouse; the debtor lived at the townhouse; and the debtor paid off his wife's mortgage on the townhouse to the tune of $353,000.  However, that is where the similarities end.

*Shepler* did not involve an unjust enrichment claim.  Instead, the issue was fraudulent conveyance.  The trial court "found that the transfer of funds . . . was 'fraudulent and done with intent to hinder, delay or defraud creditors of the debtor' . . . ."

---

[187]    Docket No. 129 at 11.

*Shepler*, 119 P.3d at 1086.  The *Shepler* debtor was indebted to numerous creditors.  He "paid off the mortgage interest using money he owed to creditors, with the intention of defrauding those creditors."  *Id.* at 1089.  It is not surprising that the appellate court found the imposition of a constructive trust proper under such circumstances.  *Id.* at 1089-90.

Those circumstances, however, are not present in this Adversary Proceeding.  With respect to the Cash Transfers and Business Transfers, the Chapter 7 Trustee alleged actual fraud and constructive fraud.  The Court rejected the Chapter 7 Trustee's claims.  Regarding the Mortgage Payoff Transfers, the Chapter 7 Trustee did not allege or prove fraud of any type.  And, whereas the debtor in *Shepler* had numerous creditors that he intended to defraud by using money he owed to them to pay off his wife's mortgage, in this dispute the Chapter 7 Trustee did not establish that the Debtor had any creditors when the Mortgage Payoff Transfers were made.  In the end, and because the cases are so different, the *Shepler* holding does not support the Eighth Claim.

Having considered the evidence and argument, the Court determines that the Chapter 7 Trustee failed to prove unjust enrichment and entitlement to a constructive trust remedy.  To the contrary, it would be unjust to permit the Chapter 7 Trustee to take one half of Crowley's house.

## VI.   <u>Conclusion</u>.

For the reasons set forth above, the Court denies the Chapter 7 Trustee relief on all of the claims asserted in the Amended Complaint.  Separately, the Court will enter Judgment against the Chapter 7 Trustee and in favor of Crowley and First Class.  Accordingly, the Court:

ORDERS that all of the Trustee's Claims for Relief asserted in his Amended Complaint are DENIED;

FURTHER ORDERS that Judgment will enter in favor of Defendants Suella M. Crowley and First Class Printing, Inc. and against Jeffery A. Weinman, Chapter 7 Trustee;

FURTHER ORDERS that all pending motions in the Adversary Proceeding are denied as moot given such disposition; and

FURTHER ORDERS that all requests for attorney's fees and costs, if any, shall be made only consistent with, and within the time permitted by, FED. R. CIV. P. 54 as incorporated by FED. R. BANKR. P. 7054.

DATED this 9th day of November 2018.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge